No. 20-36122

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

Charles G. Moore and Kathleen F. Moore

*Plaintiffs–Appellants,*

v.

United States of America

*Defendant–Appellee.*

---

On Appeal from the United States District Court
for the Western District of Washington
No. 2:19-cv-01539-JCC
The Honorable John C. Coughenour

---

**Opening Brief of Appellants
Charles G. Moore and Kathleen F. Moore**

---

SAM KAZMAN
DEVIN WATKINS
COMPETITIVE ENTERPRISE
INSTITUTE
1310 L Street N.W., 7th Floor
Washington, DC 20005
(202) 331-1010
sam.kazman@cei.org

ANDREW M. GROSSMAN
DAVID B. RIVKIN, JR.
JEFFREY H. PARAVANO
SEAN SANDOLOSKI
BAKERHOSTETLER
Washington Square, Ste. 1100
1050 Connecticut Ave., N.W.
Washington, DC 20036
(202) 861-1697
agrossman@bakerlaw.com

*Counsel for Appellants
Charles G. Moore and Kathleen F. Moore*

## **Rule 26.1 Disclosure Statement**

Appellants Charles and Kathleen Moore are individuals. Therefore, there is no parent corporation or stock-owning publicly held corporation to disclose.

Dated: March 29, 2021                              /s/   Andrew M. Grossman
                                                              Andrew M. Grossman

## **Table of Contents**

Introduction ................................................................................... 1

Statement of Jurisdiction ............................................................. 3

Statement of Issues Presented for Review ................................... 4

Pertinent Constitutional and Statutory Provisions ..................... 4

Statement of the Case ................................................................... 5

Summary of Argument ................................................................. 11

Standard of Review ...................................................................... 13

Argument ...................................................................................... 13

    I.    The Mandatory Repatriation Tax Violates the Apportionment Clause Because It Is An Unapportioned Direct Tax ......................... 13

        A.    The Mandatory Repatriation Tax Is Not a Tax on "Incomes" Exempt from Apportionment ................................... 14

            1.    The Mandatory Repatriation Tax Does Not Satisfy the Sixteenth Amendment's Requirement of a Taxable Event ........................................................ 15

            2.    The Accumulated Corporate Earnings Targeted by the Mandatory Repatriation Tax Are Not Attributable to Shareholders ................................ 17

            3.    The Mandatory Repatriation Tax Is Not a Tax on Income at Any Level, But on Capital ................................. 18

        B.    The Mandatory Repatriation Tax Is An Unapportioned Direct Tax ................................................................... 20

        C.    No Authority Exists Upholding a Tax Like the Mandatory Repatriation Tax as a Tax on "Incomes" ................................... 20

    II.    The Mandatory Repatriation Tax Violates the Fifth Amendment ...... 27

        A.    The Mandatory Repatriation Tax Is Retroactive ......................... 28

        B.    The Mandatory Repatriation Tax Violates the Fifth Amendment Because It Is a Retroactive "Wholly New Tax" ..... 32

        C.    Even If Not a Wholly New Tax, the Mandatory Repatriation Tax Flunks the Carlton Standard ........................... 36

Conclusion .................................................................................... 42

**Addendum**

26 U.S.C. § 965 ...............................................................Addendum-1

# Table of Authorities

## Cases

*Agostini v. Felton*, 521 U.S. 203 (1997) ............................................................ 22

*Alpenglow Botanicals, LLC v. United States*, 894 F.3d 1187 (10th Cir. 2018) ...... 16

*Blodgett v. Holden*, 275 U.S. 142 (1927) .......................................................... 32

*Burk-Waggoner Oil Ass'n v. Hopkins*, 269 U.S. 110 (1925) ................................ 14

*Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426 (1955) ...................................*passim*

*Comm'r v. Indianapolis Power & Light Co.*, 493 U.S. 203 (1990) .................. 18, 27

*Cooper v. United States*, 280 U.S. 409 (1930) .................................................... 33

*Corliss v. Bowers*, 281 U.S. 376 (1930) ............................................................. 39

*Dougherty v. Comm'r*, 60 T.C. 917 (1973) ................................................... 24, 25

*E. Enterprises v. Apfel*, 524 U.S. 498 (1998) ..................................................... 27

*Eder v. Comm'r*, 138 F.2d 27 (2nd Cir. 1943) .................................................... 23

*Eisner v. Macomber*, 252 U.S. 189 (1920) ...................................................*passim*

*Fernandez v. Wiener*, 326 U.S. 340 (1945) ....................................................... 20

*Garlock v. Comm'r*, 489 F.2d 197 (2nd Cir. 1973) ........................................ 23, 25

*Gen. Motors Corp. v. Romein*, 503 U.S. 181 (1992) ............................................ 40

*GPX Intern. Tire Corp. v. United States*,
    780 F.3d 1136 (Fed. Cir. 2015) ................................................ 29, 37, 40

*Koshland v. Helvering*, 298 U.S. 441 (1936) ..................................................... 22

*L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795 (9th Cir. 2017) ......................... 13

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) ....................... 27, 28, 29, 30

*Merchants' Loan & Trust Co. v. Smietanka*, 255 U.S. 509 (1921) ....................... 15

*Miller v. Florida*, 482 U.S. 423 (1987) ............................................................. 28

*Murphy v. I.R.S.*, 460 F.3d 79 (D.C. Cir. 2006) ............................................... 15

*Murphy v. I.R.S.*, 493 F.3d 170 (D.C. Cir. 2007) ......................................... 15, 16

*Murphy v. United States*, 992 F.2d 929 (9th Cir. 1993) ...................................... 26

*N.C. Dep't of Revenue v. The Kimberley Rice Kaestner 1992 Fam. Tr.*,
139 S. Ct. 2213 (2019) ............................................................ 3, 39

*Nat'l Fed'n of. Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ........................ *passim*

*Nathel v. Comm'r*, 615 F.3d 83 (2d Cir. 2010) ................................ 19, 21, 22, 24

*NetJets Aviation, Inc. v. Guillory*, 207 Cal. App. 4th 26 (2012) ..................... 33, 34

*New Colonial Ice Co. v. Helvering*, 292 U.S. 435 (1934) ...................................... 5

*Nichols v. Coolidge*, 274 U.S. 531 (1927) ............................................... 27, 32, 36

*Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121 (9th Cir. 2002) ........................... 13

*Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717 (1984) ................... 40

*Quarty v. United States*, 170 F.3d 961 (9th Cir. 1999) .................... 12, 33, 34, 36

*Quijano v. United States*, 93 F.3d 26 (9th Cir. 1996) ........................ 2, 12, 16, 21

*Sacks v. SEC*, 648 F. 3d 945 (9th Cir. 2011) .................................................... 30

*United States v. Carlton*, 512 U.S. 26 (1994) ............................................... *passim*

*United States v. Darusmont*, 449 U.S. 292 (1981) ...................................... 12, 34

*United States v. Hemme*, 476 U.S. 558 (1986) ............................................. *passim*

*Untermyer v. Anderson*, 276 U.S. 440 (1928) .............................. 3, 12, 27, 32, 33

*Vukasovich, Inc. v. Comm'r*, 790 F.2d 1409 (9th Cir. 1986) ............................. 16

*Whitlock's Estate v. Comm'r*, 494 F.2d 1297 (10th Cir. 1974) ..................... 24, 25

*Whitlock's Estate v. Comm'r*, 59 T.C. 490 (1972) ....................................... 24, 25

## Constitutional Provisions, Statutes, and Rules

26 U.S.C. § 61 ........................................................................... 31, 41

26 U.S.C. § 301 ............................................................................... 31

26 U.S.C. § 951 ..................................................................... 6, 8, 20

26 U.S.C. § 954 ................................................................................. 6

26 U.S.C. § 957 ................................................................................. 6

26 U.S.C. § 965 ......................................................................... *passim*

26 U.S.C. § 1256 ............................................................................. 26

26 U.S.C. § 7422 ............................................................... 3

28 U.S.C. § 1291 ............................................................... 3

28 U.S.C. § 1346 ............................................................... 3

Fed. R. App. P. 4 .............................................................. 3

Fed. R. Civ. P. 12 ............................................................ 10

Fed. R. Civ. P. 56 ............................................................ 10

Pub. L. 63-16, § II(B), 38 Stat. 114 (1913) ...................... 41

Tax Cuts and Jobs Act, 131 Stat. 2054 (2017) ............... 1, 7

U.S. Const. amend. XVI ................................................. 4, 12

U.S. Const., art. I, § 2, cl. 3 ...................................... 4, 12, 13

U.S. Const., art. I, § 9, cl. 4 .................................... 4, 10, 12, 13

## Other Authorities

163 Cong. Rec. S7546 (daily ed. Nov. 30, 2017) ............... 35

H.R. Rep. 115-240 (2017) ................................................. 35

H.R. Rep. 115-466 (2017) ...................................... 7, 17, 40

IRS, LB&I International Practice Service Concept Unit, Subpart F Overview (2014) .......................................... 5, 6, 38

Jim Tankersley et al., Republican Plan Delivers Permanent Corporate Tax Cut, N.Y. Times (Nov. 2, 2017) ......................... 7

Joint Committee on Taxation, Present Law and Selected Proposals Related to the Repatriation of Foreign Earnings (2015) ............... 5, 7, 29, 40

Mark E. Berg & Fred Feingold, The Deemed Repatriation Tax— A Bridge Too Far?, 158 Tax Notes 1345 (2018) ...................... 8, 25

Press Release, President Donald J. Trump's Tax Cuts are a Windfall for Americans (Mar. 14, 2018) ...................... 35

Treas. Reg. § 1.954-3 ....................................................... 6

**Introduction**

In 2005, Plaintiffs Charles and Kathleen Moore invested in their friend's vision of founding a farm-equipment supplier in India to provide India's underserved small-scale farmers with the tools they need to thrive. While that business, KisanKraft Limited ("KisanKraft"), had success over the next dozen years, the Moores never received a dime from it. The plan from the beginning was for KisanKraft to reinvest its earnings to expand its reach and carry out its important mission, and that is what it did beginning in 2006, using its retained earnings to serve more communities across India. For the Moores, being able to see the good that KisanKraft was doing was its own reward.

