# No. 20-36122

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

———————————

**CHARLES G. MOORE; KATHLEEN F. MOORE,**

**Plaintiffs-Appellants**

v.

**UNITED STATES OF AMERICA,**

**Defendant-Appellee**

———————————

**ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE WESTERN DISTRICT OF
WASHINGTON**

———————————

**BRIEF FOR THE APPELLEE**

———————————

DAVID A. HUBBERT
  *Acting Assistant Attorney General*

FRANCESCA UGOLINI        **(202) 514-3361**
MICHAEL J. HAUNGS        **(202) 514-4343**
NATHANIEL S. POLLOCK     **(202) 514-8139**
  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel:*
TESSA GORMAN
  *Acting United States Attorney*

# TABLE OF CONTENTS

**Page**

Table of contents.................................................................................i

Table of authorities ......................................................................... iii

Glossary ............................................................................................x

introduction......................................................................................1

Statement of jurisdiction.................................................................2

Statement of the issues ...................................................................3

Applicable statutes and regulations ..............................................4

Statement of the case .....................................................................4

    A.    Overview of the case and proceedings below ..........................4

    B.    Legal framework ....................................................................5

    C.    Facts of the case and the district court's decision ...............11

Summary of argument .................................................................14

Standard of review .......................................................................16

Argument:

    I.    The transition tax is not a direct tax subject to the apportionment requirement ...................................................16

        A.    Constitutional framework ...........................................16

        B.    The Constitution does *not* require income to be realized in order to be taxed.......................................21

            1.    There is no support for a realization requirement in the Sixteenth Amendment's text.........................................................................22

            2.    Precedent forecloses the Moores' realization-requirement argument ........................................23

**Page**

3.  *Glenshaw Glass* does not support the Moores' realization-requirement argument .....................30

4.  Cases upholding the pre-TCJA subpart F against similar constitutional challenges refute the Moores' realization-requirement argument ............................................34

5.  A closely analogous case in another context, as well as other Tax Code provisions, refute the notion of a constitutional realization requirement .........................................40

6.  A tax on business earnings is an income tax and, in any event, not a direct tax and thus is not subject to the apportionment requirement .........................................45

II.  The Section 965 transition tax does not violate the Fifth Amendment's Due Process Clause ......................................47

A.  Section 965 is not retroactive ......................................47

1.  Considered as a tax on a deemed repatriation, Section 965 is *not* retroactive ........49

2.  Considered as a tax on KisanKraft's prior earnings, Section 965 is not retroactive in a way that is adverse to the Moores ......................54

B.  Even if the Section 965 transition tax is retroactive, it does not violate the Due Process Clause ..........................................................58

1.  The transition tax is *not* a wholly new tax .........59

2.  The transition tax meets the rational basis standard ............................................64

**Page(s)**

Conclusion ........................................................................ 69
Statement of related cases ............................................. 70
Addendum ....................................................................... 71
Certificate of compliance ............................................... 79

## TABLE OF AUTHORITIES

**Cases:**

*Angelotti Chiropractic, Inc. v. Baker*,
    791 F.3d 1075 (9th Cir. 2015) ................................. 60
*Avila v. Los Angeles Police Dep't*,
    758 F.3d 1096 (9th Cir. 2014) ................................. 68
*Blodgett v. Holden*,
    275 U.S. 142 (1927) ......................................... 59, 62
*Commissioner v. Fender Sales, Inc.*,
    338 F.2d 924 (9th Cir. 1964) ............................... 27-28
*Commissioner v. Glenshaw Glass Co.*,
    348 U.S. 426 (1955) ............................. 23, 27, 30-33,
                                 36, 38-39, 42
*Cottage Savings Ass'n v. Commissioner*,
    499 U.S. 554 (1991) ...................................... 24-25, 29
*Dougherty v. Commissioner*,
    60 T.C. 917 (1973) ............... 12, 37-40, 45, 50-53, 68
*Eder v. Commissioner*,
    138 F.2d 27 (2d Cir. 1943) .................................. 35-36
*Eisner v. Macomber*,
    252 U.S. 189 (1920) ............................ 12-13, 19-20, 23, 26-34,
                              36-39, 42, 45-47
*Fein v. United States*,
    730 F.2d 1211 (8th Cir. 1984) ............................... 63

19483037.1

**Cases (cont'd):**                                          **Page(s)**

*Ferman v. United States,*
    993 F.2d 485 (5th Cir. 1993) ................................. 63

*Furlong v. Commissioner,*
    36 F.3d 25 (7th Cir. 1994) ..................................... 62

*Garlock Inc. v. Commissioner,*
    489 F.2d 197 (2d Cir. 1973) ............................. 34-36

*GPX Int'l Tire Corp. v. United States,*
    780 F.3d 1136 (Fed. Cir. 2015) ............................ 65

*Heiner v. Mellon,*
    304 U.S. 271 (1938) ................................. 34-36, 44

*Helvering v. Bruun,*
    309 U.S. 461 (1940) .................. 25-27, 32-33, 35, 42

*Helvering v. Enright's Estate,*
    312 U.S. 636 (1941) ............................................ 35

*Helvering v. Griffiths,*
    318 U.S. 371 (1943) ...................................... 25-26

*Helvering v. Horst,*
    311 U.S. 112 (1940) ................................. 22, 24, 26

*Helvering v. Nat'l Grocery Co.,*
    304 U.S. 282 (1938) ............................................ 45

*Hylton v. United States,*
    3 U.S. (Dall) 171 ............................................ 18-19

*Landgraf v. USI Film Products,*
    511 U.S. 244 (1994) ...................................... 48, 56

*Murphy v. United States,*
    992 F.2d 929 (9th Cir. 1993) ................................ 44

*Nat'l Fed'n of Indep. Bus. (NFIB) v. Sebelius,*
    567 U.S. 519 (2012) ...................................... 17-20

*Nathel v. Commissioner,*
    615 F.3d 83 (2d Cir. 2010) .................................. 33

*Nichols v. Coolidge,*
    274 U.S. 531 (1927) ............................................ 59

*Pollock v. Farmers' Loan & Trust Co.,*
    158 U.S. 601 (1895) ....................... 19-21, 23, 36, 46

19483037.1

# Cases (cont'd): Page(s)

*Polone v. Commissioner,*
505 F.3d 966 (9th Cir. 2007) ................................... 56

*Prescott v. Commissioner,*
561 F.2d 1287 (8th Cir. 1977) .............................. 40-43, 50-52

*Quarty v. United States,*
170 F.3d 961 (9th Cir. 1999) ..................................... 58-59, 64

*Sidney v. Commissioner,*
273 F.2d 928 (2d Cir. 1960) (Friendly, J.) ........................... 62

*Spreckels Sugar Ref. Co. v. McClain,*
192 U.S. 397 (1904) ............................................. 47

*Springer v. United States,*
102 U.S. 586 (1880) ............................................. 19

*United States v. Carlton,*
512 U.S. 26 (1994) ......................................... 13, 59, 61-62, 64

*United States v. Davis,*
370 U.S. 65 (1962) ............................................. 38, 42

*United States v. Hemme,*
476 U.S. 558 (1986) ............................................. 60-62

*United States v. James,*
333 F.2d 748 (9th Cir. 1964) ................ 12-13, 23, 26-27, 34-45

*United States v. Kirby Lumber Co.,*
284 U.S. 1 (1931) ............................................. 27

*United States v. Safety Car Heating & Lighting Co.,*
297 U.S. 88 (1936) ............................................. 27

*Untermyer v. Anderson,*
276 U.S. 440 (1928) ............................................. 59, 62

*Veazie Bank v. Fenno,*
75 U.S. 533 (1869) ............................................. 18

*Whitlock's Estate v. Commissioner,*
494 F.2d 1297 (10th Cir. 1974) ................................. 35, 38-39

*Whitlock's Estate v. Commissioner,*
59 T.C. 490 (1972) ............................................. 45

**Statutes:**                                              Page(s)

Internal Revenue Code (26 U.S.C.):

§ 61(a) ....................................................................... 5
§ 72(p)(1)(A) ............................................................ 63
§ 245A .................................................... 7-10, 52, 64
§ 301 ........................................................................ 60
§ 401(a)(9) ............................................................... 56
§ 401(k) ...............................................................56-58
§ 475 ........................................................................ 12
§ 702(a) ................................................................... 44
§ 877A ..................................................................... 12
§ 877A(a) ................................................................ 43
§ 898(c)(2) ............................................................... 49
§ 901-909 .................................................................. 5
§ 902 (2016) ............................................................ 66
§ 951(a) ................................................................... 49
§ 951(a)(1) ............................................... 6, 9, 49, 61
§ 951(a)(1)(A) ................................................... 7, 37
§ 951(a)(1)(B) ............................... 7, 37, 39-40, 50-51
§ 951(b) ............................................................ 6, 68
§ 951A .................................................................7-8
§ 951A(c) .................................................................. 7
§ 952 ........................................................................ 61
§ 954 ........................................................................ 61
§ 956 ........................................................................ 61
§ 956(a) ................................................................... 51
§ 957(c) ..................................................................... 6
§ 958(a)-(b) ............................................................... 6
§ 959 ...................................................................10-11
§ 959(a) .............................................................. 8, 61
§ 965 .............................. 2-4, 6, 8-11, 14-16, 20-22, 34, 39, 45,
                                        47-49, 52-55, 57-58, 60-65, 67-68
§ 965(a) ........................................8-10, 39, 49, 61
§ 965(c).................................................................... 10

19483037.1

**Statutes (cont'd):**                                    **Page(s)**

Internal Revenue Code (26 U.S.C.) (cont'd):

§ 965(d) .................................................................8-11, 13
§ 965(e).....................................................................8-9
§ 965(h) ....................................................................10
§ 1248(a) ...................................................................60
§ 1256.......................................................................12
§ 1361.....................................................................41-42
§ 1366(a) ...................................................................44
§ 6511(a) ....................................................................3
§ 6532(a)(1) .................................................................3
§ 7422(a) .....................................................................3

28 U.S.C.:

§ 1291........................................................................3
§ 1346(a)(1) .................................................................3
§ 2107(b) .....................................................................3

Tax Cuts and Jobs Act of 2017 (TCJA) .............1, 2, 7, 15, 48-49, 52

**Regulations:**

Treasury Regulations (26 C.F.R.):

§ 1.964-1(a) ................................................................66

**U.S. Constitution:**

U.S. Const. Art. I, sec. 8, cl. 1 .....................................16

U.S. Const. Art. I, sec. 9, cl. 4 .....................................16

U.S. Const., amend. XVI ............................................16-17

19483037.1

| Miscellaneous: | Page(s) |
|---|---|

10 Mertens Law of Fed. Income Tax'n
  (June 2021). ............................................................................ 8

Charles L.B. Lowndes, *Current Conceptions of Taxable Income*,
  25 Ohio St. L.J. (1964) ...................................................... 29

Edwin R. A. Seligman, *The Income Tax* (1911) .......................... 17-18

Federal Rules of Appellate Procedure:

    Rule 4(a)(1)(B)(i) .......................................................... 3
    Rule 28(f) ....................................................................... 4

H.R. Rep. No. 115-409 ........................................................... 10

H.R. Rep. No. 115-466 ........................................................... 10

https://anerucabsfirtaxfaurbess.org/files/JCT-letter-on-2.6-trillion-
  in-offshore-propfits-08-2016.pdf [https://perma.cc/UD6S-
  JUNE] ............................................................................... 6

https://www.federalreserve.gov/econres/notes/feds-notes/us-
  corporations-repatriation-of-offshore-profits-20190806.htm
  [https://perma.cc/XYP3-E3LK] .......................................... 10

Dawn Johnsen & Walter Dellinger, *The Constitutionality of A
  National Wealth Tax*, 93 Ind. L. J. (2018) ............... 17, 20, 29

Kuntz & Peroni, *U.S. International Taxation* .............................. 5

Marvin A. Chirelstein & Lawrence Zelenak, *Federal Income
  Taxation* (14th ed. 2018) ................................................ 29

Noel B. Cunningham & Deborah H. Schenk, *Taxation Without
  Realization: A "Revolutionary" Approach to Ownership*,
  47 Tax L. Rev. (1992) ....................................................... 29

-ix-

**Miscellaneous (cont'd):** **Page(s)**

S. Rep. 87-1881 (1962)..........................................................................5

-x-

# GLOSSARY

| Acronym | Definition |
|---------|------------|
| CFC | controlled foreign corporation |
| IRS | Internal Revenue Service |
| I.R.C. | Internal Revenue Code |
| TCJA | Tax Cuts and Jobs Act of 2017 |

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————

### No. 20-36122

### CHARLES G. MOORE; KATHLEEN F. MOORE,

**Plaintiffs-Appellants**

**v.**

### UNITED STATES OF AMERICA,

**Defendant-Appellee**

————————————

## ON APPEAL FROM THE JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON

————————————

## BRIEF FOR THE APPELLEE

————————————

## INTRODUCTION

This lawsuit seeks to invalidate the mechanism Congress chose in the Tax Cuts and Jobs Act of 2017 (TCJA) to collect taxes on previously accumulated corporate foreign earnings as the TCJA moved the United States to a system that largely eliminates tax deferral and allows tax-free repatriation of untaxed foreign earnings going forward. This mechanism for maintaining the status quo of taxation for amassed pre-TCJA foreign earnings (though at reduced rates) – the transition tax

19483037.1

(I.R.C. § 965) – will bring in an estimated $340 billion of tax revenue. So the real stakes here are quite a bit higher than the $14,729 tax refund that Charles and Kathleen Moore seek. If this lawsuit succeeds in eliminating the transition tax, U.S. multi-national corporations not only would avoid certain future U.S. taxes on the earnings of their foreign subsidiaries, they also would permanently avoid the tax on their substantial (more than $2.6 trillion in all) previously accumulated foreign earnings that cleared the decks for the new regime TCJA sets up.