And then, confirming that no good deed goes unpunished, they got the tax bill. In 2017, Congress enacted the Tax Cuts and Jobs Act ("TCJA"), which cut corporate tax rates and stopped taxing domestic corporations on much of their foreign business. To help fund those tax cuts, Congress created a new, one-time tax known alternatively as the "Deemed Repatriation Tax" or "Mandatory Repatriation Tax" ("MRT"). The MRT deems the reinvested earnings going back thirty years of certain foreign corporations with U.S. shareholders to be those shareholders' 2017 income and then taxes them on it. That so-called "income" is, by definition, money that shareholders did not receive. And for minority shareholders like the Moores, it is money that they lack the power to force the corporation to distribute to them, assuming that it is even possible to distribute earnings that were invested years ago in growing a business. Mr. Moore suspected that something about this fake-income tax was not quite on the level.

1

He was right. The MRT is that *rara avis*, a tax on the ownership of personal property—the shareholders' interest in the corporation's capital—and therefore an unapportioned direct tax. And, as the Supreme Court recently reaffirmed, "taxes on personal property [are] direct taxes" that "must be apportioned among the several States." *Nat'l Fed'n of. Indep. Bus. v. Sebelius*, 567 U.S. 519, 571 (2012) (citing *Eisner v. Macomber*, 252 U.S. 189 (1920)). The MRT indisputably is not, and it is therefore invalid.

While the Sixteenth Amendment excepts taxes on "incomes" from the Constitution's apportionment requirement, the Supreme Court has long understood that term to mean "undeniable accessions to wealth, *clearly realized*, and *over which the taxpayers have complete dominion*." *Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955) (emphases added); *see also Quijano v. United* States, 93 F.3d 26, 30 (9th Cir. 1996) (*Glenshaw Glass* defines "income" in its "constitutional sense"). Yet taxpayers subject to the MRT clearly have realized nothing, and MRT liability is not triggered by any conceivable "taxable event." Instead, the MRT simply deems a corporation's accumulations of earnings over thirty years to be its U.S. shareholders' 2017 "income" and then taxes it as such. As far as Congress has gone in identifying "income" to tax in recent decades, it has never gone this far, for the reason that the Constitution denies it the power to do so. Although the district court ruled against the Moores on this issue, it had no explanation for how the MRT satisfies the standard of *Glenshaw Glass*. Nor did the Government.

In addition, the Constitution's Due Process Clause denies Congress the power to impose tax liability reaching back thirty years. The MRT finds precedent only in a similarly retroactive new tax that was condemned by the Supreme Court as "arbitrary and invalid under the due process clause of the Fifth Amendment." *Untermyer v. Anderson*, 276 U.S. 440, 445 (1928). While constitutional due process permits "a modest period of retroactivity" when Congress adjusts existing taxes, *United States v. Carlton*, 512 U.S. 26, 32 (1994), this tax is new, and its thirty-year retroactive effect exceeds by decades any retroactive change to taxation that has ever been upheld. Unprecedented in its retroactive effect, and "arbitrary and irrational," *id*. at 30 (quotations omitted), in its attribution of "income" to persons who "have no right to demand that income and are uncertain ever to receive it," *N.C. Dep't. of Revenue v. The Kimberley Rice Kaestner 1992 Fam. Tr.*, 139 S. Ct. 2213, 2221 (2019), the MRT cannot be sustained so long as the Due Process Clause is understood to limit Congress's power to legislate retroactively.

## Statement of Jurisdiction

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422. This Court has jurisdiction pursuant to 28 U.S.C. § 1291, because the Moores appealed the district court's final judgement, entered on November 19, 2020. ER-15. This appeal is timely under Fed. R. App. P. 4(a)(1)(B)(i) because the Moores filed their notice of appeal on December 24, 2020, ER-100.

3

## Statement of Issues Presented for Review

1.     Whether the Mandatory Repatriation Tax is a "tax[] on incomes" authorized by the Sixteenth Amendment and therefore not subject to the apportionment requirement of the Apportionment Clause of Article I, which it undisputedly does not satisfy.

2.     Whether the Mandatory Repatriation Tax's retroactive reach violates the Fifth Amendment.

## Pertinent Constitutional and Statutory Provisions

U.S. Const., art. I, § 2, cl. 3, provides in relevant part:

> Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers[.]

U.S. Const., art. I, § 9, cl. 4, provides:

> No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or enumeration herein before directed to be taken.

The Sixteenth Amendment provides:

> The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration.

The relevant text of 26 U.S.C. § 965 is set forth in the Addendum bound with this brief.

## Statement of the Case

1. The Mandatory Repatriation Tax is something new: a one-time tax imposed on U.S. persons by attributing to them the accumulated active business income of foreign corporations earned abroad over the prior thirty-year period and doing so solely because they own shares.

The United States has long taxed its citizens, including corporations, on their worldwide income, and has for at least as long regarded corporations as separate entities from their shareholders, such that shareholders do not pay income tax on corporate earnings unless and until they are distributed to the shareholders. *See, e.g.*, *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 442 (1934). Thus, when a foreign corporation with U.S. shareholders retained earnings to reinvest in its business—typically called "active business income"—the U.S. shareholders were not subject to federal income tax on those earnings; only if and when they were distributed, such as through a dividend, would shareholders then pay tax on that income. *See* Joint Committee on Taxation, *Present Law and Selected Proposals Related to the Repatriation of Foreign Earnings* 2 (2015) ["JCT Report"].[1]

In limited circumstances, however, Congress has looked past the corporate form to prevent taxpayers from avoiding taxation of income reasonably regarded as theirs. One such provision in the Tax Code is Subpart F, which was enacted to address the use of foreign corporations to avoid U.S. taxation. *See generally* IRS, LB&I International Practice Service Concept Unit, *Subpart F*

---

[1]*Available at* https://www.jct.gov/publications/2015/jcx-96-15/.

*Overview*, at 3 (2014).[2] In general, Subpart F attributes to certain "United States shareholders"[3] of a "controlled foreign corporation" ("CFC")[4] a proportionate share of certain categories of the CFC's current income. *Id.* at 3–4. This includes current passive income such as dividends, interest, and royalties not derived from the active conduct of the foreign corporation's business, as well as current income from certain related-party sales and service transactions that can be used to shift sales income from the United States to foreign jurisdictions so as to avoid U.S. tax. *Id.* at 4.[5]

What these attribution provisions do not include, however, is active business income properly attributable to the CFC's own business and efforts, such as when a CFC manufactures and sells products to unrelated third parties in a foreign country. 26 U.S.C. § 954(d); Treas. Reg. § 1.954-3(a)(4). That income was not subject to U.S. taxation unless or until repatriated to the U.S. through a distribution or loan to the U.S. shareholders or through an investment in U.S.

---

[2] *Available at* https://www.irs.gov/pub/int_practice_units/DPLCUV_2_01.PDF.

[3] Prior to the TCJA, a "United States shareholder" was a U.S. person owning directly, indirectly, or constructively at least 10 percent of the voting stock of a foreign corporation. IRS, Subpart F Overview, *supra*, at 3. The TCJA expanded the definition to include those owning at least 10 percent by vote *or by value*. 26 U.S.C. § 951(b).

[4] A foreign corporation whose ownership or voting rights are more than 50 percent owned by U.S. persons. 26 U.S.C. § 957(a).

[5] *See* 26 U.S.C. § 954(c) (addressing "Foreign Personal Holding Company Income"); *id.* § 954(d) (related-party sales income); *id.* § 954(e) (related-party services income).

property. JCT Report at 2. Absent such a repatriation, U.S. taxpayers have never been liable for U.S. tax on the active business income of foreign corporations. *Id*. at 13; H.R. Rep. 115-466, at 606 (2017).

The MRT changed that. The Tax Cuts and Jobs Act, 131 Stat. 2054 (2017), shifted U.S. corporate taxation from a worldwide system toward a territorial one—that is, one where corporations generally are taxed only on their domestic-source income. To partially fund this shift, as well as a cut in corporate tax rates, Congress needed a "pay-for." And it found one, in the accumulated foreign earnings of CFCs that had not been repatriated to U.S. shareholders.[6] *See id*. TCJA Section 14103(a), codified at 26 U.S.C. § 965, established a new one-time tax on these accumulated earnings: the MRT. It deems CFCs' untaxed accumulations of earnings in years after 1986 to be the 2017 income[7] of their U.S. shareholders and then subjects that "deemed income" to U.S. taxation.[8] Specifically, those accumulated earnings are included in the 2017 income of U.S. taxpayers who own at least a 10 percent stake in a CFC and are taxed at a rate of 15.5 percent for earnings held in cash or cash equivalents and 8 percent

---

[6] *See generally* Jim Tankersley et al., Republican Plan Delivers Permanent Corporate Tax Cut, N.Y. Times (Nov. 2, 2017), *available at* https://nyti.ms/2iV3TJI.