To achieve the goal of this lawsuit, the Moores invite this Court to become the first court since at least 1920 (and arguably 1895) to determine that a federal tax is unconstitutional because it must be apportioned by state population. This Court should decline that invitation. And this Court also should decline to hold that the transition tax is both retroactive and that any such (we submit nonexistent) retroactivity lacks even a rational basis.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this tax refund suit, and this Court has jurisdiction over this appeal. On October 26, 2018,

-3-

Charles G. Moore and Kathleen F. Moore filed an amended tax return for 2017 and paid $15,130, which they reported as the additional amount owed under I.R.C. (26 U.S.C.) § 965. (ER94.) On March 25, 2019, the Moores filed a refund claim asserting that Section 965 is unconstitutional and seeking a refund of most of the October 26, 2018, payment ($14,729). (ER94-95.) *See* I.R.C. § 6511(a). On September 26, 2019, after six months had elapsed without the IRS acting on the claim, the Moores timely filed this suit for refund. (ER 98, 107.) *See* I.R.C. § 6532(a)(1). The district court had subject matter jurisdiction under I.R.C. § 7422(a) and 28 U.S.C. § 1346(a)(1).

On November 19, 2020, the district court granted the government's motion to dismiss and entered a final judgment. (ER13, 15.) The Moores filed a timely notice of appeal on December 24, 2020. (ER100.) *See* 28 U.S.C. § 2107(b) & Fed. R. App. P. 4(a)(1)(B)(i). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether I.R.C. § 965's transition tax violates the apportionment requirement of Article 1 of the U.S. Constitution.

-4-

2. Whether I.R.C. § 965's transition tax is impermissibly retroactive in violation of the Fifth Amendment's Due Process Clause.

## APPLICABLE STATUTES AND REGULATIONS

The constitutional provisions and statutes relevant to the disposition of this appeal are included as an addendum to this brief. *See* Fed. R. App. P. 28(f); 9th Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A.    Overview of the case and proceedings below

As shareholders who owned at least 10% of a controlled foreign corporation (CFC), the Moores owed the I.R.C. § 965 transition tax in 2017.  They calculated their Section 965 tax liability as $15,130, paid it, and then (having taken the appropriate administrative steps) sued for a refund based on a two-pronged constitutional challenge.  The district court rejected the Moores' contention that Section 965 is an unapportioned direct tax that violates Article I of the Constitution and the Sixteenth Amendment.  The district court also determined that Section 965 is not impermissibly retroactive in violation of the Fifth Amendment's Due Process Clause.

19483037.1

## B.    Legal framework

Operating under a system of worldwide taxation, the United

States has traditionally taxed the foreign income of its citizens and

residents just as it taxes their domestic income (providing a foreign tax

credit to alleviate double taxation).  I.R.C. §§ 61(a), 901-909.  Thus, if a

U.S. taxpayer (whether a corporation or an individual) conducts

business and earns income in a foreign country, the U.S. taxpayer pays

U.S. income tax on those earnings.  Kuntz & Peroni, *U.S. International*

*Taxation* § A1.03, 2000 WL 530073.  But there has been a significant

exception to this principle.  With exceptions for certain anti-deferral

regimes, like subpart F (described below), U.S. taxpayers have not had

to pay U.S. tax on the earnings of foreign corporations until those

earnings were distributed to them.  *Id*; *see also* S. Rep. 87-1881, at 78

(1962). The result for U.S. owners of CFCs – *i.e.*, generally a foreign

corporation with more than 50% U.S. ownership – was "the *deferral* of

U.S. taxes." Kuntz & Peroni § A1.03 (emphasis in original).  To exploit

this tax deferral opportunity, many U.S. taxpayers (especially U.S.

corporations) have separately incorporated their foreign operations.

Often, they have then kept foreign earnings offshore rather than

19483037.1

bringing those earnings back to the United States, which would cause them to be taxed. The Joint Committee on Taxation estimated that, by 2015, CFCs had accumulated more than $2.6 trillion in earnings offshore. *See* August 31, 2016, Joint Committee on Taxation Letter.[1]

For decades, Congress has sought to limit the tax deferral available through CFCs. Its main mechanism for doing that has been a set of tax laws enacted in 1962, and commonly known as subpart F, a reference to their placement in the Tax Code. In general, subpart F limits tax deferral on foreign income for U.S. shareholders of CFCs by currently taxing the U.S. shareholders on portions of the CFC's earnings even though those earnings were *not* distributed to the U.S. shareholder. *See* I.R.C. § 951(a)(1). Subpart F only applies to U.S. shareholders who own 10% or more of a CFC (the term "U.S. shareholder," for purposes of Section 965, means U.S. persons owning 10% or more of the total combined voting power of the CFC's stock). I.R.C. § 951(b); *see also* I.R.C. § 957(c) (defining "United States person"), and I.R.C. § 958(a)-(b) (defining stock ownership and providing

---

[1] Available at https://americansfortaxfairness.org/files/JCT-letter-on-2.6-trillion-in-offshore-propfits-08-2016.pdf [https://perma.cc/UD6S-JUNE].

constructive ownership rules). The portions of CFCs' undistributed earnings that have long been included under subpart F (and thus taxed currently, regardless of whether actually distributed) include (1) easily movable income, like interest, dividends, and certain sales income, and (2) earnings invested in certain U.S. property. *See* I.R.C. § 951(a)(1)(A) & (B).[2]

The Tax Cuts and Jobs Act of 2017 (TCJA) added Section 245A to the Code to change the tax-law incentives that had led to a large amount of corporate earnings being kept offshore. The TCJA did this by taking a step "toward a territorial tax system." Tax Management Portfolio 926-3rd, *CFCs II.C. Significant Subsequent Legislative Changes* (2018). It set up a "participation exemption system" that "has two principal prongs." *Id.* The first prong "provides a 100% dividend received deduction for the foreign-source portion of any dividend received by a domestic corporation that is a 10% U.S. shareholder in a 'specified 10-percent owned foreign corporation.'" *Id.* (*quoting* I.R.C.

---

[2] Congress sought to further restrict deferral by adding Section 951A to subpart F. That provision generally taxes most earnings of a CFC (other than a deemed return on tangible assets) that were not already taxable to the shareholder under other subpart F provisions. *See* I.R.C. § 951A(c) (identifying the income taxed under the provision).

§ 245A).  In other words, under the new law, when CFCs repatriate

untaxed earnings to a U.S. shareholder eligible for the Section 245A

deduction, those earnings (generally speaking) are not taxed.[3]

By itself, Section 245A would have allowed CFCs to distribute tax-

free dividends of their accumulated earnings to their corporate U.S.

shareholders.  *See* 10 Mertens Law of Fed. Income Tax'n § 38B:107 n.3

(June 2021).  So, the U.S. income tax on much of the $2.6 trillion of

CFCs' accumulated earnings would have been effectively forgiven.  To

prevent that result, Congress amended I.R.C. § 965.[4]  This second prong

of the participation exemption system was meant to "'clear the decks'

for §245A."  Tax Management Portfolio 926-3rd, *CFCs II.C.17*.  As

relevant here, the amended Section 965 includes in subpart F income

the greater of a CFC's "accumulated post-1986 deferred foreign income"

determined as of November 2, 2017, or December 31, 2017.  *See* I.R.C.

---

[3] Section 245A does not extend this deduction to earnings taxed under subpart F (§§ 951-965) (or post-2017 under section 951A described in note 4 above).  *See* 10 Mertens Law of Fed. Income Tax'n § 38B:107.  However, Section 959(a) excludes distributions of earnings previously taxed under subpart F or section 951A from gross income when those earnings are repatriated.

[4] The prior version of Section 965 was enacted in 2005 and provided for an elective, temporary, deemed repatriation.

§ 965(a), (d) & (e).[5]  Recall that subpart F works by essentially deeming certain undistributed CFC earnings to be distributed to their U.S. shareholders and taxing them currently.  *See* I.R.C. § 951(a)(1).  So, Section 965 essentially deems a pro-rata share of a CFC's accumulated post-1986 earnings and profits (earnings) to have been distributed to its U.S. shareholders.  *See* I.R.C. § 965(a) & (d).  Congress recognized that "companies have accumulated significant untaxed and undistributed foreign earnings" and, in enacting Section 965, it treated such foreign earnings "as if they had been repatriated" to "avoid a potential windfall for corporations that deferred income."  H.R. Rep. No. 115-409 at 375.[6]  The Section 965 one-time addition to subpart F income typically occurs

---

[5]  Section 965 applies to CFCs and other "specified foreign corporations."  Because KisanKraft is a CFC, we focus here on the law's application to CFCs and their U.S. shareholders.

[6]  Section 245A provides deductions only for corporate U.S. shareholders of foreign corporations.  But seeking to limit Section 965's application only to corporate U.S. shareholders of CFCs would have created significant administrative difficulties such as the need to track which CFC earnings were taxed and which were not.

(and so the tax on it typically is owed) in 2017, though taxpayers can elect to pay it over an 8-year period. I.R.C. § 965(a) & (h).[7]

Congress expected that Section 245A and the Section 965 transition tax would lead to the actual repatriation of a significant portion of the funds CFCs were holding offshore. H.R. Rep. No. 115-409 at 370-75. That expectation was a reasonable one. As with other subpart F income, amounts included in a U.S. shareholders' gross income under Section 965 can be repatriated without further U.S. taxation. I.R.C. §§ 959 & 965(d). So, it is not surprising that U.S. multinational enterprises "repatriated $777 billion in 2018" out of an estimated $1 trillion in cash holdings abroad.[8]

---

[7] The tax rate for the transition tax, achieved through a deduction, is about 15.5% on the CFCs' earnings attributable to cash and cash equivalents, and about 8% on the remaining accumulated earnings. *See* I.R.C. § 965(c); H.R. Rep. No. 115-466, at 620. The Moores contend (Br. 8) that the effective tax rates for individuals are 17.54 and 9.05 percent. Although we have not checked those figures, it is true that there is some variance in the Section 965(c) deduction formula's application and that rates can be a bit higher for individual (as opposed to corporate) U.S. shareholders of CFCs.

[8] https://www.federalreserve.gov/econres/notes/feds-notes/us-corporations-repatriation-of-offshore-profits-20190806.htm [https://perma.cc/XYP3-E3LK]. The $2.6 trillion noted earlier is the total amount of deferred foreign earnings, whereas the $1 trillion is the amount held in cash or other similarly liquid assets.