[7] Or, for some corporations, 2018 income. *See* 26 U.S.C. § 965(a).

[8] The MRT additionally applies to "any foreign corporation with respect to which one or more domestic corporations is a United States shareholder," as that term ("United States shareholder") is defined above. 26 U.S.C. § 965(e)(1). For ease of discussion, this filing refers to CFCs, as the broader definition is not relevant to any issue in this case.

otherwise. 26 U.S.C. § 965(a), (c); *see also id.* § 951(a).[9] The MRT takes no account of whether the CFC actually distributed its accumulated earnings or whether the U.S. taxpayer even had or has the ability to cause it to do so. And, unsurprisingly, the MRT is not apportioned among the states by population.

2. Charles Moore is a U.S. citizen who resides in Washington State with his wife Kathleen. ER-22. Through his work, he met and became friends with a colleague, Ravindra Kumar Agrawal ("Ravi"). ER-22–23. Ravi would tell Charles about his regular visits to India. ER-23. In the early 2000s, following an India trip, Ravi explained to Charles that many small and marginal farmers in India were constrained by their lack of modern agricultural equipment. ER-23. Their hand tools were far less efficient and effective than what Americans could obtain even from local hardware stores. ER-23. Compounding the problem, many young people in India were leaving behind rural areas and moving to the cities, with the effect of further reducing rural farmers' access to labor and productivity. ER-23. With access to better equipment, Ravi told Charles, India's rural farmers could substantially improve their livelihoods. ER-23.

That insight led Ravi to launch a new business in India, KisanKraft, to supply better equipment to India's small-scale farmers. ER-23. Ravi founded the business in 2005 as an Indian Public Limited (effectively, a corporation). ER-23. The Moores were among a handful of initial investors, putting up $40,000 in

---

[9] Because certain figures in Section 965(c) are stated in terms of corporate rates, the effective tax rates for individuals are 17.54 percent and 9.05 percent, respectively. *See* Mark E. Berg & Fred Feingold, *The Deemed Repatriation Tax— A Bridge Too Far?*, 158 Tax Notes 1345, 1349 (2018).

exchange for approximately 11 percent of KisanKraft's common shares. ER-24. The investment was a lot money for them, but they believed in KisanKraft's mission of improving the lives of India's small-scale farmers. ER-24. Charles agreed with Ravi's view that the best way for the business to succeed in its social and business missions would be for it to reinvest any earnings, so that it could grow organically and serve more geographic markets in India. ER-23.

Since founding KisanKraft, Ravi has managed the business from India. ER-24. Consistent with Ravi's vision, the business manufactures, imports, and distributes affordable farming equipment in India, primarily serving small and marginal farmers who are underserved by India's established industry. ER-36. KisanKraft's business has grown every year, funded largely by the reinvestment of all of its earnings and additional shareholder investments. ER-37. It has turned a profit in every year since 2006, and reinvested those earnings rather than distribute them to its shareholders. ER-37–38; ER-25. By so doing, it has been able to expand to over 350 employees working at offices in 13 states in India in addition to its home state of Karnataka. ER-38.

The Moores have never participated in KisanKraft's day-to-day operations or management. ER-37; ER-24. Charles, however, visited India several times, partly for vacation and partly to see for himself the impact that KisanKraft is having. ER-24.

The Moores learned about the MRT in 2018 from Ravi. ER-25. It came as quite a surprise that they would face income-tax liability when they had not, in fact, ever received any income from KisanKraft. ER-25. Based on

KisanKraft's financial statements, a CPA determined that the Moore's pro rata share of KisanKraft's retained earnings was $508,000. Never mind that they have not and may not ever see a penny of it. The Moores would have to include an additional $132,512 as taxable 2017 income under the MRT, and they owed an additional $14,729 in tax. ER-25–26. That summer, they filed an amended return and paid the additional liability. ER-26. And then, in March 2019, they filed a second amended return claiming a refund of the additional liability on the ground that the MRT was unconstitutional. ER-26. After waiting six months for a response from the Internal Review Service, they filed this action on September 26, 2019. *See* ER-90–98.

3. The Moores' complaint alleged that the MRT is unconstitutional for two distinct reasons. First, it is an unapportioned direct tax in violation of the Constitution's Apportionment Clause, U.S. Const., art. I, § 9, because it imposes tax liability on personal property, including the Moores' minority ownership interest in a CFC. ER-95–96. And, second, it retroactively imposes tax liability in violation of the Fifth Amendment's Due Process Clause. ER-96–97.

The Government moved to dismiss this action under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief could be granted. Given the lack of factual dispute between the parties, the Moores filed a cross-motion for summary judgment under Fed. R. Civ. P. 56.

The district court granted the Government's motion and denied the Moores' without oral argument. ER-4.[10] It summarily concluded that the MRT was a tax on income, rather than a direct tax subject to apportionment. ER-9. It did not, however, determine that the MRT satisfies the realization requirement of *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955). Instead, it determined that it had "no reason…to conclude that [*Eisner v. Macomber*, 252 U.S. 189 (1920),] currently controls whether the MRT is an income tax," despite identifying no decision overruling *Macomber*. ER-9. And while the district court found that the MRT was retroactive, it held that the tax did not violate the Fifth Amendment because it was neither a wholly new tax, nor arbitrary or irrational, notwithstanding its 30-year period of retroactivity. ER-11–13.

This appeal timely followed. ER-100.

## Summary of Argument

1. The MRT taxes shareholders on the ownership of personal property— the shareholders' interest in a corporation's capital. It does not tax any distribution or other transfer that those shareholders received from the CFC. 26 U.S.C. § 965(a), (f). And it does not tax anything those shareholders may have done with their shares in a CFC, such as sell them. *Id.* It is a tax on property, pure and simple, and no one disputes that it is unapportioned. Because "taxes on personal property [are] direct taxes" and "must be apportioned among the several States,"

---

[10] The court also denied as moot the Government's Rule 56(d) motion for discovery prior to its ruling on summary judgment.

*Nat'l Fed'n of. Indep. Bus. v. Sebelius*, 567 U.S. 519, 571 (2012), the MRT is unconstitutional, *see* U.S. Const., art. I, § 2, cl. 3; art. I, § 9, cl. 4.

The MRT is not saved by the Sixteenth Amendment's exception from Article I's apportionment requirement for income taxes. "'[I]ncome' in its constitutional sense," *Quijano v. United* States, 93 F.3d 26, 30 (9th Cir. 1996), means "undeniable accessions to wealth, *clearly realized*, and *over which the taxpayers have complete dominion*." *Comm'r v. Glenshaw Glass Co*., 348 U.S. 426, 431 (1955) (emphases added). The MRT fails that definition for three independent reasons: (1) MRT liability is not premised on any realization event by which "income[]" is "derived" by the taxpayer, U.S. Const., amend. XVI; (2) a CFC's retained earnings cannot be attributed to its shareholders as their "income"; and (3) even at the CFC level, past years' retained earnings are capital, not "income."

2. The MRT, with its thirty-year lookback, also violates the Due Process Clause. The Fifth Amendment bars the retroactive application of a "wholly new tax." *United States v. Hemme*, 476 U.S. 558, 568 (1986) (discussing *Untermyer v. Anderson*, 276 U.S. 440 (1928)). And a tax is "wholly new," for due process purposes, "when the taxpayer has 'no reason to suppose that any transactions of the sort will be taxed at all.'" *Quarty v. United States*, 170 F.3d 961, 967 (9th Cir. 1999) (quoting *United States v. Darusmont*, 449 U.S. 292, 298, 300 (1981)). Quite unlike a mere "change in tax rates," *id*., the MRT imposes liability on transactions that were never subject to U.S. taxation. And taxpayers like the Moores had no reason to expect that the Government would tax them for foreign-corporation "income" that has never previously been subject to U.S. taxation. Even if

the MRT were deemed not to be a "wholly new tax," it would still violate the Due Process Clause. *United States v. Carlton*, 512 U.S. 26, 30, 32 (1994), permits "only a modest period of retroactivity" in taxation and disapproves arbitrary and irrational measures. The MRT fails on both scores, with its unprecedented thirty-year period of retroactivity and taxation of "income" imposed upon persons who have no right to receive any income and are uncertain ever to receive it.

### Standard of Review

This Court reviews *de novo* both: (1) a district court's order granting a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017), and (2) a district court's denial of a motion for summary judgment, *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1124 (9th Cir. 2002).

### Argument

## I.    The Mandatory Repatriation Tax Violates the Apportionment Clause Because It Is An Unapportioned Direct Tax

Congress's power to tax is not infinite. The U.S. Constitution commands that "No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken." U.S. Const., art. I, § 9, cl. 4; *see also* art. I, § 2, cl. 3 ("Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union[.]"). "This requirement means that any 'direct Tax' must be apportioned so that each State pays in proportion to its population." *Nat'l Fed'n of. Indep. Bus. v.*

*Sebelius*, 567 U.S. 519, 570 (2012). Even after the Sixteenth Amendment authorized Congress to "lay and collect taxes on incomes…without apportionment," the Supreme Court's jurisprudence has "continued to consider taxes on personal property to be direct taxes" that must be apportioned. *Id.* at 571 (citing *Eisner v. Macomber*, 252 U.S. 189, 218–19 (1920)). Because the MRT is a tax on personal property—an ownership interest in a CFC—it is a direct tax, not an income tax exempt from apportionment. And because the MRT is not apportioned, it is unconstitutional.