### C.    Facts of the case and the district court's decision

In 2006, the Moores became 11% owners of a majority-U.S.-owned

Indian company called KisanKraft, Ltd.  (ER5.)  From 2006 through

2017, KisanKraft did not make any distributions of its earnings to its

owners.  (*Id.*)  Thus, under the then-applicable rules, the Moores did not

pay any U.S. tax on KisanKraft's earnings.  (*Id.*)

As explained above, the law changed in 2017.  Under I.R.C. § 965,

the Moores owed a tax on their pro rata share of KisanKraft's post-1986

earnings.  The Moores calculated the tax to be $15,130, which they paid.

(ER5-6.)  Then, after filing an administrative refund claim and

satisfying the jurisdictional requirements, they sued for a refund in

district court.  They argued that the tax is unconstitutional under the

Apportionment Clause of Article I, Section 9, and the Fifth

Amendment's Due Process Clause.  (ER6.)  The government moved to

dismiss, arguing that Section 965 is constitutional.

The district court granted the government's motion to dismiss.

The court first rejected the Moores' argument that the transition tax is

a direct tax on property that violates the Apportionment Clause.  It

explained that the Moores relied on the Supreme Court's determination

-12-

in *Eisner v. Macomber*, 252 U.S. 189 (1920), that a stock dividend did
not result in any realization of profits of the stockholder and thus did
not supply a basis for income taxation. (ER7.) The district court
determined, however, that "decisions dealing with foreign income have
routinely departed from *Macomber*'s realization standard." (ER8.) The
court discussed Second Circuit and Tenth Circuit cases that rejected
challenges to similar Tax Code provisions that have long required
current inclusion in shareholder income of undistributed income of
foreign companies. (*Id.*) The court also found compelling the Tax
Court's ruling in *Dougherty v. Commissioner*, 60 T.C. 917 (1973), that
inclusion in shareholder income of accumulated earnings of a CFC was
constitutional despite *Macomber*. (*Id.*)

The district court noted that there are "numerous contemporary
statutory regimes, outside of subpart F, that require the current
taxation of unrealized income—none of which have been successfully
challenged on *Macomber* grounds." (ER9 (citing I.R.C. §§ 1256, 475,
and 877A).) The court explained that this Court, in *United States v.
James*, 333 F.2d 748 (9th Cir. 1964), determined that *Macomber*'s
precedential value was limited to whether a stock dividend is income to

the shareholder and that "insofar as it purported to offer a comprehensive definition of the term income as used in the Sixteenth Amendment, [*Macomber*] has been discarded." (ER8 n.1 (quoting *James*).) The district court thus concluded that "[g]iven the cabining of *Macomber* by the Supreme Court and the clear departure from it by other courts, there is no reason for this Court to conclude that *Macomber* currently controls whether the [transition tax] is an income tax." (ER9.) The court held that the tax is an income tax and that it therefore "does not violate the Apportionment Clause." (*Id.*)

The district court then turned to the Moores' Due Process Clause challenge. It first concluded, contrary to the government's contentions, that the transition tax is retroactive. (ER10 (quoting I.R.C. § 965(d)).) The court determined, however, that the transition tax does not violate the Due Process Clause because it "(1) is supported by a legitimate legislative purpose and (2) is furthered by rational means." (ER11 (citing *United States v. Carlton*, 512 U.S. 26, 30-31 (1994).) The court determined that the tax served the legitimate legislative purpose of ensuring that the TCJA's other changes to international taxation would not "eliminate U.S. tax on a CFC's undistributed earnings and profits

originating before 2018." (ER11.) The court held that the length of the retroactive period was reasonable in view of significance of the shift in international tax law and of the result, which would occur without a transition tax, of allowing previously undistributed CFC earnings to "escape the imposition of U.S. taxation." (ER12.) The court also concluded that the transition tax was not a "wholly new tax" but "a change in subpart F." (*Id.*)

## SUMMARY OF ARGUMENT

1. The Section 965 transition tax is constitutional. The Moores' argument that it is unconstitutional because it is not apportioned requires this Court to accept the notion that the Constitution requires income to be "clearly realized" before it can be taxed. That notion conflicts with Supreme Court precedent; it conflicts with this Court's precedent; and it conflicts with decisions upholding related Tax Code provisions against similar constitutional attack. The Constitution does not bar Congress from attributing U.S. taxpayers' foreign corporate earnings to them and taxing them on those earnings.

2. Section 965 does not attach new legal consequences to completed conduct and thus is not retroactive. Correctly understood,

the tax is imposed on a deemed repatriation of income to U.S. shareholders that happened *after* the TCJA was enacted. But even if the tax were understood as a tax on the earnings of the CFC, it would not be retroactive. The subpart F regime has always exercised a right of taxation over all the earnings of CFCs as earned, providing for current imposition of tax on certain earnings and deferred imposition of tax on other earnings. Thus, the legal consequence of a CFC's relevant earnings remained deferred taxability both before and after the TCJA. Section 965 merely altered prospectively the deferral period by changing it from an indefinite period to one that ends on a fixed future date.

Even if the Section 965 transition tax were retroactive, it would not violate due process because it serves a legitimate purpose by a rational means. When Congress decided to move to a more territorial system for taxing corporations on foreign earnings, it was legitimate for Congress to collect the taxes on trillions of dollars in prior accumulated foreign earnings rather than forgiving most of those taxes. Section 965 was a rational means of doing that.

## STANDARD OF REVIEW

The constitutionality of Section 965's transition tax is a legal issue that this Court reviews de novo.

## ARGUMENT

### I. The transition tax is not a direct tax subject to the apportionment requirement

### A. Constitutional framework

First, some background on direct taxes, apportionment, and the Sixteenth Amendment: The Constitution grants Congress the power "To lay and collect Taxes, Duties, Imposts, and Excises." U.S. Const. Art. I, sec. 8, cl. 1. It also provides – in the Direct Tax Clause – that "No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken." U.S. Const. Art. I, sec. 9, cl. 4; *see* Art. I, sec. 2, cl. 3 ("Representatives and direct taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers ...."). The Sixteenth Amendment modifies the Direct Tax Clause by stating that "Congress shall have power to lay and collect taxes on incomes, *from whatever source derived*, without apportionment among

the several States, and without regard to any census or enumeration."

U.S. Const., amend. XVI (emphasis added).  Thus, after the Sixteenth

Amendment, capitations and other direct taxes remain subject to the

apportionment requirement unless they are "taxes on incomes."

"[T]axes on incomes" that are not capitations or other direct taxes never

were subject to any apportionment requirement, and the Sixteenth

Amendment did not change that.

History reveals that the meaning of "other direct tax" is both

obscure and very narrow.  During the Constitutional Convention,

delegates discussed linking taxation to representation by requiring both

to be apportioned[9] in the same way.  Edwin R. A. Seligman, *The Income

Tax* 550-51 (1911).  The purpose of this would have been to make

southern states pay for the additional representation they were getting

---

[9]  Apportionment in the tax context means that "each State pays
in proportion to its population."  *NFIB*, 567 U.S. at 570.  To illustrate, if
Congress enacted an apportioned national yacht tax, taxpayers from
Ohio would have to pay 3.52% of the total tax (its percentage of the U.S.
population) even if it turned out that total yacht values in Ohio make
up far less than 3.52% of the total value of yachts in the United States.
*See* Dawn Johnsen, Walter Dellinger ("Johnsen & Dellinger"), *The
Constitutionality of A National Wealth Tax*, 93 Ind. L. J. 111, 117
(2018).

-18-

via the three-fifths compromise (under which three fifths of the number of enslaved persons were counted for representation purposes). *Id.* Ultimately, it was decided that only "direct taxes" would have to be apportioned. *Id.* at 551. The delegates avoided defining that term even to the point of ignoring one delegate's request for an explanation of its "precise meaning." *See Veazie Bank v. Fenno*, 75 U.S. 533, 544 (1869); *see also* Ackerman at 11 (explaining that precisely defining direct tax would have threatened "to undo the desperate expedient on representation and taxation [the founders had] patched together."). Thus, "[e]ven when the Direct Tax Clause was written it was unclear what else, other than a capitation (also known as a 'head tax' or a 'poll tax'), might be a direct tax." *Nat'l Fed'n of Indep. Bus. (NFIB) v. Sebelius*, 567 U.S. 519, 570 (2012) (citation omitted).

In *Hylton v. United States,* 3 U.S. (Dall) 171 (1796), the Supreme Court unanimously ruled that a tax on the ownership of carriages was not a direct tax. Justice Paterson recalled that the requirement of apportionment for direct taxes was intended as a resolution on the treatment of slaves, not as a restriction on Congress's taxing authority, and concluded that "[t]he rule, therefore, ought not to be extended by

-19-

construction." *Id.* at 178. As the Court explained in *NFIB*, "those Justices who wrote opinions [in *Hylton*] either directly asserted or strongly suggested that only two forms of taxation were direct: capitations and land taxes." *Id.* at 571.

"That narrow view of what a direct tax might be persisted for a century." *NFIB*, 567 U.S. at 571; *see also Springer v. United States*, 102 U.S. 586, 602 (1880) ("*[D]irect taxes*, within the meaning of the Constitution, are only capitation taxes, as expressed in that instrument, and taxes on real estate."). Then, in *Pollock v. Farmers' Loan & Trust Co.,* 158 U.S. 601, 637 (1895), the Supreme Court held that a tax on *income from* real and personal property was a direct tax requiring apportionment, concluding that such a tax was, in substance, a tax on the property itself. The Sixteenth Amendment overturned that result (more on that below).

The Sixteenth Amendment did not address *Pollock*'s apparent conclusion that taxes on personal property are direct taxes. And *Eisner v. Macomber*, 252 U.S. 189 (1920), also reflects the view that a tax on personal property is a direct tax. But rather than endorsing that view as the Moores suggest (Br. 21), *NFIB* casts it further into doubt.

19483037.1

*NFIB*'s recounting of the history of the Direct Tax Clause shows that the *Pollock*/*Macomber* conception of direct tax strays from the "narrow view of what a direct tax might be" that had held sway for the first century of the republic. 567 U.S. at 571. The Court avoided directly addressing whether a tax on personal property is a direct tax, but its observation that *Macomber* had "continued to consider taxes on personal property to be direct taxes" *id.*, was *not* an endorsement of that view. Rather, *NFIB* seems to indicate misgivings about the *Pollock*/*Macomber* interpretation.

In any event, because neither *Pollock* nor *Macomber* actually ruled that taxes on personal property were direct taxes, it is far from clear that the notion that a tax on personal property is a direct tax is binding on this Court.[10] Thus, even if Section 965's transition tax was a tax on property (rather than on income), issuing the first decision ever to *hold* that a tax on personal property is constitutional only if

---

[10] *See, e.g.*, Johnsen & Dellinger, 93 Ind. L.J. at 135 (arguing that taxes on personal property are not direct taxes and contending that "*Pollock* (and its partial revival in *Macomber*) is [best] viewed as an anomaly, fundamentally at odds with core constitutional principles and over a century of precedent and practice both before and after the decision").

-21-

apportioned by population (an impossibility in practice) should give this Court pause.

Fortunately, this Court need not consider that weighty issue because the Section 965 transition tax is *not* a tax on property. It is a tax on a deemed repatriation of CFC income to certain U.S. shareholders. According to *Pollock*, a tax on income from personal property (like a stock dividend) is a direct tax. But the Sixteenth Amendment overturned that result by stating that Congress may tax incomes "from whatever source derived" without triggering the apportionment requirement. So a tax on a deemed repatriation of CFC income to U.S. shareholders is a tax on income from property that is, because of the Sixteenth Amendment, not subject to the apportionment requirement.

## B. The Constitution does *not* require income to be realized in order to be taxed

Section 965's transition tax is an income tax and thus is not subject to the apportionment requirement. The Moores principally argue that, to be income for Sixteenth Amendment purposes, a gain

-22-

must be "clearly realized" by the taxpayer.  (Br. 15.)[11]  They are wrong.

It is true that "the revenue laws have been interpreted as defining

'realization' [*i.e.*, full receipt] of income as the taxable event rather than

the acquisition of the right to receive it."  *Helvering v. Horst*, 311 U.S.

112, 115 (1940).  And the Tax Code still normally taxes income when it

is realized.  But the Moores mistake this general statutory rule, borne

of administrative convenience, for a constitutional command.

> ### 1. There is no support for a realization requirement in the Sixteenth Amendment's text

The Moores briefly argue (Br. 15) that the Sixteenth Amendment's

text contains a realization requirement because it exempts from the

apportionment requirement "incomes, from whatever source derived."