### A. The Mandatory Repatriation Tax Is Not a Tax on "Incomes" Exempt from Apportionment

"Congress cannot make a thing income which is not so in fact." *Burk-Waggoner Oil Ass'n v. Hopkins*, 269 U.S. 110, 114 (1925). And yet the decision below countenanced precisely that, upholding what it understood to be an unapportioned tax on "*unrealized* income." ER-9 (emphasis added).

The accumulations of earnings targeted by the MRT are not "income" for CFC shareholders because there has never been a taxable event that makes those earnings their "income," as required by the Sixteenth Amendment. *Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955). In addition, governing case law specifically holds a corporation's retained earnings from past years cannot be attributed to shareholders as their "income" and that, even at the level of the corporation, such retained earnings are not "income" at all, but capital. For each of these three independent reasons—lack of any taxable event resulting in

14

income to the taxpayers it targets, forbidden attribution, and taxation of capital rather than income—the MRT is not a tax on income.

### 1. The Mandatory Repatriation Tax Does Not Satisfy the Sixteenth Amendment's Requirement of a Taxable Event

To qualify as "income" for purposes of the Sixteenth Amendment there must be a "taxable event" consisting of "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." *Glenshaw Glass*, 348 U.S. at 431. Because the MRT applies in the absence of any such thing, it is not a tax on income.

To determine whether something is "income" within the meaning of the Sixteenth Amendment, a court must "rely upon 'the commonly understood meaning of the term which must have been in the minds of the people when they adopted the Sixteenth Amendment.'" *Murphy v. I.R.S.*, 460 F.3d 79, 88–89 (D.C. Cir. 2006) (quoting *Merchants' Loan & Trust Co. v. Smietanka*, 255 U.S. 509, 519 (1921)), *vacated on other grounds*, 493 F.3d 170 (D.C. Cir. 2007). Crucially, "income" is not merely "growth…of value in the investment," but a "gain" or "profit" "received or drawn by the recipient (the taxpayer) for his separate use, benefit and disposal." *Macomber*, 252 U.S. at 207 (emphases omitted). That "fundamental conception is clearly set forth in the Sixteenth Amendment" through its text: "'incomes, *from* whatever *source derived*.'" *Id.* (emphases in original).

*Glenshaw Glass* sets forth the governing definition of "income" for Sixteenth Amendment purposes. The case involved a tax on punitive damages under a catch-all provision of the Internal Revenue Code that the Court had

previously held reflected "the full measure of [Congress's] taxing power." *Glenshaw Glass*, 348 U.S. at 429 (quotations omitted). The Court held that punitive damages were taxable as income because they were "instances of [1] undeniable accessions to wealth, [2] clearly realized, and over which [3] the taxpayer has complete dominion"—in other words, a "taxable event" had occurred. *Id.* at 430–31 (emphasis added).

Although *Glenshaw Glass* addressed a question of statutory interpretation, the Court was clear that it was defining the term "income" in its constitutional sense, as well. *Id.* at 432 n.11 (explaining that the statutory definition of "gross income" at issue was "based on the [Sixteenth Amendment] and the word 'income' is used in its constitutional sense"). This Court has specifically recognized that *Glenshaw Glass* defines "'income' in its constitutional sense." *Quijano v. United* States, 93 F.3d 26, 30 (9th Cir. 1996); *see also Alpenglow Botanicals, LLC v. United States*, 894 F.3d 1187, 1199 (10th Cir. 2018) (noting that "[t]he Tax Code codified the Sixteenth Amendment's definition of income" and citing *Glenshaw Glass*); *Murphy*, 493 F.3d at 176 ("'Gross income' in § 61(a) is at least as broad as the meaning of 'incomes' in the Sixteenth Amendment."). *Glenshaw Glass*, then, sets the outer bounds of what Congress can tax without apportionment, requiring, at a minimum, a taxable event. *Cf. Vukasovich v Comm'r*, 790 F.2d 1409, 1414–15 (9th Cir. 1986) (describing evolution of the constitutional standard that culminated in *Glenshaw Glass*).

The district court eschewed *any* analysis applying this requirement to the MRT, but little analysis is required to determine that the MRT does not satisfy

it. MRT liability is not triggered by any arguable taxable event that results in income to the taxpayer, such as an actual payment or transfer or repatriation of funds; even the CFC has not experienced any kind of taxable event that triggers MRT liability. Instead, the MRT simply deems the CFC's accumulated earnings to be current "income" of its shareholders, in the absence of any event whatsoever. 26 U.S.C. § 965(a), (f); H.R. Rep. 115-466, at 606 (2017) (describing MRT as a "deemed repatriation"). The question of what kinds of event might theoretically qualify as a taxable event matters little here, given that the MRT turns on no event at all: the taxpayer has not "clearly realized" and obtained "dominion" over anything and so has not obtained any "income" that could be taxed as such.

### 2. The Accumulated Corporate Earnings Targeted by the Mandatory Repatriation Tax Are Not Attributable to Shareholders

A corporation's accumulation of earnings is not attributable to its shareholders, which makes sense because a shareholder who has received nothing obviously has not obtained an "undeniable accession[] to wealth, clearly realized, and over which the [shareholder] has complete dominion." *Glenshaw Glass*, 348 U.S. at 431.

*Glenshaw Glass* carried forward the first principles that were laid out by the Supreme Court in *Eisner v. Macomber*, 252 U.S. 189. At issue in *Macomber* was a federal tax on certain stock dividends that were, in essence, a stock split: they resulted in no gain to shareholders, but merely increased the number of shares they possessed without changing their ownership interests. 252 U.S. at 209–11. The dividends, in turn, were motivated by earnings that the corporation had

retained. *Id.* at 200. And the Supreme Court held that attributing those earnings to its shareholders was barred by the Sixteenth Amendment. Congress, it explained, may not

> ignore the substantial difference between corporation and stockholder, treat the entire organization as unreal, look upon stockholders as partners, when they are not such, treat them as having in equity a right to a partition of the corporate assets, when they have none, and indulge the fiction that they have received and realized a share of the profits of the company which in truth they have neither received nor realized.

*Id.* at 214. In other words, a corporation's earnings cannot simply be deemed its owners' income unless and until realized by them.

Yet that is precisely what the MRT does—deem a corporation's old and cold accumulated earnings to be income to its shareholders. *See* 26 U.S.C. § 965(a), (f). And it does so notwithstanding that the owners—especially minority owners like the Moores—lack the required "complete dominion," *Glenshaw Glass*, 348 U.S. at 431, over the CFC's accumulated earnings from prior years that were reinvested in the business, given that they have no "guarantee that [they] will be allowed to keep the money" or even receive it. *Comm'r v. Indianapolis Power & Light Co.*, 493 U.S. 203, 210 (1990).

### 3. The Mandatory Repatriation Tax Is Not a Tax on Income at Any Level, But on Capital

*Macomber* also holds that a corporation's accumulations of earnings in past years are capital (i.e., shareholder equity), not income, and so may not be taxed as income. The Government argued there, as it argued below in this case,

that Congress could tax as income "the stockholder's share of the undivided profits previously accumulated by the corporation." 252 U.S. at 217. The Court disagreed, holding that the accumulation of past years' earnings is not "income" at all for purposes of the Sixteenth Amendment: "[W]hat is called the stockholder's share in the accumulated profits of the company is capital, not income." *Id*. at 219; *see also id*. at 211 (recognizing "that the company's accumulated profits have been capitalized"). The corporation's "accumulation of profits," the Court explained, may leave the shareholder "richer because of an increase in his capital." *Id*. at 212. But "enrichment through increase in value of capital investment is not income in any proper meaning of the term." *Id*. at 214–15. Thus, a tax on past years' accumulated earnings is not an income tax at all, but instead "would be taxation of property because of ownership, and hence would require apportionment under the provisions of the Constitution." *Id*. at 217.

So too here: the MRT taxes earnings previously accumulated by a CFC and used for capital investment, and so it is not a tax on "income" at any level. Contrary to the district court's apparent view, *see* ER-9; *see also* § 1.C *infra*, *Macomber* remains binding on this point. *See Glenshaw Glass*, 348 U.S. at 431 (approving *Macomber*'s approach to "distinguishing gain from capital"); *Nathel v. Comm'r*, 615 F.3d 83, 92 (2d Cir. 2010) (recognizing that "the earlier cases' treatment of capital as distinct from income," including in *Macomber*, remains good law).

### B. The Mandatory Repatriation Tax Is An Unapportioned Direct Tax

So what is the MRT, then? A tax on personal property.

The MRT does not tax the CFC itself for its receipt of income, but the CFC's U.S. shareholders. 26 U.S.C. § 965(f). It does not tax any distribution or other transfer that those shareholders received from the CFC. 26 U.S.C. § 965(a), (f). And it does not tax anything those shareholders may have done with their shares in a CFC, such as sell them. *Id.* Instead, the MRT taxes a CFC's U.S. shareholders on their ownership of a property interest, shares in a CFC that retained earnings after 1986. 26 U.S.C. § 965(f); *id.* § 951(a)(2)(A) (premising tax on the "pro rata" share of "the stock which such shareholder owns"). Because the MRT "falls upon the owner merely because he is owner, regardless of his use or disposition of the property," it is "a direct tax." *Fernandez v. Wiener*, 326 U.S. 340, 362 (1945).