That language does not suggest that a taxpayer must realize a gain for

it to be income.  This Court has directly stated that "[t]he Sixteenth

Amendment uses, but does not purport to define, the term 'income.'"

---

[11]  The Moores also repeatedly stress their minority-shareholder status and alleged inability to induce KisanKraft to distribute its income.  That should not affect the outcome of this appeal.  On the apportionment issue, either the tax itself must be apportioned, or not; the notion that a tax is a direct tax that must be apportioned as to certain taxpayers is nonsensical.  Nor does the Moores' minority-shareholder status impact whether the Section 965 transition tax is retroactive.

*United States v. James*, 333 F.2d 748, 751 (9th Cir. 1964) (en banc).

Additionally, the phrase "from whatever source derived" has a definite

historical meaning that has nothing to do with whether a gain must be

realized to be income. In *Pollock*, the Supreme Court determined that a

tax on income from real and personal property was a direct tax, but also

explained that a tax on income from other sources – like wages and

"gains or profits from business" – is not a direct tax. 158 U.S. at 635-37.

The Sixteenth Amendment superseded the determination that a tax on

income from certain sources (*i.e.*, property) is a direct tax by stating

that incomes "from whatever source derived" could be taxed without

apportionment. In short, there is no basis for the notion that the

Sixteenth Amendment's text contains a realization requirement.

### 2. Precedent forecloses the Moores' realization-requirement argument

The Moores' main argument in favor of a constitutional realization

requirement is their contention (Br. 15-18) that the Supreme Court

recognized such a requirement in *Macomber* and carried it forward in

*Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955). That

contention conflicts with Supreme Court precedent, and that of this

Court.

-24-

As the Supreme Court "recognized" in 1940 and reaffirmed in 1991, "the concept of realization is 'founded on administrative convenience.'" *Cottage Savings Ass'n v. Commissioner*, 499 U.S. 554, 559 (1991) (quoting *Horst*, 311 U.S. at 116). The Court explained in *Cottage Savings* that the general rule that gains are taxed when they are realized allows the IRS to avoid "the cumbersome, abrasive, and unpredictable administrative task of valuing assets on an annual basis to determine whether the assets had appreciated or depreciated in value." *Id.* (citation and internal quotation marks omitted).

The Court's determination in *Cottage Savings* that the realization requirement was borne of administrative convenience – and thus not of constitutional necessity – was not some ill-considered *dictum*. It was material to the Court's ruling. The Court rejected the Commissioner's determination that a financial institution's exchange of one group of residential mortgages for another did not amount to a realization of income in part because it concluded that "the complexity of the Commissioner's approach ill serves the goal of administrative convenience that underlies the realization requirement." *Cottage Savings*, 499 U.S. at 565. And while the Court rejected the

government's bottom-line position, it *deferred* to the Commissioner's regulatory determination that an exchange of one property for another property meets the realization requirement when the exchanged properties are materially different from one another. *Id.* at 560-61. The Supreme Court *does* defer to Treasury Regulations when they reasonably interpret Tax Code provisions, but it *does not* defer to the Commissioner's interpretation of the Constitution. If the realization rule were a constitutional requirement, the Court would not have deferred to an administrative determination of what counts as realization; nor would the Court have based its rejection of the Commissioner's specific determination of whether a property exchange satisfied the realization requirement on a conclusion that that determination "ill serves the goal of administrative convenience."

In *Helvering v. Griffiths*, 318 U.S. 371, 393 (1943), the Court directly recognized that its post-*Macomber* decisions reject the notion of a strict constitutional realization requirement for income taxation. The Court explained that *Helvering v. Bruun*, 309 U.S. 461 (1940), "rejected the concept that taxable gain could arise only when the taxpayer was able to sever increment from his original capital," and the Court then

concluded that *Bruun* and other later decisions undermine the

"theoretical bases of the decision in *Eisner v. Macomber*." *Id.* (also

quoting *Helvering v. Horst*). The Court, in *Griffiths*, did not overrule

*Macomber*'s specific holding concerning the taxation of stock dividends

because it concluded that Congress did not intend to tax the dividends

in question. *Id.* at 404. But notably, Justice Douglas, joined by Justices

Black and Murphy, stated, in analysis that was not inconsistent with

the majority's, that he saw "no reason" that the Constitution should be

interpreted to prevent Congress from treating stockholders' increased

wealth from "earnings of the corporation in which they hold shares" as

income to the shareholders. *Id.* at 409 (Douglas, J. dissenting).

Like the Supreme Court, this Court does not interpret *Macomber*

to constitutionalize a realization requirement for income tax. In *United

States v. James*, this Court explained that *Macomber* is authority for

the proposition "that a stock dividend is not income to the shareholder,

at least if the stock is of the same class and in the same corporation as

that previously held by the taxpayer." 333 F.2d at 752 (en banc). But

*Macomber* is *not* good authority on the issue of what counts as income

under the Sixteenth Amendment: "insofar as [*Macomber*] purported to

offer a comprehensive definition of the term income as used in the Sixteenth Amendment, it has been discarded." *Id.* This Court traced the demise of *Macomber* beginning in *United States v. Kirby Lumber Co.*, 284 U.S. 1 (1931), through *United States v. Safety Car Heating & Lighting Co.*, 297 U.S. 88, 99 (1936), and *Helvering v. Bruun*, culminating in *Glenshaw Glass*. *James*, 333 F.2d at 751-52. This Court's discussion of *Bruun* is particularly relevant: The Supreme Court there rejected the notion that *Macomber* precluded the government from taxing an unrealized increase in value of a taxpayer's real property. *James*, 333 F.2d at 752 (discussing *Bruun*).

This Court also rejected the notion that *Macomber* imposes a constitutional realization requirement for income tax in *Commissioner v. Fender Sales, Inc.*, 338 F.2d 924 (9th Cir. 1964). There, stockholder-employees of a company received additional stock in exchange for discharging indebtedness for unpaid salaries, with the value of the newly received stock and discharged debt being identical. *Id.* at 925-26. The Tax Court had relied on *Macomber* to hold that the issuance of the new shares "did not constitute income to [the shareholder-employees] within the meaning of the 16th Amendment." *Id.* at 926 (quoting the

Tax Court opinion). This Court reversed. It interpreted *Macomber* as

having held that the issuance of a stock dividend does not result in

taxable income because it "represents nothing of value." *Id.* at 927.

This Court viewed *Macomber*'s ruling as based on recognizing that a

stock dividend "is just a piece of paper" that does not change "the basic

net worth of the corporation." *Id*; *see also Macomber*, 252 U.S. at 202-05

(explaining that by itself a stock dividend leaves the corporation "no

poorer" and the stockholder "no richer than they were before" and that

its decision in the case could rest on its prior recognition that "the

essential nature of a stock dividend necessarily prevents its being

regarded as income in any true sense"). And because it determined that

the transaction at issue in *Fender Sales* did increase the value of the

taxpayers' capital interest in the company, this Court held that

*Macomber* was "not even apposite, let alone controlling." *Id.* In other

words, this Court held that the increase in value of the taxpayers'

capital interests in a corporation was taxable and that *Macomber* is no

impediment to that conclusion. *See also id.* at 930 (Barnes, J.,

dissenting in part) (disagreeing with the majority's recognition of "a

realization of income by shareholders upon an increase in corporate net

worth, where no dividend has been declared or capital gain yet realized by the shareholders").

In sum, the Supreme Court in *Cottage Savings*, long after *Macomber*, has understood the realization requirement to be a rule of administrative convenience and – by direct implication – rejected the notion that realization is required under the Sixteenth Amendment. And this Court has (twice) directly rejected the notion that, under *Macomber*, realization is a constitutional prerequisite to income taxation.[12]

---

[12] Legal scholars have also recognized that the general realization rule for income tax is an administrative convenience, not a constitutional requirement. *See, e.g.*, Johnsen & Dellinger, 93 Ind. L.J. at 134 ("*Macomber*'s realization principle remains influential as a matter of tax policy, in that unrealized gains (such as appreciation on property) generally are not taxed, but it has become a rule of administrative convenience rather than a constitutional requirement."); Marvin A. Chirelstein & Lawrence Zelenak, *Federal Income Taxation* 73 (14th ed. 2018) ("[R]ealization is strictly an administrative rule and not a constitutional, much less an economic requirement, of 'income.'"); Noel B. Cunningham & Deborah H. Schenk, *Taxation Without Realization: A "Revolutionary" Approach to Ownership*, 47 Tax L. Rev. 725, 741 & n.69 (1992) (citing "[t]he scholarly consensus" despite *Eisner v. Macomber* that the "[t]he realization requirement is not constitutionally mandated" and that "Congress may treat gains as realized at any point"); Charles L.B. Lowndes, *Current Conceptions of Taxable Income*, 25 Ohio St. L.J. 151, 176 (1964) ("[I]t appears that as a constitutional prerequisite realization is no longer required.").

### 3. *Glenshaw Glass* does not support the Moores' realization-requirement argument

Perhaps aware that the much-maligned *Macomber* is a slender reed to support their argument, the Moores focus on *Glenshaw Glass*. They assert (Br. 21) that "[e]ven putting *Macomber* aside," the transition tax is unconstitutional under *Glenshaw Glass*, which undisputedly "remains good law." And they contend (Br. 22) that *Glenshaw Glass* "maintained *Macomber*'s realization requirement." Given the clear state of present law (*see* above), whether *Glenshaw Glass* "carried forward" (Br. 17) from *Macomber* a constitutional realization requirement is largely academic. But, it did not.

*Glenshaw Glass* did not address the question of realization at all. The issue in *Glenshaw Glass* was whether punitive (or exemplary) damages are gross income under the Tax Code. There was no dispute about whether the taxpayers had realized the damages awards. The issue was whether the source of these awards – *i.e.*, the fact that they were "windfalls flowing from the culpable conduct of third parties" rather than gains from capital or labor – should prevent them from being included in gross income. *Glenshaw Glass*, 348 U.S. at 429. The Court determined that *Macomber*'s definition of income, as gain from

capital or labor, did not prevent this other kind of gain from being
recognized as income.  *Id.* at 431.

The Court in *Glenshaw Glass* explained that the issue in
*Macomber* was "whether the distribution of a corporate stock dividend
constituted a realized gain to the shareholder, or changed 'only the
form, not the essence,' of his capital investment."  *Glenshaw Glass Co.*,
348 U.S. at 430-31.  The Court then distinguished the situation in
*Macomber* from that at hand:  "*Here we have* instances of undeniable
accessions to wealth, clearly realized, and over which the taxpayers
have complete dominion."  *Id.* at 431 (emphasis added).  The court was
simply saying that, unlike in *Macomber*, the gain at issue in *Glenshaw
Glass* was "clearly realized."  The Court did not say or suggest that, to
be gross income (or income for Sixteenth Amendment purposes) gains
always must be "clearly realized" by the taxpayer.  *Glenshaw Glass* also
does *not* suggest that a "taxable event" is a prerequisite to income
taxation, as the Moores appear to assert (Br. 15-16).  The Court merely
noted that, in *Macomber*, the distribution of a stock dividend "was held
not a taxable event."

That *Glenshaw Glass* did not address, and had no occasion to address, whether realization by the taxpayer is required (by either the Constitution or Tax Code) – or, if so, what satisfies the realization requirement – is sufficient to refute the notion that *Glenshaw Glass* carried this so-called requirement forward from *Macomber*. But there is more.

After explaining that *Macomber*'s definition of income "was not meant to provide a touchstone to all future gross income questions," *Glenshaw Glass* cites *Bruun*. In *Bruun*, the Court held that a lessor who, at the termination of the lease, "received back his land with a new building on it, which added an ascertainable amount to its value" received taxable income equal to the increased value of the property. 309 U.S. at 469. The Court explained that the *Macomber* language the taxpayer relied on sought to "clarify the distinction between an ordinary dividend and a stock dividend" and was "not controlling here." *Bruun*, 309 U.S. at 468-69.

In short, *Bruun* held that *Macomber*'s determination that a gain must be "severed from the capital" and received for the taxpayer's "separate use, benefit, and disposal" before it can be taxed – that is, the

-33-

so-called realization requirement – was not controlling.  And it determined that an increase in value of a capital investment could be taxed as income.  So the Supreme Court's citation of *Bruun* in *Glenshaw Glass* after it stated that the *Macomber* definition of income was not "a touchstone" suggests (to put it mildly) that *Glenshaw Glass* did not carry forward the *Macomber* realization requirement.