Despite being a direct tax, the MRT is not apportioned among the states. *See* 26 U.S.C. § 965(f) (placing liability on U.S. taxpayers based on their "pro rata" ownership share, without respect to states). And that is what dooms it. *NFIB*, 567 U.S. at 571 (2012) (citing *Macomber* and stating that "taxes on personal property [are] direct taxes" and "must be apportioned among the several States").

### C. No Authority Exists Upholding a Tax Like the Mandatory Repatriation Tax as a Tax on "Incomes"

Rather than explain how the MRT could tax CFC shareholders' "incomes," the district court simply said it was so. ER-9. The district court never

accounted for *Glenshaw Glass*, despite that this Court has recognized that decision to define "income" in its "constitutional sense." *Quijano*, 93 F.3d at 30. Nor did the district court explain how the MRT met *Glenshaw Glass*'s definition of income. Perhaps the district court failed to do so because the Government also had no explanation for how the MRT could possibly satisfy *Glenshaw Glass*. Indeed, the Government, in its briefing, declined even to mention that central governing authority.

Rather than engage with *Glenshaw Glass*, the district court's analysis focused on a handful of cases that it considered to "cabin[]" *Macomber* in some unspecified way, leading the court to doubt that "*Macomber* currently controls whether the MRT is an income tax." ER-9.

But the MRT's fate need not turn on the vitality of *Macomber*. Even putting *Macomber* aside, the MRT on its face fails to satisfy the taxable-event requirement of *Glenshaw Glass*, and neither the Government nor the district court disputed that *Glenshaw Glass* remains good law.

And in any event, *Macomber* too remains good law as relevant here. The Supreme Court relied on it as recently as 2012 for the proposition that unapportioned taxes on property are unconstitutional. *NFIB*, 567 U.S. at 571. And *Glenshaw Glass* carried forward *Macomber*'s core holding that a taxable event is required. *Glenshaw Glass*, 348 U.S. at 431; *Macomber*, 252 U.S. at 207–08. While *Glenshaw Glass* recognized that *Macomber* was "not meant to provide a touchstone to all future gross income questions," 348 U.S. at 431, it "did not overrule [its] distinction between capital and income," *Nathel*, 615 F.3d at 92. To the

21

contrary, the Court explicitly stated that *Macomber*'s definition of income was "useful" inasmuch as it "distinguish[ed] gain from capital," 348 U.S. at 431, and left those principles undisturbed, *see Nathel*, 615 F.3d at 89. So while the *Glenshaw Glass* Court slightly reframed *Macomber*'s definition of income, it maintained *Macomber*'s realization requirement and did nothing to dilute the distinction between capital and income. The MRT fails under either decision.

Further, the district court strayed from how lower federal courts are to treat Supreme Court precedents that have "not been expressly overturned," including (as the Government conceded below, ER-19), *Macomber*. The Supreme Court retains the exclusive "prerogative of overruling its own decisions," leaving the lower courts to "follow the case" or cases "which directly control[]." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quotations omitted). Here those cases are *Glenshaw Glass* and *Macomber*. It does not matter that the Government believes *Macomber* "should be overruled." ER-19. What matters is that it has not been.

Regardless, no authority cited below provides a basis to conclude that the MRT taxes CFC shareholders' "incomes" and thereby passes Sixteenth Amendment muster. *Koshland v. Helvering*, 298 U.S. 441 (1936), cited by the district court in a footnote, ER-8 n.1, but not by the Government, certainly does not. It stands only for the uncontroversial position that a stock dividend in which a shareholder receives a different category of shares is not akin to the stock split at issue in *Macomber*. 298 U.S. at 445–46. *Koshland* did not purport to overrule or even narrow *Macomber*, and it of course had nothing to say about *Glenshaw Glass*, which would not be decided for another 19 years.

The two Second Circuit decisions cited by the district court are similarly inapt. The court concluded that *Eder v. Commissioner of Internal Revenue*, 138 F.2d 27 (2nd Cir. 1943)—a case that did not even cite *Macomber*—lessened *Macomber*'s relevance because "the Second Circuit found that current inclusion of foreign corporate income under a regime predating subpart F was constitutional." ER-8. But while the taxpayers in *Eder* apparently raised some kind of constitutional argument, the court there dismissed it in a brusque sentence bereft of analysis. 138 F.2d at 29. So the Second Circuit's statement thirty years later in *Garlock v. Commissioner* that *Eder* had definitively upheld against constitutional challenge "the foreign personal holding provisions of the income tax laws upon which subpart F was patterned," 489 F.2d 197, 202 (2nd Cir. 1973), does not hold much persuasive value either. *Garlock* states, in a footnote, that "the doctrine of [*Macomber*], as applied to the facts in this case…has no validity." *Id.* at 203 n.5. That may or may not be so—again, the court did not have much to say about what issue it was deciding—but there is no indication in *Garlock* that the Second Circuit regarded *Macomber's* realization-event holding as overruled, nor would that have made any sense, given that the Supreme Court reaffirmed *Macomber's* realization-event requirement in *Glenshaw Glass* after the Second Circuit decided *Eder*.

Further, neither *Eder* nor *Garlock* involved the attribution of past years' accumulated earnings of the sort that *Macomber* held to be capital, not income. Whatever *Eder* and *Garlock* may stand for in the realm of constitutional law, and it isn't much, their reasoning is less unconvincing than non-existent, and they

do not reach so far as to support the MRT's treatment of capital as income. *See Nathel*, 615 F.3d 87–88. In any event, neither could possibly overrule any decision of the Supreme Court.

The same is true of the other two Subpart F cases cited by the district court, neither of which even calls into question the application of *Glenshaw Glass* and *Macomber* here. Both *Whitlock's Estate* and *Dougherty* involved Subpart F taxes triggered by a CFC's investment of its earnings in U.S. property. The Tenth Circuit in *Whitlock's Estate* distinguished *Macomber* on the ground that the "tax here considered is computed in reference to a transaction, an investment in United States property," which (given the taxpayers' complete control of the CFC) amounted to a constructive distribution—a realization event. *Whitlock's Estate v. Comm'r*, 494 F.2d 1297, 1301 (10th Cir. 1974) (citation omitted); *see also Whitlock's Estate v. Comm'r*, 59 T.C. 490, 506 n.19 (1972) (identifying a CFC's "increase in earnings invested in U.S. property as a constructive dividend to [its U.S. owners]."). The MRT, by contrast, does not involve even an arguable taxable event.

Likewise, the Tax Court's decision in *Dougherty*—which the district court regarded as the "most compelling post-*Macomber* decision," ER-8, also provides no basis to depart from *Glenshaw Glass* and *Macomber*. *Dougherty* specifically identified a "taxable event," for constitutional purposes, an "investment in U.S. property," which "manifest[ed] the shareholder's exercise of control" over the amount invested. *Dougherty v. Comm'r*, 60 T.C. 917, 930 (1973). And *Macomber*, it reasoned, did not "interpose a constitutional barrier to a statutory constructive

dividend doctrine which in effect is what is involved herein." *Id*. The MRT, by contrast, involves no constructive dividend or other arguable taxable event. As noted, it turns on no actual event or transaction at all, but rather the ownership of shares in a CFC that retained earnings over the past thirty years. So even decisions like *Dougherty*—"the high-water mark" for congressional taxing power[11]—are insufficient to sustain this unprecedented enactment.

Additionally, these decisions, reflecting *Glenshaw Glass*, rely on the taxpayer's dominion and control over a foreign corporation's property—something that here is lacking. The Tax Court's decision in *Whitlock's Estate*, for example, additionally distinguished *Macomber* on the ground that the taxpayers before it "had the actual right and power to manipulate their corporation as if it were the family pocketbook," which was what it found enabled Congress to "disregard…the corporate entity" and tax its owners on its income. 59 T.C. at 509. The Tenth Circuit likewise regarded as essential that the taxable event at issue— the purchase of U.S. property by the CFC—"came about when the taxpayers controlled the corporation." 494 F.2d at 1301. So too in *Dougherty*, 60 T.C. at 930 (reasoning that "the shareholder's control over the corporation" permitted the corporation to be "bypassed for taxation purposes"), and seemingly in *Garlock*, 489 F.2d at 203 n.5 (distinguishing *Macomber* on "the facts in this case," which as canvassed by the court concerned the taxpayer's complete control over a CFC). Again, the MRT contains no such requirement or limitation.

---

[11] Mark E. Berg & Fred Feingold, *The Deemed Repatriation Tax—A Bridge Too Far?*, 158 Tax Notes 1345, 1354 (2018).

The "contemporary statutory regimes" cited by the district court further demonstrate the relevance of a taxpayer's dominion and control over the money to be taxed, as well as the realization requirement. ER-9. 26 U.S.C. § 1256 requires taxpayers to treat certain commodity futures contracts held in marked-to-market accounts as "treated as sold for its fair market value on the last business day of [the] taxable year" and to take into account any gain or loss for that year. But, as this Court explained in *Murphy v. United States*, 992 F.2d 929 (9th Cir. 1993), Section 1256 is permissible *because* it satisfies *Macomber* and *Glenshaw Glass*: "Under a marked-to-market system of accounting, each trader's equity or cash position in his futures contracts on an exchange is measured at the end of each trading day based on the net unrealized gain or loss on each open futures contract," and the taxpayer "has the right to withdraw cash from or is obligated to pay cash into his futures trading account on a daily basis." *Id.* at 930–31 (quotation marks omitted). A taxpayer's gains "could be treated as realized" and subject to taxation "because he [is] entitled to withdraw those gains daily." *Id.* at 931. And the same is true of the other statutory provisions cited by the district court, Section 475 and Section 877A, ER-9, which both require marked-to-market accounting to be used by security dealers and expatriates.