The Moores contend (Br. 21-22) that *Nathel v. Commissioner*, 615 F.3d 83 (2d Cir. 2010), shows that *Macomber* remains good law on the distinction between income and capital.  But *Nathel*'s discussion of *Macomber* and *Glenshaw Glass* was limited to its conclusion that the distinction between income and capital remains relevant to the determination of what the Tax Code considers as income.  *Id.* at 92. *Nathel* does not endorse *Macomber*'s suggestion that the Sixteenth Amendment bars taxation of shareholders on a corporation's accumulated profits.

Finally, the Moores wrongly contend (Br. 22) that *Macomber* binds this Court.  This Court is free to conclude that a precedent has eroded so much that it is precedential only in its narrow holding.  That is what this Court *has already concluded*, correctly, about *Macomber*.  *See*

-34-

*James*, 333 F.2d at 752 and pp.26-27, *supra*. This case is not about whether Congress can tax a shareholder on the issuance of a stock dividend in the same class of stock and thus *Macomber*'s narrow holding is not controlling.

### 4. Cases upholding the pre-TCJA subpart F against similar constitutional challenges refute the Moores' realization-requirement argument

The logic of the Moores' realization-requirement argument applies as much to other provisions of subpart F as to Section 965. So the reasoning of decisions rejecting direct-tax challenges to the pre-TCJA subpart F applies here.

**a.** Like Section 965, other subpart F provisions require U.S. shareholders of CFCs to include in their income a certain portion of the corporation's income "whether or not that income has been distributed to the shareholder." *Garlock Inc. v. Commissioner*, 489 F.2d 197, 198 (2d Cir. 1973). The Second Circuit rejected a constitutional challenge to subpart F based on *Macomber* as an argument that "borders on the frivolous." *Id.* at 202. The Court determined that the "doctrine of" *Macomber* lacked any continuing validity "as applied to the facts of this case." *Id.* at 203 n.5 (citing *Heiner v. Mellon*, 304 U.S. 271, 281 (1938)).

The Supreme Court in *Mellon* held that taxing a partner's "distributive share" of a partnership, even though that share could not be paid to the partner under state law, was permissible "and the fact that it may not be currently distributable, whether by agreement of the parties or by operation of law, is not material." *Mellon*, 304 U.S. at 281.

In rejecting the *Macomber*-based constitutional challenge to subpart F, *Garlock* relied on *Eder v. Commissioner*, 138 F.2d 27 (2d Cir. 1943). In *Eder*, the Second Circuit rejected a challenge to taxation of a U.S. shareholder's interest in a foreign corporation. The shareholder argued that taxing him on the corporation's income was unconstitutional because Colombian law prevented most of that income from being distributed to him. *Id.* at 28. The court, however, observed that "[i]n a variety of circumstances it has been held that the fact that the distribution of income is prevented by operation of law, or by agreement among private parties, is no bar to its taxability." *Id.* (citing *Mellon*, *Bruun*, and *Helvering v. Enright's Estate*, 312 U.S. 636, 641 (1941), another case upholding taxation of a partner on partnership income that the partner (or his estate) did not receive in the year at issue). *See also Whitlock's Estate v. Commissioner*, 494 F.2d 1297, 1301

(10th Cir. 1974) (concluding that Article I, the Sixteenth Amendment, *Glenshaw Glass*, *Macomber*, and *Pollock* "considered together" reveal that there is "no merit" in the direct tax challenge to subpart F).

The Moores fault (Br. 23) the Second Circuit's alleged "non-existent" reasoning in *Eder* and *Garlock* and contend that "there is no indication in *Garlock* that the Second Circuit regarded *Macomber's* realization-event holding as overruled." But there is such an indication, and quite a strong one. *Garlock* cited *Mellon*, which held that a partner can constitutionally be taxed on partnership income he has not received for his separate use and benefit – *i.e.*, has not realized. *Garlock* also cited *Eder*, which, in turn, even more directly stated that the fact that corporate income has not been distributed to a taxpayer "is no bar to its taxability." *Eder*, 138 F.2d at 28.

The Moores note that *Eder* and *Garlock* involved current rather than accumulated earnings. But the Moores argue that, under the Constitution, corporate income cannot be taxed to shareholders until it is distributed to them. Under that argument, whether the corporate earnings are from the current year or accumulated from prior years is irrelevant.

**b.** The Tax Court also rejected an argument that subpart F is an unconstitutional direct tax when it taxes prior accumulated earnings in *Dougherty v. Commissioner*, 60 T.C. 917 (1973). It observed that *Macomber* "does not prevent Congress from bypassing the corporate entity in determining the incidence of Federal income taxation." *Id.* at 928. The court explained that subpart F represents Congress's judgment that 10% U.S. shareholders of CFCs have a "degree of control over their foreign corporation" that "allows them to treat the corporation's undistributed earnings as they see fit." *Id.* at 928 & n.13. The court explained that, in exercising its legitimate discretion over whether to disregard the form of a CFC, Congress elected to tax U.S. shareholders directly on some types of CFC income (I.R.C. § 951(a)(1)(A)) but to tax other CFC income only when the CFC invests it in U.S. property (I.R.C. § 951(a)(1)(B)). *Id.* at 930. The court recognized that such investment in U.S. property did not separate the assets from the CFC or distribute assets to shareholders "for their separate use and benefit." *Id.* (citing *Macomber*). But the court determined that *Macomber* nonetheless did not "interpose a constitutional barrier" to such taxation. *Id.*

-38-

The Moores contend (Br. 24) that *Dougherty* (and *Whitlock's Estate*) do not support the district court's rejection of their direct tax argument because (they assert) those cases, unlike this one, involved a taxable event – the CFCs' investment in U.S. property. There are several problems with that.

One problem is that the Moores seek to create an equivalence between the notion (from *Macomber*) that the Sixteenth Amendment prohibits taxation of unrealized gains and the concept of a taxable event. These concepts are distinct. *Macomber* does not use the term "taxable event." *Glenshaw Glass* described *Macomber* as having determined that the stock dividend there at issue was "not a taxable event." *Glenshaw Glass*, 348 U.S. at 431. It does not follow from that description that the Constitution contains a "taxable event" requirement that is equivalent (or similar) to the so-called *Macomber* realization requirement. In reality, "taxable event" is merely a descriptive term used to identify the event that triggers taxation. *See United States v. Davis*, 370 U.S. 65, 69-71 (1962) (treating whether a stock transfer was a taxable event as a statutory issue resolved by

-39-

determining "whether the transfer in issue was an appropriate occasion for taxing the accretion to the stock").

A second problem with the Moores' effort to distinguish *Dougherty* is that the distinction undercuts their central argument that *Macomber* and *Glenshaw Glass* require a gain to be realized – *i.e.*, distributed for the taxpayer's separate use and benefit – to be income subject to taxation. As *Dougherty* specifically recognized, a foreign company's investment in U.S. property does not actually separate and distribute anything to that company's U.S. shareholders. 60 T.C. at 930. Thus, the subpart F provision at issue in *Whitlock's Estate* and *Dougherty* (§ 951(a)(1)(B)) violates the (supposed) *Macomber* realization rule just as much, and for the very same reason, as Section 965. Both statutes (as relevant here) tax U.S. shareholders of CFCs on amounts they have *not* received for their separate use and benefit. Thus, if *Whitlock's Estate* and *Dougherty* correctly determined that *Macomber* does not invalidate Section 951(a)(1)(B), it also does not invalidate Section 965(a).

The third problem with the Moores' attempt to distinguish *Dougherty* (and *Whitlock's Estate*) is their claim that the outcome in

those cases turned on the ability of the litigant-taxpayers to control the

foreign corporation. The notion that Section 951(a)(1)(B) or the

transition tax could be a direct tax as to some taxpayers (who lack

control over their CFC) but not others (who have sufficient control) is

nonsensical. Either a tax is a direct tax that must be apportioned, or

not. In any event, the control the Tax Court focused on was the level of

control sufficient for inclusion within the subpart F regime, not the

taxpayer's particular amount of influence over the CFC. *See*

*Doughterty*, 60 T.C. at 928, 930 & n.13.[13]

> **5. A closely analogous case in another context, as
> well as other Tax Code provisions, refute the
> notion of a constitutional realization
> requirement**

**a.** Perhaps the most closely analogous case to this one is *Prescott*

*v. Commissioner*, 561 F.2d 1287 (8th Cir. 1977). That case did not

involve subpart F, but rather a 1954 law that allowed unincorporated

sole proprietorships and partnerships to elect to be treated as

---

[13] Moreover, the Moores were aware (or should have been) in 2006 when they became 11% owners in KisanKraft that they were subjecting themselves to subpart F. They could have decided to become 9% owners instead and avoided inclusion in the subpart F framework. The subpart F framework has imputed certain types of CFC income to U.S. shareholders with a least 10% ownership for nearly 60 years.

corporations for tax purposes. *Id.* at 1289; *see also id.* at 1289 n.2

(quoting this law, which was then codified at I.R.C. § 1361). Congress

repealed the law in 1966, and the taxpayers who had made use of it,

unless they transferred the business assets to a real corporation, were

taxed as if the "section 1361 corporation" was liquidated on January 1,

1969. *Id.* at 1289-90. Two taxpayers who owned sole proprietorships

and had elected to treat them as corporations for tax purposes were

assessed significant tax deficiencies when they failed to pay tax on the

gains from the deemed liquidation of their § 1361 corporations. *Id.* at

1290. The court acknowledged that the taxpayers were not "in any

different situation on January 1, 1969" than on the day before but were

still "taxed as of that date on the appreciation in value of their

businesses." *Id.* at 1292. The court explained, however, that a

condition of the benefit of elective corporate tax treatment was separate

taxation of distributions to the (for tax purposes) shareholders of the

fictional corporation. *Id.* Thus, failing to tax the appreciation in the

value of the businesses would have been in essence a tax-free

distribution of corporate profits – a benefit the 1954 law had not

contemplated – causing "an unmerited windfall" to the taxpayers. *Id.*

The taxpayers contended that the deemed-liquidation treatment of their Section 1361 corporations "unconstitutionally impos[ed] an unapportioned direct tax on something other than income." *Prescott*, 561 F.2d at 1290. The court of appeals noted that *Macomber* could be understood to support the taxpayers' direct tax argument. *Id.* at 1293. But the court concluded that, in *Bruun*, the Supreme Court "abandoned the idea that gain must be severed from capital to be taxable." *Prescott*, 561 F.2d at 1293. The court also recognized that *Glenshaw Glass* "not[ed] this change" — a recognition presumably based on *Glenshaw Glass*'s citation of *Bruun* for the proposition that *Macomber* was not the "touchstone" for "gross income questions." *Prescott*, 561 F.2d at 1293 (citing *Glenshaw Glass*, 348 U.S. at 431). And the court saw *Glenshaw Glass* and *Davis* as replacing "the concept of severance" – *i.e.*, realization – with the inquiry, which *Davis* makes plain is not a constitutional requirement (370 U.S. at 69-71), that asks "whether some event has occurred which marks an appropriate time to tax the increase in value of assets." *Prescott*, 561 F.2d at 1293. The court determined that the change in the law on fictional corporate status for sole proprietorships and corresponding deemed liquidation of the fictional

corporations "created an event upon which it was appropriate to tax the increase in value [of taxpayers'] businesses." *Id.*

The parallels between *Prescott* and this case are striking. Both cases involve a change in tax law that, unaddressed, would allow certain taxpayers to receive tax-free corporate dividends. In fact, the situation here, without the transition tax, would be a far greater windfall to certain U.S. taxpayers than the situation in *Prescott*. This Court should reject the Moores' direct tax argument for the same reasons that the Eighth Circuit rejected the direct tax argument in *Prescott*. There is no constitutional realization requirement for income taxation. And a deemed repatriation of income, like a deemed liquidation of an entity recognized as a corporation for tax purposes, is an event that Congress is free to determine marks an appropriate time to impose an income tax. *See Prescott*, 561 F.2d at 1293.