Unlike in the cases and statutory schemes cited by the district court, a CFC's retained earnings are not its shareholders' personal checking account. Not only have they obtained no "accessions to wealth, clearly realized," but they also do not exercise, as required, "complete dominion" over the capital of the CFC that the MRT deems them to have received. *Glenshaw Glass*, 348 U.S. at

431; *see also Indianapolis Power*, 493 U.S. at 210 ("The key is whether the taxpayer has some guarantee that he will be allowed to keep the money."). The MRT therefore is not a tax on anything that can fairly be called their income, or on income at all; it is instead a tax on their property, the shares they own in CFCs. Accordingly, it fails for lack of apportionment.

## II.    The Mandatory Repatriation Tax Violates the Fifth Amendment

"[F]or centuries our law has harbored a singular distrust of retroactive statutes." *E. Enterprises v. Apfel*, 524 U.S. 498, 547 (1998) (Kennedy, J., concurring in judgment and dissenting in part). The Supreme Court stated in *Landgraf v. USI Film Products* that "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." 511 U.S. 244, 265 (1994). For that reason, a "presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Id*.

These principles are given legal force in the tax context by the Fifth Amendment. "[A] statute purporting to tax may be so arbitrary and capricious as to amount to confiscation and offend the Fifth Amendment." *Nichols v. Coolidge*, 274 U.S. 531, 542 (1927). The Fifth Amendment bars the retroactive application of a "wholly new tax." *United States v. Hemme*, 476 U.S. 558, 568 (1986) (discussing *Untermyer v. Anderson*, 276 U.S. 440 (1928)). That rule is dispositive here because the MRT is a wholly new tax that applies retroactively to accumulations of earnings going back thirty years.

27

Even were the MRT not a new tax, it would still contravene the Fifth Amendment's Due Process Clause, which requires that tax statutes with a retroactive effect "establish[] only a modest period of retroactivity" so as to achieve ends that are "neither illegitimate nor arbitrary." *United States v. Carlton*, 512 U.S. 26, 30, 32 (1994). A thirty-year retroactive effect far exceeds the "customary congressional practice," approved by the Supreme Court, of retroactivity "confined to short and limited periods required by the practicalities of producing national legislation." *Id.* at 33 (citation and quotation marks omitted). Under either standard, the MRT is unlawful and cannot be constitutionally applied here.

### A. The Mandatory Repatriation Tax Is Retroactive

As an initial matter, the MRT has retroactive effect that triggers the protections of the Fifth Amendment because it "changes the legal consequences of acts completed before its effective date." *Landgraf*, 511 U.S. at 269 n.23 (quoting *Miller v. Florida*, 482 U.S. 423, 430 (1987)). The district court agreed, concluding that "[by] its very nature, the MRT is a retroactive tax." ER-11.

The Supreme Court has set forth the standard for assessing whether a tax statute has retroactive effect—a separate question from whether that effect is lawful. *See* §§ II.B and II.C, *infra*. The required inquiry is whether the "statute gives a different and more oppressive legal effect to conduct undertaken before enactment of the statute." *Hemme*, 476 U.S. at 569. In other words, does the statute's treatment of prior conduct leave taxpayers "worse off than they would have been without the enactment of the [statute]"? *Id.* at 570. This standard is a tax-specific application of the general rule for assessing statutory retroactivity,

which "ask[s] whether the new provision attaches new legal consequences to events completed before its enactment." *Landgraf*, 511 U.S. at 269–70.

The MRT is retroactive because it attaches new legal consequences—tax liability—to events completed before its enactment. This is plain on the face of the statute: it imposes tax liability based on a CFC's "post-1986 earnings and profits," which it defines as "the earnings and profits of the foreign corporation…*accumulated in taxable years beginning after December 31, 1986*." 26 U.S.C. § 965(d)(3) (emphasis added). Needless to say, accumulations of earnings in 1987, 2006, and the other years targeted by the MRT were completed before the MRT's enactment in 2017. And the MRT inflicts "a different and more oppressive legal effect" on that completed conduct: it imposes a tax based on past years' accumulations of earnings and profits to which they otherwise would not have been subject. That is a retroactive effect. *Compare GPX Intern. Tire Corp. v. United States*, 780 F.3d 1136, 1143 (Fed. Cir. 2015) (finding change in duties to be retroactive because it applied to conduct predating change in law).

That is the case with respect to application of the MRT here. Each year beginning in 2006, KisanKraft retained its earnings and reinvested them in its business rather than distributing them, such that the Moores received no income subject to U.S. tax. *See* JCT Report at 2, 6 (describing how, under prior law, reinvested foreign-corporation earnings were not subject to U.S. tax). The MRT altered the legal consequences of those completed past events—the accumulations of earnings in past years—by taxing the Moores for the past-year earnings.

That obviously left them worse off than they would have been, subject to a tax liability that they otherwise would not have borne.

That the MRT labels tax liability for past years' accumulated earnings as current-year (i.e., 2017) gross income does not make it any less retroactive. If that were so, no tax would ever be retroactive so long as Congress framed the liability as arising in or after the year of enactment—for example, by doubling income-tax rates going back thirty years but providing that the additional liability be included in the current tax-year. The legal standard for retroactivity, however, takes no account of such labels, turning instead on whether a law attaches new or different consequences to past acts. *See Hemme*, 476 U.S. at 568; *Landgraf*, 511 U.S. at 269–70. The MRT does, imposing liability based on conduct reaching back three decades. It is premised on "earnings and profits…accumulated in taxable years beginning after December 31, 1986." 26 U.S.C. § 965(d)(3). In that way, the statute "clearly expresses" its retroactive effect. *Sacks v. SEC*, 648 F. 3d 945, 951 (9th Cir. 2011).

Nor can the MRT avoid being classified as retroactive on the theory that it is just a mechanism to collect deferred taxes. "The MRT does more than simply accelerate tax already owing. It *ensures* that a ratable share of a CFC's earnings and profits will be subject to U.S. tax." ER-10. Subpart F did not and does not codify the maxim about death and taxes. Instead, the law simply defines what tax is due in the current tax year. Under previous law, the taxpayers who are now subject to the MRT owed no tax on CFCs' retained earnings, because no provision taxed them on those earnings. Conversely, previous law

taxed distributions of CFC earnings to taxpayers. 26 U.S.C. §§ 61(a), 301(c). The Moores had no obligation under previous law to pay tax on such earnings in any past year or any future year so long as they remained overseas with KisanKraft. The MRT changed that by imposing tax liability directly on past years' accumulations of earnings—the ones that were not taxed under previous law—irrespective of any actual or *de facto* distribution. That new consequence works a serious injury on taxpayers like the Moores, because they haven't actually received any distribution that they could use to pay the tax and may never see the money—after all, businesses do get sold, and others go belly up, before making any distributions to shareholders. But under the MRT, the Moores have to pay up, no matter whether they ever would have incurred tax liability under previous law.

*Dougherty v. Commissioner* is not to the contrary. The Government had argued below that *Dougherty* held that Subpart F inclusions of prior year earnings and profits were not retroactive. ER-84. The Tax Court's decision in that case, however, assumed that the tax there had retroactive effect and instead addressed whether it passed constitutional muster. 60 T.C. at 928–30. What's more, the tax liability there turned on a taxable event (a repatriation of accumulated earnings) that occurred after enactment of the statute. *Id.*; ER-10. That fact only underscores the unprecedented nature of the MRT, which imposes liability based on events completed years or even decades before its enactment in the absence of any post-enactment event.

**B.**     **The Mandatory Repatriation Tax Violates the Fifth Amendment Because It Is a Retroactive "Wholly New Tax"**

Ever since the Supreme Court declared that the Fifth Amendment's Due Process Clause bars retroactive application of a new tax, Congress has refrained from encroaching that limitation on its power. But Congress crossed that line with the MRT, a wholly new one-time tax that reaches decades back into the past, far beyond anything ever legislated by Congress, let alone sustained by the courts. Under governing precedent, it cannot be constitutionally applied.

*Nichols v. Coolidge*, 274 U.S. 531, rejected retroactive application of the then-new estate tax to pre-death transfers in which the estate-holder maintained an interest made before the tax was enacted. Such retroactive application of the tax, the court held, was "so arbitrary and capricious as to amount to confiscation and offend the Fifth Amendment." *Id*. at 542. Subsequently, in *Blodgett v. Holden*, the Supreme Court refused to apply the then-new federal gift tax to a transfer made before the tax was proposed in Congress. 275 U.S. 142 (1927). The decision was unanimous, but split as to reasoning. For four justices, retroactive application of the tax was, as in *Nichols*, "so arbitrary and capricious that its enforcement would amount to deprivation of property without due process of law within the inhibition of the Fifth Amendment." *Id*. at 147 (McReynolds, J.). The other four were able to avoid reaching the constitutional issue only by heroically reinterpreting the statute to preclude retroactive application. *Id*. at 148–49 (Holmes, J.). Finally, in *Untermyer*, 276 U.S. 440, the court extended *Blodgett*'s constitutional logic to bar application of the gift tax to transfers made shortly

before its enactment. Once again, it held retroactive application of the tax to be "arbitrary and invalid under the due process clause of the Fifth Amendment," reasoning that due process requires fair notice: "The taxpayer may justly demand to know when and how he becomes liable for taxes…." *Id.* at 445.