**b.** Under the logic of the Moores' constitutional-realization-requirement argument, other Tax Code provisions would also fall. For instance, I.R.C. § 877A(a) taxes certain U.S. citizens who relinquish their citizenship after June 16, 2008, on the value of their property in excess of $600,000 by treating the property as "sold on the day before

-44-

the expatriation date for its fair market value." This deemed sale would no more satisfy the Moores' asserted constitutional realization requirement than does the deemed repatriation of CFC accumulated earnings here.

Similarly, partners and shareholders in S corporations must pay tax on a share of the partnership or S corporation income whether or not that share is distributed to them. *See* I.R.C. §§ 702(a) and 1366(a). These Tax Code provisions would also fall if realization were a constitutional prerequisite to taxation. Yet the Supreme Court has held that taxing a partner on income not distributed to him is permissible. *Mellon*, 304 U.S. at 281.

The Moores appear to contend (Br. 26) that this Court's decision in *Murphy v. United States*, 992 F.2d 929 (9th Cir. 1993), supports the notion that it is unconstitutional to impose a tax on an unrealized gain. That is incorrect. This Court declined to reach the constitutional issue in *Murphy* because it concluded that gains in commodities futures contracts are "little different from" interest credited to a bank account. *Id.* at 931. But although this Court did not resolve "whether Congress *could* tax the gains inherent in capital assets prior to

-45-

realization or constructive receipt," it included a "Cf." citation to its

decision in *James*, which it described as establishing that the "concept

of income is flexible."

> **6.  A tax on business earnings is an income tax and,
> in any event, not a direct tax and thus is not
> subject to the apportionment requirement**

If the Section 965 transition tax was considered as a tax on the

CFC's earnings themselves rather than on the deemed repatriation of

those earnings, Section 965 would still be constitutional.  Considered in

this way, Section 965 is a statute that looks through the corporate form

and taxes the CFC's shareholders directly on its earnings.  As the Tax

Court has recognized, *Macomber* does not prevent Congress from

disregarding the corporate form.  *Dougherty*, 60 T.C. at 928-30;

*Whitlock's Estate v. Commissioner*, 59 T.C. 490, 507-09 (1972).  Indeed,

until 1921, excess corporate gains and profits were taxed to the

shareholder even absent distribution and despite lack of control.

*Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 288–89 & n.4 (1938); *see

also id.* (noting the varied ways in which imposition of tax looks through

the corporate form to the taxpayer); *Whitlock's Estate*, 59 T.C. at 507

("[T]he history of U.S. income taxation shows that Congress has for

-46-

decades been drafting income tax statutes which have bypassed the corporate entity.").

The realization-requirement issue is irrelevant when the tax is considered from this perspective.  Recall that the Sixteenth Amendment was only necessary to relieve taxes on income *from certain property* from the apportionment requirement that would otherwise, under *Pollock*, have applied to such taxes.  *See* p. 23, *supra*.  Even under *Pollock*, other types of income taxes, including taxes "on profits and gains from business" are not direct taxes.  158 U.S. at 635.  Because the Sixteenth Amendment does not address or impact taxes on business income, any Sixteenth Amendment realization requirement (even if it existed) would not affect such taxes.

The Moores argue (Br. 18-19) that under the Sixteenth Amendment, the income of a corporation is no longer income at all (even to the corporation) once the corporation reinvests it in the business, but becomes capital that can no longer be taxed.  This argument is meritless.  For one thing, it misinterprets *Macomber*.  *Macomber* stated, in *dicta*, that a "stockholder's share in the accumulated profits of the company is capital" and cannot be taxed as the shareholder's income.

252 U.S. at 219.  This was incorrect, as we have explained, but even *Macomber* merely indicated that the company's accumulated profits were the shareholders' capital; it did not suggest that Congress is powerless to tax the corporation itself on accumulated profits.  If that were true, corporations (and perhaps any taxpayer) would have a constitutional right not to pay income tax on income that the taxpayer used to make a capital investment.  We are unaware of any authority (nor do the Moores cite any) supporting that notion.  In any event, even if the Sixteenth Amendment somehow excluded income used for capital investment from its definition of income, that would not impact Congress's authority under Article I of the Constitution to tax business gains.  Indeed, the Supreme Court has upheld Congress's determination to tax the gross receipts of certain businesses against constitutional challenge.  *See Spreckels Sugar Ref. Co. v. McClain*, 192 U.S. 397, 410-11 (1904) (upholding a tax on the gross receipts of certain businesses).

## II.  The Section 965 transition tax does not violate the Fifth Amendment's Due Process Clause

### A.  Section 965 is not retroactive

Contrary to the district court's conclusion (ER9-10), the Section 965 transition tax does not have a retroactive effect; it does not attach

new legal consequences to completed conduct. *See Landgraf v. USI Film Products*, 511 U.S. 244, 269-70 (1994).

The Moores' retroactivity argument relies on subtly shifting the description of the pre- and post-TCJA law. They describe the new law as a tax on prior CFC earnings and the old law as imposing a tax only on a repatriation of such earnings. (Br. 29-31.) In fact, the pre-TCJA law imposed a tax on repatriation and the post-TCJA law imposes a tax on a deemed repatriation. Because the taxable event is a deemed repatriation that occurred (as relevant here) after the TCJA was enacted, Section 965 is not retroactive.

But if the Moores' description of the new law (as a tax on the underlying CFC earnings) is adopted, the old law should be understood in the same terms. The subpart F regime has always exercised a right of taxation over all the earnings of CFCs as earned, providing for current imposition of tax on certain earnings and deferred imposition of tax on other earnings. Under pre-TCJA law, deferral of income other than subpart F income was allowed until the earnings were repatriated (or deemed repatriated via an investment in United States property) and under post-TCJA law deferral of such income was allowed until

-49-

December 31, 2017 (or, in some instances, a later date). The legal consequence of completed conduct (the relevant CFC earnings) remained deferred taxability before and after the TCJA; the TCJA merely altered the deferral period prospectively by changing it from an indefinite period to one that ends on a fixed future date.

### 1. Considered as a tax on a deemed repatriation, Section 965 is *not* retroactive

The taxable event for the transition tax – that is, the event that triggers the tax – is the deemed repatriation of KisanKraft's accumulated earnings. For many U.S. shareholders of CFCs, including the Moores, that deemed repatriation occurred on December 31, 2017, just over a week *after* Congress enacted Section 965.[14] Because Section 965 taxes a post-enactment deemed repatriation, it is not retroactive.

---

[14] The deemed repatriation can also occur later than December 31, 2017, if the CFC's last taxable year that began before January 1, 2018, ends after December 31, 2017. That would be true of CFCs that elect to use a taxable year that is different from the calendar year. *See* I.R.C. §§ 898(c)(2), 951(a), 965(a).

Also, in limited cases, a United States shareholder could have incurred a Section 965 tax liability prior to December 31. 2017, if the United States shareholder disposed of its interest in a CFC, and, as a result, the CFC was no longer a CFC. *See* I.R.C. § 951(a)(1). However, even in those cases, the tax liability would have arisen within the same

(continued…)

This situation is much like the situation in *Prescott*. As discussed above (pp. 40-43), *Prescott* considered a challenge to the deemed liquidation that accompanied the elimination of elective corporate tax treatment for partnerships and sole proprietorships. The Eighth Circuit concluded that the tax was not retroactive because the taxable event was the deemed liquidation of the fictional corporation that "occurred after the enactment of" the challenged statute and regulation. *Prescott*, 561 F.2d at 1294.

The Tax Court reached a very similar conclusion on retroactivity in *Dougherty*. As discussed above (pp. 37-40), the tax there at issue was the subpart F inclusion based on a CFC's investment in U.S. property (§ 951(a)(1)(B)). The taxpayer argued that the tax was unconstitutionally retroactive because it taxed "earnings and profits of a controlled foreign corporation accumulated before the effective date of subpart F." *Dougherty*, 60 T.C. at 929. The Tax Court rejected that argument. It explained that the event that triggered the tax (subpart F inclusion) was the CFC's investment in U.S. property and that that

---

calendar year and would be constitutional. And, in any event, this Court need not address that situation, which is not present here.

event happened "during a year subject to the operation of the statute." *Id.* It also determined that Congress has the power to tax income of a CFC "imputed to its shareholders" even when "the measure of the income is generated by income of a past year prior to the effective date of the statute." *Id.*

The foreseeable retort is that, in *Dougherty*, the taxable event was a real occurrence rather than (as here and *Prescott*) the deeming-to-have-occurred of an event that has not (or, at least, not yet) occurred. But the tax at issue in *Dougherty* is *not* truly a tax on the CFC's investment in U.S. property. Rather, that investment triggers a different taxable event – a mandatory inclusion in the U.S. shareholders' gross income that is, in effect, a deemed distribution to the CFC's U.S. shareholders equal to the amount of the investment. *See* I.R.C. §§ 951(a)(1)(B) & 956(a). The Tax Court recognized that the tax depended on a legal fiction because the U.S. shareholders did not receive assets from the CFC "for their separate use and benefit." *Dougherty*, 60 T.C. at 930. Indeed, the court noted that the mere act of investing in U.S. property "might well be insufficient to justify taxation under the judicially created doctrine of constructive dividends." *Id.* So

-52-

the salient retroactivity point in *Dougherty* is that the *deemed inclusion* of CFC income in a U.S. shareholder's income is the taxable event for retroactivity purposes – *not* the prior earning of that income. Likewise, here. The taxable event is the deemed inclusion of KisanKraft's accumulated earnings in the income of its U.S. shareholders (*i.e.*, deemed repatriation) that occurred after Section 965's enactment – *not* KisanKraft's prior earning of those amounts.

Moreover, the deemed repatriation here (and the deemed liquidation in *Prescott*) are just as closely tied to real world events as the deemed income inclusion in *Dougherty*. Here the deemed repatriation is tied to a major change in the law that will mean that many CFCs' future untaxed earnings are likely to be repatriated tax free. As explained above, the TCJA provides a deduction for dividends CFCs issue to their U.S. corporate shareholders. *See* pp. 7-8, *supra*. Thus, as the district court determined (ER12), enacting Section 245A without enacting Section 965 (or a similar provision) would have been a major change in the status quo for CFCs' accumulated untaxed earnings. Without Section 965, a CFC's pre-2017 earnings that would have been taxed when they were distributed to U.S. corporate

-53-

shareholders under the old law would now be able to be distributed to those shareholders tax free.

The Moores' argument relies on mixing two descriptions of the Section 965 transition tax. Their direct tax argument attacks the deemed distribution, but their retroactivity argument treats the tax as a tax on old earnings that they contend were not taxed under prior law. The taxpayer in *Dougherty* tried something similar. The Tax Court correctly declined to play along with the taxpayer's shifting characterization of the tax there at issue. After determining that Congress could impose a tax on what was, in effect, a deemed distribution to U.S. shareholders occasioned by the CFC's investment in U.S. property, the court rejected the notion that the CFC's original earning of the income was the relevant event for retroactivity purposes. *Dougherty*, 60 T.C. at 927-30. The relevant question was whether the *deemed income inclusion* (effectively a deemed distribution) was impermissibly retroactive, *not* whether a tax on earnings in years before the statute's effective date was. *Id.* at 929.

## 2. Considered as a tax on KisanKraft's prior earnings, Section 965 is not retroactive in a way that is adverse to the Moores

Even if Section 965 is viewed as imposing a tax on prior earnings of the CFC, it would still not be a retroactive tax, except perhaps in the sense that it retroactively lowers the tax rates previously applicable to those earnings – an aspect of Section 965 the Moores do not challenge.

The Section 965 transition tax is a continuation of the pre-TCJA law that exercised taxing jurisdiction over deferred earnings. If the transition tax is viewed as a tax on the original generating of business earnings, then the prior law should be viewed the same way. So viewed, pre-TCJA law made all earnings of CFCs subject to taxation under the subpart F regime as earned, with current imposition of tax on certain earnings (for example, subpart F income) and deferred imposition of tax on other earnings.

Thus, if the old and new laws are viewed as imposing taxes on CFC earnings, the new law does not have any adverse retroactive effect. The old law treated CFC earnings as taxable, and simply deferred the calculation and imposition of the tax until the earnings were distributed to the CFC's U.S. shareholders (taxing the earnings at a rate

-55-

corresponding to the tax rate of its U.S. shareholders, which would normally be higher than 15.5%). Section 965 taxes CFC earnings at about 8 or 15.5% (depending on asset makeup) and changed the period of deferral from an indefinite period that would end when a distribution is made to a definite period that ends on a fixed future date (frequently, as here, December 31, 2017).