These decisions have never been overruled, nor has the Supreme Court ever had occasion to do so: not since *Untermyer* has it been faced with a new tax of truly retroactive application. But it has recognized their vitality. *Hemme*, a 1986 decision, recognized that "absence of notice" dooms retroactive application of a "wholly new tax" under *Untermyer*. 476 U.S. at 567–68. Likewise, *Carlton*, a 1994 decision, recognized that *Untermyer* applies "to situations involving the creation of a wholly new tax." 512 U.S. at 32 (quotations omitted); *see also id.* at 38 (O'Connor, J., concurring) (explaining that, under the Supreme Court's precedents, "a 'wholly new tax' cannot be imposed retroactively"); *Quarty v. United States*, 170 F.3d 961, 967 (9th Cir. 1999) (discussing rule applicable to a "new tax"). The only limitation recognized to this anti-retroactivity rule is that Congress may lawfully "require that taxable income should include profits from transactions consummated within the year." *Cooper v. United States*, 280 U.S. 409, 412 (1930). Otherwise, the prohibition on retroactive application of a new tax is absolute. *Cf. NetJets Aviation, Inc. v. Guillory*, 207 Cal. App. 4th 26, 57 (2012) ("No case cited by any party to this appeal has permitted retroactive application of a newly created assessment.").

*Untermyer* controls here because the MRT is a wholly new tax. A tax is "wholly new," for due process purposes, "when the taxpayer has 'no reason to

suppose that any transactions of the sort will be taxed at all.'" *Quarty*, 170 F.3d at 967 (quoting *United States v. Darusmont*, 449 U.S. 292, 298, 300 (1981)). Quite unlike a mere "change in tax rates," *id*., the MRT imposes liability on transactions that were never subject to U.S. taxation. And taxpayers like the Moores had no reason to expect that the Government would tax them for foreign-corporation income that is not their own income in any respect, that is not subject to the anti-tax-circumvention rationale of Subpart F, and that has never previously been subject to U.S. taxation. *Compare Netjets Aviation*, 207 Cal. App. 4th at 54–56 (holding tax to be "wholly new," for due process purposes, because it applied to property that had not previously been taxed). Taxpayers certainly had no reason to suspect that the United States would not only impose this new tax, but do so with an unprecedented period of retroactivity extending back decades beyond anything ever sanctioned by the courts. *See Carlton*, 512 U.S. at 38 (O'Connor, J., concurring) ("In every case in which we have upheld a retroactive federal tax statute against due process challenge, however, the law applied retroactively for only a relatively short period prior to enactment."). That is especially so since the Tax Code, up until the MRT, recognized the reality that those transactions did not result in taxpayers like the Moores receiving anything on which they could fairly be taxed. *See* § I, *supra*.

The district court rejected this argument in a footnote bereft of analysis, stating that "[t]he MRT is a component of the TCJA, which modified [S]ubpart F." ER-11. But the MRT is not merely an amendment to Subpart F—it is new in terms of its form and structure. Although Congress placed the MRT within

Subpart F, it operates independently from regular Subpart F tax, with its own unique tax rates, lookback period, limitations on foreign tax credits, and timing provisions. And while the other provisions of Subpart F apply year after year to specific types of CFC income, the MRT is a one-time assessment, imposing a novel levy on past-years' accumulations of income that does not apply in subsequent years. Simply put, it reclassifies previously untaxable income as taxable. That makes it a wholly new tax.

Indeed, Congress itself regarded the MRT as something other than a tweak to the operation of Subpart F; instead, it was, per the TCJA's conference committee, "a one-time repatriation of money held offshore." H.R. Rep. 115-240, at 315 (2017). Likewise, the White House described the MRT not as an adjustment of current tax law, but as "[a] one-time repatriation tax…on income that has already accumulated overseas." Press Release, *President Donald J. Trump's Tax Cuts are a Windfall for Americans* (Mar. 14, 2018).[12] In fact, much of the Congressional debate over the provision concerned how to spend what members recognized to be a one-time windfall, separate and apart from the steady stream of normal Subpart F revenue. *See, e.g.*, 163 Cong. Rec. S7546 (daily ed. Nov. 30, 2017) (Sen. Cardin) (stating that "[t]he House repatriation bill would bring in approximately $300 billion of one-time-only revenues" and proposing how to use "this one-time-only source"). This reflects the reality that the MRT's "one-time repatriation" is a new standalone tax.

---

[12]  *Available at* https://trumpwhitehouse.archives.gov/briefings-statements/president-donald-j-trumps-tax-cuts-windfall-americans/

If this were not deemed a new tax, it would be quite easy for Congress to evade Fifth Amendment scrutiny for imposing new taxes. It could smuggle new taxes into existing provisions of the Tax Code, dressing them up as revisions. Or it could include them in broader "tax reform" bills, tying them to some other, actual revision of the Tax Code. Congress could propound a new "income inclusion" of "your wallet and your keys"—or, less cheekily, the value of all volunteer labor received by nonprofits over the past five years—and taxpayers would have no recourse but to pay up. That view is, of course, inconsistent with the standard applied in *Quarty*, that a tax is wholly new when the taxpayer has "no reason to suppose that any transactions of the sort will be taxed at all." *Quarty*, 170 F.3d at 967 (quotation marks omitted). And it also conflicts with *Nichols*, which held the Fifth Amendment to bar enforcement of *an amendment* to the existing federal estate tax that swept in transfers made before the amendment's passage. 274 U.S. at 533–34, 542–43.

In short, what Congress legislated was a wholly new one-time "deemed repatriation" of CFC's accumulated earnings. Because that is a new tax, the Fifth Amendment bars its retroactive application.

## C. Even If Not a Wholly New Tax, the Mandatory Repatriation Tax Flunks the *Carlton* Standard

Even if the Court were to conclude that the MRT is not a new tax, the MRT still violates the Fifth Amendment. It violates the rule of *Carlton*, 512 U.S. at 30, 32, that permits "only a modest period of retroactivity" in taxation and disapproves arbitrary and irrational retroactive measures. If the MRT—with its

unprecedented thirty-year retroactive reach and other arbitrary features—satisfies the *Carlton* standard, then it is difficult to imagine any retroactive exaction that would not.

The Supreme Court has upheld retroactive taxation only where "Congress acted promptly and established only a modest period of retroactivity." *Id.* at 32. The MRT reaches back thirty years and, as applied here, imposes liability on the Moores for KisanKraft's retained earnings from over a decade before its enactment. *Carlton*, in contrast, involved retroactivity "for a period only slightly greater than a year," consistent with the "customary congressional practice" of "confin[ing] [tax retroactivity] to short and limited periods required by the practicalities of producing national legislation." *Id.* at 33 (citation and quotation marks omitted). Surveying the Supreme Court's precedents, Justice O'Connor observed that, in "every case in which [the Court] ha[s] upheld a retroactive federal tax statute against due process challenge…, the law applied retroactively for only a relatively short period prior to enactment," typically just a few months or as long as a year. *Id.* at 38 (O'Connor, J., concurring). That experience, she explained, likely reflects "Congress' sensitivity to the due process problems that would be raised by overreaching." *Id.*

Reaching back thirty years, the MRT can only be viewed as a serious overreach, unjustified by legislative practicalities. *See GPX*, 780 F.3d at 1143 (regarding a five-and-a-half-year retroactivity period as "substantial"); *id.* at 1142 (finding that "the length of the retroactive effect" did not support the tax's lawfulness). In the court below, the Government was unable to identify any change to

tax law with anywhere near so long a retroactivity period as the MRT. *See* ER-87 (maxing out at four years). The Supreme Court "has never intimated that Congress possesses unlimited power to readjust rights and burdens…and upset otherwise settled expectations," *id*. at 37 (O'Connor, J., concurring), but nothing short of that would suffice to sustain the MRT.

Contrary to the district court, this Court need not view *Carlton* as imposing any bright-line rule or create its own, ER-11, because it is beyond cavil that a thirty-year retroactive effect is blatantly immodest and far exceeds—by decades—the "short and limited periods required by the practicalities of producing national legislation" that have previously been approved. 512 U.S. at 33. Wherever precisely the *Carlton* line lies, the MRT leaps past it, setting a new record for retroactive taxation.

The MRT is also arbitrary and irrational, *Carlton*, 512 U.S. at 30, in taxing CFC shareholders on accumulated earnings that are not in any sense theirs and in targeting long-ago reported earnings that a CFC may no longer possess or be able to access in liquid form. The entire policy rationale of Subpart F has been to capture foreign-corporation income reasonably attributable to U.S. persons so as to prevent them from taking advantage of the corporate form to avoid U.S. taxation. IRS, Subpart F Overview, *supra*, at 3. Its longstanding features are carefully tailored to that end, targeting things like related-party transactions and foreign passive-investment holdings that serve to artificially shift income offshore and thereby avoid the U.S. income tax. *Id*. at 2–4. That, in turn, rationally justifies imposing tax liability on a CFC's owners, rather than the CFC itself—the

idea is that this income is properly attributable to the owners and would be theirs but for their abuse of the corporate form. *Id.* The MRT, by contrast, applies only to income that is otherwise outside of Subpart F and that has been retained by the CFC for reinvestment in the business. It therefore does not further the avoidance rationale that justifies the rest of Subpart F. And it is decidedly irrational and arbitrary in its retroactive sweep, imposing taxes on long-ago reported earnings that the CFC may no longer possess or may lack access to in liquid form. The MRT is in no way "a rational means of affecting a legitimate legislative purpose" tied to the transition to a territorial tax, as the district court concluded, ER-12; it is a cash grab.