The alteration of the tax deferral period is not retroactive. Both before and after Section 965's enactment the legal consequence of CFC earnings was deferral of U.S. taxation. Section 965 does not retroactively affect that tax deferral. It does not, for instance, treat the corporation's 2006 earnings as taxed in 2006 at the then-applicable rates and impose interest and penalties for the corporation's failure to pay that tax until 2017. Thus, Section 965 did not alter the legal consequence – tax deferral – of CFCs' prior earnings; it only *prospectively* altered the deferral period by (as relevant here) ending it on a fixed future date.

To be sure, Section 965 may well have upended CFCs' and CFC shareholders' expectations about how long the tax deferral would continue. That, however, does not make it retroactive. Of course,

people commonly arrange their affairs based on current tax law and would have arranged them differently had they known the law would change. But the fact that a law "upsets expectations based in prior law" does not make it retroactive. *Polone v. Commissioner*, 505 F.3d 966, 972 (9th Cir. 2007) (*quoting Landgraf*, 511 U.S. at 269-70); *see also Landgraf*, 511 U.S. at 269 n.24 (listing examples of "uncontroversially prospective statutes [that] may unsettle expectations"). So, "even though 'a new property tax or zoning regulation may upset the reasonable expectations that prompted those affected to acquire property,' a change in the property tax regime would not be considered retroactive with respect to all who had purchased property prior to the effective date of the amendment." *Polone*, 505 F.3d at 972 (*quoting Landgraf*, 511 U.S. at 269 n.24).

The tax deferral provided under I.R.C. § 401(k) may supply another useful example. Currently (subject to certain conditions), the tax owed on income contributed to a Section 401(k) plan can be deferred until the beneficiary is 72 years old. I.R.C. § 401(a)(9). Suppose John is 64 years old and plans to wait until he is 72 to take distributions from his Section 401(k) plan. Now suppose that Congress changes the law so

that Section 401(k) plan beneficiaries must begin taking minimum

distributions at age 65. Certainly, the change disrupts John's plans.

But no retroactive effect has occurred. The legal effect of John's past

conduct (instructing his employer to deposit part of his earnings into

the Section 401(k) account) remains tax deferral. The only change is a

prospective change that affects John's expectation about how long that

legal consequence will persist.

But the Moores argue (Br. 30) that, under the pre-2017 law, the

tax on a CFC's active earnings could be deferred forever and the district

court seems to have agreed (ER10). In reality, though, the indefinite

deferral period for the tax on CFC earnings under the old law does not

make Section 965 retroactive. Returning to our Section 401(k) example,

suppose (counterfactually) the law allowed potentially perpetual

deferral – *i.e.*, suppose that if John dies before taking distributions his

heir would get a fresh deferral period, and that his heir's heir could

likewise receive the Section 401(k) account with a fresh deferral period

so that a long chain of beneficiaries might die during the deferral period

before taking any distributions or paying any tax. Under this

hypothetical, the mere fact that perpetual tax deferral is possible would

not mean that the income in the Section 401(k) account is not subject to

tax. So a law that cut short such a theoretically perpetual deferral

period by lowering the mandatory distribution age *would* "simply

accelerate tax already owing." (ER10.)[15]

## B. Even if the Section 965 transition tax is retroactive, it does not violate the Due Process Clause

Even if the transition tax were retroactive, it would not violate the

Fifth Amendment's Due Process Clause. As this Court has noted, "[t]he

Supreme Court repeatedly has upheld retroactive tax legislation

against a due process challenge." *Quarty v. United States*, 170 F.3d

961, 965 (9th Cir. 1999) (citations and quotation marks omitted). The

test for determining whether a retroactive tax statute violates due

process is whether its "retroactive application itself serves a legitimate

---

[15] The district court stated that the indefinite tax deferral for CFC earnings before Section 965's enactment "often result in *de facto* permanent deferrals from U.S. tax." (ER10.) But "permanent deferrals" is a contradiction in terms. Every tax deferral necessarily must end someday in either payment or discharge of the deferred tax. When a CFC began accumulating tax-deferred earnings, its U.S. shareholders were going to have to pay the tax if the earnings were repatriated or if Congress decided to end the indefinite deferral period. The scenarios in which the tax would never be owed are: (1) Congress or the IRS forgives the tax; or (2) the company goes bankrupt and the tax is fully discharged.

-59-

purpose by rational means." *Id.* (*citing United States v. Carlton*, 512 U.S. 26, 30 (1994).

### 1. The transition tax is *not* a wholly new tax

Like the taxpayers in *Quarty*, the Moores argue mainly (Br. 32-36) that the *Carlton* test is inapplicable because the transition tax is a wholly new tax. In so doing, they "attempt to gain succor from whatever vitality remains in *Blodgett v. Holden,* 275 U.S. 142 (1927), and *Untermyer v. Anderson,* 276 U.S. 440 (1928)." *Quarty*, 170 F.3d at 966; *see also id.* at 966-67 (rejecting that attempt). Indeed, *Carlton*, suggests that *Blodgett* and *Untermyer* – as well as *Nichols v. Coolidge,* 274 U.S. 531 (1927), on which the Moores also rely (Br. 32) – are on life support. 512 U.S. at 34. It explained that "[t]hose cases were decided during an era characterized by exacting review of economic legislation under an approach that 'has long since been discarded.'" *Id.* (citation omitted). And it cautioned that *Blodgett* and *Untermyer* "essentially have been limited to situations involving 'the creation of a wholly new tax,'" but that their "authority is of limited value in assessing the constitutionality of subsequent amendments that bring about certain changes in operation of the tax laws." *Id.* (quoting

-60-

*United States v. Hemme*, 476 U.S. 558, 568 (1986)); *see also Angelotti*

*Chiropractic, Inc. v. Baker*, 791 F.3d 1075, 1084 (9th Cir. 2015)

(interpreting *Carlton* as expressing "skepticism as to the degree to

which *Nichols* and *Untermyer* still apply").

The Moores argue that Section 965 imposed a wholly new tax

because it taxed "transactions that were never subject to U.S. taxation"

and because they "had no reason to expect that the Government would

tax them on foreign-corporation income that is not their own." (Br. 34.)

This argument fails for two, alternative, reasons.

First, the Moores had every reason to expect that the Government

would tax them on their share of their CFC's earnings as soon as that

share was distributed to them. *See* I.R.C. § 301.[16] The Moores'

frustrated expectations over the tax on their share of KisanKraft's

accumulated earnings is about the timing of that tax, not its existence.

Second, the transition tax builds upon subpart F. Prior to 2017,

the Moores, as greater-than-10-percent U.S. shareholders of a CFC,

knew that certain categories of KisanKraft's earnings could be taxable

---

[16] The earnings also could be taxed on sale or exchange of the shares of the shares. *See* I.R.C. § 1248(a) (earnings and profits taxed as dividend income, but not in excess of gain on the sale or exchange).

to them in the current tax year even if those earnings were not distributed to them. *See* I.R.C. § 951(a)(1). They knew that if KisanKraft had earned passive income, or engaged in certain sales transactions, or invested earnings in U.S. property, they would be subject to present tax liability even though such activities would not provide them with any assets for their separate use and benefit. *See* I.R.C. §§ 951(a)(1), 952, 954, and 956. So Section 965 simply expands the categories of undistributed CFC earnings on which an existing tax is owed.[17] Section 965's enactment thus is not a "situation[] involving 'the creation of a wholly new tax,'" *Carlton*, 512 U.S. at 34 (1994) (quoting *Hemme*, 476 U.S. at 568).[18]

---

[17] *See* I.R.C. § 965(a) (providing that "the subpart F income of such foreign corporation shall be increased" by the amount subject to the transition tax).

[18] But notably, even the structure of subpart F confirms the correctness of the first theory – *i.e.*, that the tax is an acceleration of a tax that would otherwise be paid later. Any distribution to a U.S. shareholder of earnings on which the U.S. shareholder previously paid tax under subpart F is excluded from the U.S. shareholder's gross income. *See* I.R.C. § 959(a). Congress provided that exclusion to avoid taxing U.S. shareholders twice on the same CFC earnings. And that double-taxation-avoidance rationale makes sense only if taxes on subpart F inclusions are understood as advance payments of the tax owed when CFC earnings are distributed to U.S. shareholders.

-62-

In *Carlton* and *Hemme*, the Supreme Court explained that *Untermyer* and *Blodgett* involved the levy of "the first gift tax." *Carlton*, 512 U.S. at 34; *Hemme*, 476 U.S. at 568. *Hemme*'s discussion of *Untermyer*, which *Carlton* quotes, juxtaposes "wholly new tax" with "certain changes in operation of the tax laws." *Hemme*, 476 U.S. at 568. That shows that the Court used the term "wholly new tax" to mean a new *type* of tax – *i.e.*, a tax like the first gift tax. *See also Sidney v. Commissioner*, 273 F.2d 928, 932 (2d Cir. 1960) ("If *Untermyer* remains authority at all, it is so only for the particular situation of a wholly new *type* of tax there under consideration.") (emphasis added) (Friendly, J.). Section 965 is not a new type of tax. Rather, it is a change "in operation of the tax laws." *Hemme*, 476 U.S. at 568. Thus, even if Section 965 could be characterized as imposing income tax on previously untaxed transactions (and it really cannot), *Untermyer* and *Blodgett* would still be "of limited value." *Id.*

Other courts of appeals have rejected contentions that new laws that make some change to the income, gift, or estate taxes are "wholly new taxes" for due process purposes. *See, e.g.*, *Furlong v. Commissioner*, 36 F.3d 25, 27 (7th Cir. 1994) (rejecting the contention

that a Tax Code provision that subjected previously untaxed loan proceeds to income tax (I.R.C. § 72(p)(1)(A)) was a wholly new tax because that law "is part of the larger income tax code, which has existed since the beginning of this century"); *Ferman v. United States*, 993 F.2d 485, 490 (5th Cir. 1993) (determining that a law retroactively limiting an estate tax deduction was not a wholly new tax because, among other things, "[t]he estate tax was in place before [that law] was introduced"); *Fein v. United States*, 730 F.2d 1211, 1213 (8th Cir. 1984) (determining that a law that reduced the categories of property eligible for exclusion from the existing estate tax on gifts made within three years of the decedent's death was not a wholly new tax because "[t]here were estate and gift taxes long before 1977," when that law took effect).

The Moores contend that Section 965 imposes a wholly new tax because that is how "Congress" and "the White House" described it. (Br. 35 (citing a House Report and a White House press release).)  This argument is meritless.  The Moores' cite no authority (because none exists) for the notion that such descriptions bear on whether a law imposes a wholly new tax for due process purposes.

### 2. The transition tax meets the rational basis standard

Retroactive application of Section 965 (if it is retroactive) passes muster under the Due Process Clause because such application "serves a legitimate purpose by rational means." *Quarty*, 170 F.3d at 965 (citing *Carlton*, 512 U.S. at 30). The district court accepted the Moores' contention that the transition tax has a retroactivity period of 30 years, but it still determined that Section 965 serves a legitimate purpose by a rational means. Section 965 easily clears rational-basis scrutiny.

The district court's conclusion that Congress enacted Section 965 for a legitimate legislative purpose is unassailable. As the court explained, without Section 965, the TCJA's other changes to the Tax Code would often "effectively eliminate U.S. tax on a CFC's undistributed earnings originating before 2018." (ER11); *see also* pp. 7-10, *supra*. So the legitimate legislative purpose of Section 965 was preserving the status quo for past CFC earnings because Section 245A would otherwise have eliminated the repatriation tax on much of those past earnings going forward. Preserving the status quo and thereby preventing large windfalls for corporate U.S. shareholders of CFCs was

-65-

sound fiscal policy, not, as the Moores would have it (Br. 39), "a cash grab."

Because its legislative purpose is legitimate, the relevant question is whether Section 965 is a "rational means" of achieving *that* purpose. The Moores ignore that means-purpose link, instead discussing (Br. 40-42), without reference to Section 965's purpose, a nondispositive series of "considerations" enumerated in *GPX Int'l Tire Corp. v. United States*, 780 F.3d 1136, 1141-45 (Fed. Cir. 2015). Yet even that case makes clear that the various non-dispositive factors discussed are meant to be an aid to determining whether retroactive application of the law has "a rational basis" – that is, whether the law's retroactive application rationally achieves its legitimate purpose. *Id.* at 1141-45.