And it is the height of irrationality and arbitrariness to impose such liability on minority shareholders like the Moores who lack the power to compel distribution of the retained earnings that the MRT arbitrarily deems to be theirs. *See Corliss v. Bowers*, 281 U.S. 376, 378 (1930) (holding that the grantor of a revocable trust could be constitutionally taxed on its income that remained "subject to [his] unfettered command and that he is free to enjoy at his own opinion…, whether he sees fit to enjoy it or not"). Indeed, the Supreme Court held recently that due process prohibits states from taxing trust income where the resident beneficiaries "have no right to demand that income and are uncertain ever to receive it." *N.C. Dep't of Revenue v. The Kimberley Rice Kaestner 1992 Fam. Tr.*, 139 S. Ct. 2213, 2221 (2019). That is the precise circumstance that the MRT puts minority shareholders like the Moores in, rendering application of the MRT here equally arbitrary and unlawful.

The Federal Circuit's opinion in *GPX Intern. Tire Corp.*, 780 F.3d 1136, although not binding on this Court, provides a convenient overview of the factors courts have considered in challenges to retroactive statutes and is, for that reason, persuasive.

First is "whether the retroactive provision is 'wholly new.'" *Id.* (quoting *Hemme*, 476 U.S. at 568). The MRT is, as described above. *See* § II.B, *supra*.

Second is "whether the retroactive action resolves uncertainty in the law," where a "curative" measure is more likely to comply with the Due Process Clause. *GPX*, 780 F.3d at 1142 (citing *Gen. Motors Corp. v. Romein*, 503 U.S. 181 (1992)). The district court concluded that the MRT resolves uncertainty in the law because prior to its passage, "it was unclear when and if a CFC's earnings attributable to U.S. shareholders would be subject to U.S. tax." ER-12. But that analysis focuses on uncertainty to the taxman; not the citizen that the Fifth Amendment is meant to protect. And there was no uncertainty prior to the enactment of the MRT as to whether U.S. owners were taxed for CFCs' retained earnings. They were not. *See* JCT Report at 13; H.R. Rep. 115-466, at 606.

Third is "the length of the period of retroactivity." *GPX*, 780 F.3d at 1142 (citing *Carlton*, 512 U.S. at 32–33). The MRT's period of retroactivity is without precedent, as described above.

The fourth consideration is "whether the affected party had notice of the potential change prior to the conduct that was retroactively regulated." *GPX*, 780 F.3d at 1142 (citing *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 731–32 (1984)). As even the district court recognized, the Moores, like others

40

subject to the MRT, did not. ER-13. There was no indication in 1987, 2006, or the other years targeted by the MRT that Congress would reverse course and impose tax liability on a category of earnings that has never been subject to U.S. taxation. They and other shareholders in foreign businesses were left to arrange their affairs in reliance on consistent U.S. tax law—until, that is, Congress pulled the rug out from under them. That Congress would do so even to taxpayers like the Moores who, because they are minority shareholders, lack the power to force a CFC to distribute retained earnings (assuming that is even possible) was a particular surprise.

The fifth consideration is "whether the retroactive provisions are remedial in nature," 780 F.3d at 1142—in other words, whether they have some policy purpose beyond mere revenue generation, *id.* at 1144. The MRT does not. Congress sought a revenue windfall, not to deter U.S. investment in foreign business. Confirming as much, the MRT does not apply prospectively—and so does not disincentivize future foreign investment—and was enacted as part of legislation designed to liberalize U.S. tax treatment of U.S. businesses' overseas operations by shifting toward a territorial taxation system. The Government claimed below that taxpayers like the Moores would "reap a windfall" in the absence of something like the MRT, and that it is, therefore, remedial in nature. But this does not withstand scrutiny; since the dawn of the federal income tax, it has always been the case that, if and when a corporation makes a distribution to its owners, they are taxed on that income. *See* Pub. L. 63-16, § II(B), 38 Stat. 114, 167 (1913); 26 U.S.C. § 61(a)(7) (defining income to include "dividends"). The

novelty of the MRT is that it operates in the absence of anything that might fairly be called their income.[13]

In sum, the MRT is truly "harsh and oppressive," *Carlton*, 512 U.S. at 30, in its decades-long retroactivity and targeting of taxpayers who have not and may never receive any of the "income" it arbitrarily attributes to them. Wherever the line lies dividing permissible retroactive effect from forbidden, the MRT leaps over it in unprecedented fashion.

## Conclusion

The trial court's order granting the Government's motion to dismiss and denying the Moores' motion for summary judgment should be reversed.

Respectfully submitted,

/s/ Andrew M. Grossman

SAM KAZMAN
DEVIN WATKINS
COMPETITIVE ENTERPRISE
INSTITUTE
1310 L Street N.W., 7th Floor
Washington, DC 20005
(202) 331-1010
sam.kazman@cei.org

ANDREW M. GROSSMAN
DAVID B. RIVKIN, JR.
JEFFREY H. PARAVANO
SEAN SANDOLOSKI
BAKERHOSTETLER
Washington Square, Ste. 1100
1050 Connecticut Ave., N.W.
Washington, DC 20036
(202) 861-1697
agrossman@bakerlaw.com

*Counsel for Appellants*
*Charles G. Moore and Kathleen F. Moore*

---

[13] The district court concluded that the MRT is "remedial" because it "incentivizes U.S. taxpayers to repatriate foreign earnings." ER-12. But that is just another way of saying that it generates revenue for the Government.

## **Statement of Related Cases**

The Moores are aware of no cases pending in this Circuit that satisfy the definition of "related cases" under Ninth Circuit Rule 28-2.6.

## <u>Certificate of Compliance for Briefs</u>

**9th Cir. Case Number(s):** _____ 20-36122 _____

I am the attorney or self-represented party.

**This brief contains 11,220 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Andrew M. Grossman        **Dated:** March 29, 2021

**<u>Certificate of Service</u>**

I hereby certify that I electronically filed the Appellants' Opening Brief and Addendum with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: March 29, 2021         <u>/s/   Andrew M. Grossman </u>
                                           Andrew M. Grossman

## Addendum

## 26 U.S.C. 965 – Treatment of Deferred Foreign Income Upon Transition to Participation Exemption System of Taxation

**(a)** Treatment of deferred foreign income as subpart F income

In the case of the last taxable year of a deferred foreign income corporation which begins before January 1, 2018, the subpart F income of such foreign corporation (as otherwise determined for such taxable year under section 952) shall be increased by the greater of-

**(1)** the accumulated post-1986 deferred foreign income of such corporation determined as of November 2, 2017, or

**(2)** the accumulated post-1986 deferred foreign income of such corporation determined as of December 31, 2017.

…

**(c)** Application of participation exemption to included income

**(1)** In general

In the case of a United States shareholder of a deferred foreign income corporation, there shall be allowed as a deduction for the taxable year in which an amount is included in the gross income of such United States shareholder under section 951(a)(1) by reason of this section an amount equal to the sum of-

**(A)** the United States shareholder's 8 percent rate equivalent percentage of the excess (if any) of-

**(i)** the amount so included as gross income, over

**(ii)** the amount of such United States shareholder's aggregate foreign cash position, plus

**(B)** the United States shareholder's 15.5 percent rate equivalent percentage of so much of the amount described in subparagraph (A)(ii) as does not exceed the amount described in subparagraph (A)(i).

**(2)** 8 and 15.5 percent rate equivalent percentages

…

**(d)** Deferred foreign income corporation; accumulated post-1986 deferred foreign income

For purposes of this section-

…

**(3)** Post-1986 earnings and profits

The term "post-1986 earnings and profits" means the earnings and profits of the foreign corporation (computed in accordance with sections 964(a) and 986, and by only taking into account periods when the foreign corporation was a specified foreign corporation) accumulated in taxable years beginning after December 31, 1986, and determined-

**(A)** as of the date referred to in paragraph (1) or (2) of subsection (a), whichever is applicable with respect to such foreign corporation, and

**(B)** without diminution by reason of dividends distributed during the taxable year described in subsection (a) other than dividends distributed to another specified foreign corporation.

**(e)** Specified foreign corporation

**(1)** In general

For purposes of this section, the term "specified foreign corporation" means-

**(A)** any controlled foreign corporation, and

Addendum-2

**(B)** any foreign corporation with respect to which one or more domestic corporations is a United States shareholder.

…

**(f)** Determinations of pro rata share

**(1)** In general

For purposes of this section, the determination of any United States shareholder's pro rata share of any amount with respect to any specified foreign corporation shall be determined under rules similar to the rules of section 951(a)(2) by treating such amount in the same manner as subpart F income (and by treating such specified foreign corporation as a controlled foreign corporation).

**(2)** Special rules

The portion which is included in the income of a United States shareholder under section 951(a)(1) by reason of subsection (a) which is equal to the deduction allowed under subsection (c) by reason of such inclusion-

**(A)** shall be treated as income exempt from tax for purposes of sections 705(a)(1)(B) and 1367(a)(1)(A), and

**(B)** shall not be treated as income exempt from tax for purposes of determining whether an adjustment shall be made to an accumulated adjustment account under section 1368(e)(1)(A).

…