If looking back as far as 1987 to measure the accumulated CFC earnings deemed to be repatriated in 2017 makes Section 965 retroactive, it is retroactivity born of necessity. Having eliminated the repatriation tax on CFCs' distributions to corporate U.S. shareholders, Congress needed some way to avoid forgiving the repatriation tax on previously accumulated offshore earnings. Conceivably, Congress could have found a different way such as continuing to collect the repatriation

tax on dividends and portions of dividends paid out of a CFC's pre-2017 earnings, while eliminating that tax for dividends and portions of dividends paid out of post-2017 earnings. But such a two-tiered system would impose substantial administrative costs. Among other things, there would have to be some kind of reporting requirement for U.S. shareholders of CFCs to tell the IRS what portion of any dividends were paid out of pre- and post-2017 earnings, and the IRS would need to devote resources to checking the accuracy of such reporting.

It was at least rational for Congress to opt, instead, to tax all at once the accumulated pre-2017 CFC earnings that would have been taxed eventually under the old law. The Moores focus most of their criticism on the supposed 30-year retroactivity period. But, basing the calculation on post-1986 earnings was rational (and in fact a targeted exercise of a taxation right that extended to all pre-2017 earnings). Taxpayers were already required to track post-1986 earnings of their CFCs for purposes claiming foreign tax credits on actual dividends and inclusions under subpart F.[19] Thus, Congress made use of data that

---

[19] *See* I.R.C. §§ 902 (2016) and 960(a)(1) (2016) and Treas. Reg. § 1.964-1(a).

U.S. shareholders were already calculating rather than requiring a new calculation based on an arbitrary date.

Further, if the goal of maintaining the status quo of taxation of pre-2017 CFC earnings is legitimate, then shortening the 30-year period makes little sense. Presumably, including earnings accumulated beginning in 1987 covers almost all accumulated earnings. Thus, as a practical matter, shortening the period would simply make the law less effective in achieving the legitimate legislative purpose of preserving the status quo. If, for instance, Congress had used a 5-year period, the law would have forgiven the repatriation tax on accumulated earnings from 2012 and earlier – leading to windfalls to U.S. shareholders of CFCs with long-held accumulated earnings. It was rational for Congress to calculate the tax based on data taxpayers were already tracking and a 30-year period that would sweep in most of the pre-2018 accumulated earnings rather than a shorter period that would not.

Finally, it is far from clear that the Moores' invocation of their minority-shareholder status (Br. 39) constitutes a distinct alternative argument that, even if Section 965 is rational as to shareholders that could induce an income distribution by the CFC, it is irrational as to

shareholders who cannot. *See Avila v. Los Angeles Police Dep't*, 758 F.3d 1096, 1101 (9th Cir. 2014) ("Arguments 'not raised clearly and distinctly in the opening brief' are waived") (citation omitted). But making Section 965 applicable only to U.S. shareholders who own 50% or more of a CFC's stock would certainly have been a windfall for corporate shareholders under that threshold. It was rational for Congress to choose 10%. Section 965 is a part of subpart F, which has long taxed U.S. taxpayers that own 10% or more of a CFC on certain earnings of the CFC. *See* I.R.C.§ 951(b) and *Dougherty*, 60 T.C. at 928, 930 & n.13. In any case, such an as-applied argument would require fact finding about the Moores' ability to induce KisanKraft to issue a dividend.

# CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

DAVID A. HUBBERT
  *Acting Assistant Attorney General*

/s/ Nathaniel S. Pollock

| | |
|---|---|
| FRANCESCA UGOLINI | (202) 514-3361 |
| MICHAEL J. HAUNGS | (202) 514-4343 |
| NATHANIEL S. POLLOCK | (202) 514-8139 |

  *Attorneys*
  *Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel:*
TESSA GORMAN
  *Acting United States Attorney*

JULY 22, 2021

19483037.1

-70-

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, counsel for the United States respectfully inform the Court that they are unaware of any cases related to the instant appeal that are pending in this Court.

# ADDENDUM

U.S. Const. art. I, § 8, cl. 1 ................................................................72

U.S. Const. art. I, § 9, cl. 4 ................................................................72

U.S. Const. amend. XVI ......................................................................72

I.R.C. § 245A (excerpt) .......................................................................72

I.R.C. § 951 (excerpt) ..........................................................................73

I.R.C. § 959 (excerpt) ..........................................................................74

I.R.C. § 965 (excerpt) ..........................................................................75

19483037.1

**Constitution of the United States of America:**

**Article I, Section 8, Clause 1:**

The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States

**Article I, Section 9, Clause 4:**

No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken.

**Amendment XVI:**

The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration.

**Internal Revenue Code of 1986 (26 U.S.C.):**

**I.R.C. § 245A. Deduction for foreign source-portion of dividends received by domestic corporations from specified 10-percent owned foreign corporations (excerpt):**

(a) **In general.**-- In the case of any dividend received from a specified 10-percent owned foreign corporation by a domestic corporation which is a United States shareholder with respect to such foreign corporation, there shall be allowed as a deduction an amount equal to the foreign-source portion of such dividend.

\* \* \*.

**I.R.C. § 951. Amounts included in gross income of United States shareholders (excerpt):**

**(a) Amounts included.--**

> **(1) In general.--** If a foreign corporation is a controlled foreign corporation at any time during any taxable year, every person who is a United States shareholder (as defined in subsection (b)) of such corporation and who owns (within the meaning of section 958(a)) stock in such corporation on the last day, in such year, on which such corporation is a controlled foreign corporation shall include in his gross income, for his taxable year in which or with which such taxable year of the corporation ends—

>> **(A)** his pro rata share (determined under paragraph (2)) of the corporation's subpart F income for such year, and

>> **(B)** the amount determined under section 956 with respect to such shareholder for such year (but only to the extent not excluded from gross income under section 959(a)(2)).

> **(2) Pro rata share of subpart F income.**--The pro rata share referred to in paragraph (1)(A)(i) in the case of any United States shareholder is the amount—

>> **(A)** which would have been distributed with respect to the stock which such shareholder owns (within the meaning of section 958(a)) in such corporation if on the last day, in its taxable year, on which the corporation is a controlled foreign corporation it had distributed pro rata to its shareholders an amount (i) which bears the same ratio to its subpart F income for the taxable year, as (ii) the part of such year during which the corporation is a controlled foreign corporation bears to the entire year, reduced by

>> **(B)** the amount of distributions received by any other person during such year as a dividend with respect to such stock, but only to the extent of the dividend which would have been

-74-

received if the distribution by the corporation had been the amount (i) which bears the same ratio to the subpart F income of such corporation for the taxable year, as (ii) the part of such year during which such shareholder did not own (within the meaning of section 958(a)) such stock bears to the entire year.

For purposes of subparagraph (B), any gain included in the gross income of any person as a dividend under section 1248 shall be treated as a distribution received by such person with respect to the stock involved.

* * *

**(b) United States shareholder defined.**--For purposes of this title, the term "United States shareholder" means, with respect to any foreign corporation, a United States person (as defined in section 957(c)) who owns (within the meaning of section 958(a)), or is considered as owning by applying the rules of ownership of section 958(b), 10 percent or more of the total combined voting power of all classes of stock entitled to vote of such foreign corporation, or 10 percent or more of the total value of shares of all classes of stock of such foreign corporation.

## I.R.C. § 959. Exclusion from gross income of previously taxed earnings and profits (excerpt)

**(a) Exclusion from gross income of United States persons.**--For purposes of this chapter, the earnings and profits of a foreign corporation attributable to amounts which are, or have been, included in the gross income of a United States shareholder under section 951(a) shall not, when—

**(1)** such amounts are distributed to, or

**(2)** such amounts would, but for this subsection, be included under section 951(a)(1)(B) in the gross income of,

such shareholder * * * directly or indirectly through a chain of ownership described under section 958(a), be again included in the

gross income of such United States shareholder (or of such other United States person). * * *.

## I.R.C. § 965. Treatment of deferred foreign income upon transition to participation exemption system of taxation (excerpt)

**(a) Treatment of deferred foreign income as subpart F income.--**
In the case of the last taxable year of a deferred foreign income corporation which begins before January 1, 2018, the subpart F income of such foreign corporation (as otherwise determined for such taxable year under section 952) shall be increased by the greater of--

> **(1)** the accumulated post-1986 deferred foreign income of such corporation determined as of November 2, 2017, or

> **(2)** the accumulated post-1986 deferred foreign income of such corporation determined as of December 31, 2017.

* * *

**(c) Application of participation exemption to included income.--**

**(1) In general.**--In the case of a United States shareholder of a deferred foreign income corporation, there shall be allowed as a deduction for the taxable year in which an amount is included in the gross income of such United States shareholder under section 951(a)(1) by reason of this section an amount equal to the sum of--

> **(A)** the United States shareholder's 8 percent rate equivalent percentage of the excess (if any) of--

>> **(i)** the amount so included as gross income, over

>> **(ii)** the amount of such United States shareholder's aggregate foreign cash position, plus

> **(B)** the United States shareholder's 15.5 percent rate equivalent percentage of so much of the amount described in subparagraph (A)(ii) as does not exceed the amount described in subparagraph (A)(i).

19483037.1

* * *

**(d) Deferred foreign income corporation; accumulated post-1986 deferred foreign income.**--For purposes of this section--

**(1) Deferred foreign income corporation.**--The term "deferred foreign income corporation" means, with respect to any United States shareholder, any specified foreign corporation of such United States shareholder which has accumulated post-1986 deferred foreign income (as of the date referred to in paragraph (1) or (2) of subsection (a)) greater than zero.

**(2) Accumulated post-1986 deferred foreign income.**--The term "accumulated post-1986 deferred foreign income" means the post-1986 earnings and profits except to the extent such earnings--

**(A)** are attributable to income of the specified foreign corporation which is effectively connected with the conduct of a trade or business within the United States and subject to tax under this chapter, or

**(B)** in the case of a controlled foreign corporation, if distributed, would be excluded from the gross income of a United States shareholder under section 959.

To the extent provided in regulations or other guidance prescribed by the Secretary, in the case of any controlled foreign corporation which has shareholders which are not United States shareholders, accumulated post-1986 deferred foreign income shall be appropriately reduced by amounts which would be described in subparagraph (B) if such shareholders were United States shareholders.

**(3) Post-1986 earnings and profits.**--The term "post-1986 earnings and profits" means the earnings and profits of the foreign corporation (computed in accordance with sections 964(a) and 986, and by only taking into account periods when the foreign corporation was a specified foreign corporation) accumulated in

taxable years beginning after December 31, 1986, and determined--

    **(A)** as of the date referred to in paragraph (1) or (2) of subsection (a), whichever is applicable with respect to such foreign corporation, and

    **(B)** without diminution by reason of dividends distributed during the taxable year described in subsection (a) other than dividends distributed to another specified foreign corporation.

**(e) Specified foreign corporation.--**

    **(1) In general.**--For purposes of this section, the term "specified foreign corporation" means--

        **(A)** any controlled foreign corporation, and

        **(B)** any foreign corporation with respect to which one or more domestic corporations is a United States shareholder.

\* \* \*

**(f) Determinations of pro rata share.--**

    **(1) In general.**--For purposes of this section, the determination of any United States shareholder's pro rata share of any amount with respect to any specified foreign corporation shall be determined under rules similar to the rules of section 951(a)(2) by treating such amount in the same manner as subpart F income (and by treating such specified foreign corporation as a controlled foreign corporation).

    **(2) Special rules.**--The portion which is included in the income of a United States shareholder under section 951(a)(1) by reason of subsection (a) which is equal to the deduction allowed under subsection (c) by reason of such inclusion--

        **(A)** shall be treated as income exempt from tax for purposes of sections 705(a)(1)(B) and 1367(a)(1)(A), and

-78-

**(B)** shall not be treated as income exempt from tax for purposes of determining whether an adjustment shall be made to an accumulated adjustment account under section 1368(e)(1)(A).

* * *.

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 20-36122

I am the attorney or self-represented party.

**This brief contains** | 13,722 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____ .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Nathaniel S. Pollock | **Date** | Jul 22, 2021

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*