No. 20-36122

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

Charles G. Moore and Kathleen F. Moore

*Plaintiffs–Appellants*,

v.

United States of America

*Defendant–Appellee.*

---

On Appeal from the United States District Court
for the Western District of Washington
No. 2:19-cv-01539-JCC
The Honorable John C. Coughenour

---

**Reply Brief of Appellants
Charles G. Moore and Kathleen F. Moore**

---

SAM KAZMAN
DEVIN WATKINS
COMPETITIVE ENTERPRISE
INSTITUTE
1310 L Street N.W., 7th Floor
Washington, DC 20005
(202) 331-1010
sam.kazman@cei.org

ANDREW M. GROSSMAN
DAVID B. RIVKIN, JR.
JEFFREY H. PARAVANO
SEAN SANDOLOSKI
BAKERHOSTETLER
Washington Square, Ste. 1100
1050 Connecticut Ave., N.W.
Washington, DC 20036
(202) 861-1697
agrossman@bakerlaw.com

*Counsel for Appellants
Charles G. Moore and Kathleen F. Moore*

**Table of Contents**

Introduction ................................................................................ 1

Argument .................................................................................... 2

I. The Government's New Argument that Taxes on Property
Are Not "Direct Taxes" Contravenes Over a Century of
Binding Precedent ................................................................ 2

II. The Mandatory Repatriation Tax Is Not a Tax on "Incomes" ............. 5

    A. The Government Identifies No Authority Dispensing
with *Glenshaw Glass*'s Realization Requirement for
Sixteenth Amendment "Incomes" ................................. 6

    B. The Government Identifies No Authority Authorizing
Taxation of Capital Like Past Years' Retained Earnings
as "Incomes" ................................................................. 12

    C. The Government Identifies No Authority Overruling
*Macomber*'s Holding on Attribution of Corporate Income
to Shareholders .......................................................... 14

    D. The MRT Is Nothing Like the Other Taxes the
Government Claims Would Be Threatened by
Enforcement of the Constitution ................................. 18

III. The Mandatory Repatriation Tax Violates the Fifth
Amendment ...................................................................... 19

    A. The Government's Arguments Against the MRT's
Retroactivity Ignore the Tax's Operation and Practical
Effect ........................................................................... 19

    B. The Mandatory Repatriation Tax Is Wholly New and
Therefore Invalid ........................................................ 21

    C. The Government Identifies No Authority Upholding a
Tax Even Approaching the MRT's Retroactivity or
Arbitrariness ............................................................... 24

Conclusion .............................................................................. 26

## Table of Authorities

### Cases

*Agostini v. Felton*, 521 U.S. 203 (1997) ............................................................9, 14

*Alpenglow Botanicals, LLC v. United States*, 894 F.3d 1187 (10th Cir. 2018) ........ 8

*Blodgett v. Holden*, 275 U.S. 142 (1927) ........................................................ 21

*Burk-Waggoner Oil Ass'n. v. Hopkins*, 269 U.S. 110 (1925) ................................ 6

*Cole v. Comm'r*, 637 F.3d 767 (7th Cir. 2011) .................................................... 8

*Comm'r v. Fender Sales, Inc.*, 338 F.2d 924 (9th Cir. 1964)............................... 11

*Comm'r v. Glenshaw Glass*, 348 U.S. 426 (1955) ..........................................*passim*

*Comm'r v. Kowalski*, 434 U.S. 77 (1977) ........................................................ 7

*Cottage Savings Ass'n v. Comm'r*, 499 U.S. 554 (1991)...................................9, 10

*Dougherty v. Comm'r*, 60 T.C. 917 (1973) ...................................................12, 20

*Eder v. Comm'r*, 47 B.T.A. 235 (1942) .......................................................... 16

*Eder v. Comm'r*, 138 F.2d 27 (2d Cir. 1943) ...............................................12, 16

*Eisner v. Macomber*, 252 U.S. 189 (1920) ...................................................*passim*

*Fein v. United States*, 730 F.2d 1211 (8th Cir. 1984) ........................................ 23

*Ferman v. United States*, 993 F.2d 485 (5th Cir. 1993) ..................................... 23

*Furlong v. Comm'r*, 36 F.3d 25 (7th Cir. 1994) ................................................ 23

*Garlin v. Murphy*, 42 A.D.2d 30 (N.Y. App. Div. 3d 1973) ............................ 19

*Garlock v. Comm'r*, 58 T.C. 423 (1972) ......................................................... 12

*Garlock v. Comm'r*, 489 F.2d 197 (2d Cir. 1973)...........................................12, 16

*Helvering v. Bruun*, 309 U.S. 461 (1940)...................................................7, 10, 11

*Helvering v. Griffiths*, 318 U.S. 371 (1943) ..................................................... 10

*Helvering v. Nat'l Grocery Co.*, 304 U.S. 282 (1938).......................................... 14

*James v. United States*, 366 U.S. 213 (1961)..................................................... 7

*Kean v. Comm'r*, 469 F.2d 1183 (9th Cir. 1972) .............................................. 19

*Md. Casualty Co. v. United States*, 52 Ct. Cl. 201 (1917) .................................... 5

*Nathel v. Comm'r*, 615 F.3d 83 (2d Cir. 2010) ..................................................8, 13

*N.C. Dep't of Revenue v. The Kimberley Rice Kaestner 1992 Fam. Tr.*,
    139 S. Ct. 2213 (2019) .......................................................................... 25

*NFIB v. Sibelius*, 567 U.S. 519 (2012) ............................................................ 2, 3

*Nichols v. Coolidge*, 274 U.S. 531 (1927) ....................................................21, 24

*Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429 (1895) ............................. 4, 5

*Pollock v. Farmers' Loan & Trust Co.*, 158 U.S. 601 (1895) ...........................3, 18

*Polone v. Comm'r*, 505 F.3d 966 (9th Cir. 2007) .............................................. 21

*Prescott v. Comm'r*, 561 F.2d 1287 (8th Cir. 1977) ...................................8, 9, 20

*Spreckels Sugar Ref. Co. v. McClain*, 192 U.S. 397 (1904) ................................ 13

*Quarty v. United States*, 170 F.3d 961 (9th Cir. 1999) ................................22, 24

*Quijano v. United States*, 93 F.3d 26 (1st Cir. 1996) .......................................... 8

*Roemer v. Comm'r*, 716 F.2d 693 (9th Cir. 1983) .............................................. 8

*United States v. Burke*, 504 U.S. 229 (1992) ..................................................... 7

*United States v. Carlton*, 512 U.S. 26 (1994) ................................................... 24

*United States v. Darusmont*, 449 U.S. 292 (1981) ............................................ 22

*United States v. Davis*, 370 U.S. 65 (1962) ........................................................ 9

*United States v. James*, 333 F.2d 748 (9th Cir. 1964) ...............................7, 8, 11

*United States v. Schillinger*, 27 F. Cas. 973 (C.C.S.D.N.Y. 1876) ...................... 5

*United States v. Wright*, 798 F. App'x 849 (6th Cir. 2019) ................................ 8

*Untermyer v. Anderson*, 276 U.S. 440 (1928) ................................................22, 24

*Vukasovich, Inc. v. Comm'r*, 790 F.2d 1409 (9th Cir. 1986) ............................... 8

*Weiss v. Stearn*, 265 U.S. 242 (1924) ................................................................ 9

*Whitlock's Estate v. Comm'r*, 59 T.C. 490 (1972) ............................................. 16

**Constitutional and Statutory Provisions**

U.S. Const., Art I, § 9, cl. 4.................................................................. 4

26 U.S.C. § 877A..................................................................... 18, 19

26 U.S.C. § 965 ................................................................. 16, 20, 22

26 U.S.C. § 1362...................................................................... 19

**Other Authorities**

Erik M. Jensen, *The Apportionment of "Direct Taxes": Are Consumption Taxes Constitutional?*, 97 Colum. L. Rev. 2334 (1997).................................. 4

Federalist No. 36 (Alexander Hamilton).................................................... 4, 5

2 Records of the Federal Convention of 1787 (M. Farrand ed. 1911) .............. 5

**Introduction**

At its core, the Government's defense of the Mandatory Repatriation Tax ("MRT") is that the Apportionment, Direct Tax, and Due Process Clauses impose no limitation on Congress's taxing power so long as it labels a tax's object the "income" of targeted taxpayers. No matter that those taxpayers have realized nothing at all, that they lack dominion over this supposed "income," and that the tax imposes new and oppressive consequences on investment decisions made decades ago. The audacity of the Government's position should not be lost on the Court. Nor should the boldness of its many requests that the Court shrug off controlling authority, particularly those Supreme Court decisions holding that taxes on personal property must be apportioned and that, absent realization, there is no "income" taxable as such under the Sixteenth Amendment. The Government's arguments to the contrary are not only wrong but foreclosed. No precedent, from any court at any level, supports the proposition that is required for the Government to prevail on those issues: that Congress may tax as income that which the taxpayer has not realized in any fashion. And it is undisputed here that Appellants Charles and Kathleen Moore have not realized the sums that the MRT treats as their "income."

The Government also does not dispute that the Moores, like others subject to the MRT, have no guarantee of ever receiving the money that the MRT taxes, because it was reinvested years ago in the business of the corporation that earned it. Congress has never before taxed this sort of active business income, let alone pinned the liability on shareholders. Yet the Government insists that imposing

1

new and oppressive consequences on these investment decisions going back thirty years is nothing new. It fails, however, to identify any precedent for the MRT itself, its retroactive reach, or its arbitrary targeting of shareholders like the Moores. While the authorities approve "a modest period of retroactivity" to accommodate the practicalities of revising the Tax Code, they condemn imposition of a new retroactive tax like the MRT, and no court has ever upheld anything like the MRT's decidedly immodest thirty years of retroactivity. The MRT is an extreme outlier in every dimension. It cannot be sustained so long as the Fifth Amendment is understood to limit Congress's power to tax retroactively.

## Argument

### I. The Government's New Argument that Taxes on Property Are Not "Direct Taxes" Contravenes Over a Century of Binding Precedent

Reasonably lacking confidence in its argument that the MRT is a tax on incomes, the Government now argues that taxes on personal property like the Moore's KisanKraft shares are not "direct taxes" subject to the apportionment mandate. *See* Gov't Br. 20–21. Although the Moores do not object to the Government raising this new legal issue on appeal, the argument must be understood as one directed solely to the Supreme Court, because Supreme Court precedent forecloses acceptance of it here—which would also be wrong as a matter of constitutional interpretation.

The Court need not look beyond the Supreme Court's most recent statement on this issue in *National Federation of Independent Business v. Sibelius*, 567 U.S. 519 (2012), to see that the Government's argument is foreclosed. *NFIB*

recognized that the Supreme Court has long interpreted the Direct Tax Clause "to include taxes on personal property and income from personal property" and that, following ratification of the Sixteen Amendment, has "continued to consider taxes on personal property to be direct taxes." *Id*. at 571. *NFIB* proceeded to hold that a "shared responsibility payment" imposed on individuals lacking health insurance "does not fall within any recognized category of direct tax" because, *inter alia*, it was "plainly not a tax on the ownership of land or personal property." *Id*. The Government's claim (at 20) that *NFIB* "seems to indicate misgivings" about the Court's precedents on direct taxes is unsupportable and effectively concedes that those precedents, as recited and applied in *NFIB*, remain controlling.

The Government's treatment of those precedents is indefensible. It makes the surprising claim (at 20) that "neither *Pollock* nor *Macomber* actually ruled that taxes on personal property were direct taxes." Yet *Pollock* specifically identifies that as a holding: "taxes on personal property…are likewise direct taxes." *Pollock v. Farmers' Loan & Trust Co*., 158 U.S. 601, 637 (1895). And *Macomber* holds that, if Congress "tax[es] shareholders upon their property interests in the stock of corporations," that "would be taxation of property because of ownership, and hence would require apportionment under the provisions of the Constitution." *Eisner v. Macomber*, 252 U.S. 189, 217 (1920). The Government's disagreement with these holdings does not give it license to elide them.

There is no merit to the Government's interpretation of the Apportionment and Direct Tax Clauses to exclude taxes on property. The Direct Tax

Clause provides that apportionment is required for any "capitation, *or other direct*, tax," U.S. Const., Art I, § 9, cl. 4 (emphasis added), reflecting that the category of direct taxes is *not* limited to capitations. In fact, the concept of a "direct tax" was well known to the Framing generation and was understood to encompass those taxes imposed directly on individuals, unlike a tariff or excise tax. *See Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429, 558 (1895) (describing distinction); *id.* at 573–74 ("[A]ll taxes on real estate or personal property or the rents or income thereof were regarded as direct taxes"). In Federalist No. 36, Alexander Hamilton explained that the kinds of internal taxes the new government could levy "may be divided into those of the DIRECT and those of the INDIRECT kind," with the latter consisting of "duties and excises on articles of consumption."

The Constitution distinguished between these two categories of taxes based on the understanding that, "[w]ith indirect taxes, the market protects against governmental abuse" through the price mechanism, whereas "[d]irect taxes contain no similar built-in protection," because they cannot be shifted. Erik M. Jensen, *The Apportionment of "Direct Taxes": Are Consumption Taxes Constitutional?*, 97 Colum. L. Rev. 2334, 2396 (1997). In addition to preventing abuse, the apportionment requirement for direct taxes was seen as key to federalism, both to protect the States' traditional source of revenue and plenary taxing power from federal encroachment, *id.* at 2396–97, and to deter Congress from working "partiality and oppression" against localities through direct taxes that

might have localized impacts either unknown to remote Members of Congress, Federalist No. 36 (Hamilton), or intended by them, *Pollock*, 157 U.S. at 582–83.

The Framers had good reasons to be wary of direct taxation by Congress, specifically taxes on personal property. *See* 2 Records of the Federal Convention of 1787, p. 307 (M. Farrand ed. 1911) ("For a long time the people of America will not have money to pay direct taxes. Seize and sell their effects and you push them into revolts." (Gouverneur Morris)). And so they required that direct taxes be apportioned. The Government's pinched reading of the Apportionment and Direct Tax Clauses reduces this meaningful structural limitation on federal power into an arbitrary and pointless near-nullity. It is wrong, has already been rejected, and should continue to be rejected.

## II. The Mandatory Repatriation Tax Is Not a Tax on "Incomes"

The Government claims (at 22–23) that the Sixteenth Amendment does not require any kind of realization, whether actual or constructive, for Congress to label something as particular taxpayers' "income" and tax them on it, just as the MRT does to the Moores. Putting aside the staggering implications of that claim, it fails as a matter of text, precedent, and common sense. The Sixteenth Amendment authorizes unapportioned taxation of "incomes," a term that inherently involves receipt of a gain,[1] and the adjacent "from whatever source

---

[1] *See, e.g.*, *United States v. Schillinger*, 27 F. Cas. 973 (C.C.S.D.N.Y. 1876) (No. 16,228) ("[I]ncome must be taken to mean money, and not the expectation of receiving it, or the right to receive it, at a future time."); *Md. Casualty Co. v. United States*, 52 Ct. Cl. 201, 209–10 (1917) (courts have "uniformly construed" income

derived" language that the Government quotes throughout its brief confirms as much: a gain is not income unless and until it has been "derived" by the taxpayer from some "source."

What the Government forgets is that "Congress cannot make a thing income which is not so in fact." *Burk-Waggoner Oil Ass'n. v. Hopkins*, 269 U.S. 110, 114 (1925). And what must be "so in fact" is settled by precedent: income requires "undeniable accessions to wealth, *clearly realized*, and over which the taxpayer has complete dominion." *Comm'r v. Glenshaw Glass*, 348 U.S. 426, 477 (1955) (emphasis added). The Government so strenuously resists that standard because it recognizes, and effectively concedes by its failure to argue that MRT taxpayers like the Moores realized anything, that the MRT does not satisfy it.

## A. The Government Identifies No Authority Dispensing with *Glenshaw Glass*'s Realization Requirement for Sixteenth Amendment "Incomes"

1.  The Government's attacks on *Glenshaw Glass* falter right out of the gate. It argues at length (at 30–33) that *Glenshaw Glass* "did not address the question of realization" and render a holding on that constitutional question. Although the issue before the Court was statutory, its holding assumed a constitutional dimension because the statutory provision in dispute exerted "the full measure of [Congress's] taxing power" under the Sixteenth Amendment, 348 U.S. at 429 (quotation marks omitted), and because the taxpayer argued that

---

"to include only the receipt of actual cash as opposed to contemplated revenue due but unpaid").

application of that provision to awards of certain kinds of litigation damages exceeded Congress's authority under *Macomber*, *id*. at 430; *see also id*. at 432 n.11 (noting that statutory provision used the word "income" "in its constitutional sense"). The Court disagreed, holding that the awards at issue fell comfortably within Congress's power to tax "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." *Id*. at 431.

Since then, the Supreme Court has repeatedly recognized that standard to define Congress's power to tax incomes and applied it as such. *See James v. United States*, 366 U.S. 213, 218–19 (1961); *Comm'r v. Kowalski*, 434 U.S. 77, 83, 94 (1977); *United States v. Burke*, 504 U.S. 229, 233 (1992). This alone renders irrelevant the Government's other arguments on *Glenshaw Glass*,[2] *Macomber*, and lower-court precedents, as it does not contend that any decision has overruled what the Supreme Court held in *Glenshaw Glass* and its progeny.

**2.**     The Government flat-out ignores that this Court has expressly recognized *Glenshaw Glass* to set the constitutional standard for income, including in the Government's principal authority, *United States v. James*, 333 F.2d 748 (9th Cir. 1964) (en banc). *James* recited and applied the *Glenshaw Glass* standard to answer the question of whether a widow's allowance paid out of her husband's

---

[2] The Government contends (at 32–33) that *Glenshaw Glass*'s citation to *Helvering v. Bruun*, 309 U.S. 461 (1940), somehow undercuts its holding on realization. But *Bruun* recognizes that income requires "realization of gain," clarifying only that the gain need not be severable from the taxpayer's original capital—as occurred there when the taxpayer received, at the termination of a lease, a building the tenant had constructed on his land. *Id*. at 469. Elsewhere, the Government recognizes *Bruun*'s limited holding. Gov't Br. 25.

estate was "income under the Constitution." *Id*. at 748, 752 (holding that standard "clearly applicable"). The Government's claim (at 26) that *James* dispensed with the realization requirement for Sixteenth Amendment "income" is false. More recently, this Court recognized that the Supreme Court in "*Glenshaw Glass* has defined gross income in terms of 'accessions to wealth, clearly realized, and over which the taxpayers have complete dominion.'" *Vukasovich, Inc. v. Comm'r*, 790 F.2d 1409, 1414 (9th Cir. 1986) (citation omitted); *cf. Roemer v. Comm'r*, 716 F.2d 693, 696 n.2 (9th Cir. 1983) (citing *Glenshaw Glass* for the proposition that the Supreme Court's precedents require "realized accessions to wealth").

Every court to consider the question for a half-century or more has regarded *Glenshaw Glass* as setting the constitutional standard for income. *See, e.g.*, *Quijano v. United States*, 93 F.3d 26, 30 (1st Cir. 1996) (recognizing *Glenshaw Glass* as describing income "in its constitutional sense");[3] *Alpenglow Botanicals, LLC v. United States*, 894 F.3d 1187, 1199 (10th Cir. 2018) (noting that "[t]he Tax Code codified the Sixteenth Amendment's definition of income" and citing *Glenshaw Glass*); *United States v. Wright*, 798 F. App'x 849, 856–57 (6th Cir. 2019); *Cole v. Comm'r*, 637 F.3d 767, 778 (7th Cir. 2011); *Nathel v. Comm'r*, 615 F.3d 83, 89 (2d Cir. 2010). Even *Prescott v. Commissioner*, on which the Government places great emphasis (at 40–43), holds that a "taxable event" is required for there to be

---

[3] The Moores' opening brief erroneously identified *Quijano* as a Ninth Circuit case. The point still stands that this Court has recognized *Glenshaw Glass* to set the constitutional standard for income. *See James*, 333 F.2d at 752; *Vukasovich*, 790 F.2d at 1414.

Sixteenth Amendment income, citing *Glenshaw Glass* for that proposition. 561 F.2d 1287, 1293 (8th Cir. 1977).[4]

The Government identifies no authority to the contrary, let alone an authority recognizing the unlikely proposition that it needs to prevail: that realization is unnecessary to render something a taxpayer's "income" under the Sixteenth Amendment.[5]

**3.**     The Government's argument (at 24–25) that realization is a matter of mere "administrative convenience," and not a constitutional requirement, is contradicted by the decisions discussed above and by the Government's sole authority for this argument, *Cottage Savings Ass'n v. Comm'r*, 499 U.S. 554 (1991). In *Cottage Savings*, the Supreme Court recognized and followed "our landmark precedents on realization," including *Macomber* and *Weiss v. Stearn*, 265 U.S. 242, 253 (1924) (applying *Macomber*'s constitutional standard); recognized that there is a "realization requirement" for the income tax; and did not purport to overrule or narrow any prior decision. 499 U.S. at 562. The Government's view that this overruled a long line of precedent by implication is both wrong and unavailing here. *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (warning that lower

---

[4] *Prescott* found such an event in the dissolution of fictional corporate elections by operation of law, such that their owners could be taxed on the dissolution proceeds, which (unlike here) they received. 561 F.2d at 1293. The Government's argument (at 43) that *Prescott* somehow superseded *Glenshaw Glass* on the issue of realization is puzzling, as *Prescott* relied on *Glenshaw Glass*.

[5] At one point, the Government remarks in passing that *United States v. Davis*, 370 U.S. 65 (1962), "makes plain [that realization] is not a constitutional requirement." Gov't Br. 42. *Davis* contains not a word supporting that proposition.

courts should not "conclude our more recent cases have, by implication, over-ruled an earlier precedent"). Moreover, the question before the Court was not whether realization was required for there to be income, but whether the exchange of one group of mortgage loans for another "gives rise to a realization event." *Cottage Savings*, 499 U.S. at 566. The Court answered that question in the affirmative "so long as the exchanged properties are 'materially different.'" *Id*. This does not aid the Government; if anything, the Court's rejection of the Government's "'economic substitute'" theory of realization cuts against the Government's argument here that anything goes.

**4.** Unable to make headway against *Glenshaw Glass*, the Government trains its fire on *Macomber*. To what end? After all, irrespective of *Macomber*, application of the *Glenshaw Glass* standard is sufficient to sink the MRT. In any event, its shots miss the mark. Although a single aspect *Macomber* has been over-ruled, the realization requirement that it recognized for "income" under the Sixteenth Amendment remains good law, as discussed above. In particular, *Helvering v. Bruun* did not walk back *Macomber*'s realization requirement, instead over-ruling its separate rule that a taxable gain must be severable from the taxpayer's original capital. *See supra* n.2; Gov't Br. 25 (acknowledging as much). And, as the Government concedes (at 26), *Helvering v. Griffiths*, 318 U.S. 371, 404 (1943), refused to reconsider any aspect of *Macomber*, and Justice Douglas's *dissent* lacks any precedential force. In short, the Government's claim (at 29) that the Supreme Court has "rejected the notion that realization is required under the

Sixteenth Amendment" is unsupported by any authority even suggesting so audacious a thing.

The Government's argument (at 26–28) also finds no support in this Court's cases. *James*, as noted, applied the *Glenshaw Glass* standard, including the requirement that income be "clearly realized." 333 F.2d at 752–53.[6] Likewise, *Commissioner v. Fender Sales, Inc*. insisted on a "taxable event" and found one when "stockholder-employees received and accepted capital stock in discharge of the delinquent obligations of the corporation to them for salaries." 338 F.2d 924, 927 (9th Cir. 1964). The Court regarded *Macomber* as "not even apposite" because the taxpayers there received not "just a piece of paper" (as in *Macomber*), but "a substantially different investment." *Id*. Again, nothing in *Fender Sales* even suggests the Court jettisoned the realization requirement for Sixteenth Amendment "income."

**5.** The Government's argument for dispensing with the realization requirement finds no support in the cases it cites (at 34–40) concerning Subpart F, nor could it. Prior to enactment of the MRT, Subpart F tax liability was triggered by taxable events like repatriation or the receipt of income by which the taxpayer was regarded as actually or constructively realizing a gain. *See* Moore Br. 5–7. The cases applying subpart F do not express any doubt on the necessity of some kind of taxable event involving realization of income by taxpayers, but instead

---

[6] *James* does not support the Government's claim (at 27) that *Bruun* "reject[ed] the notion that *Macomber* precluded the government from taxing an unrealized increase in the value of a taxpayer's real property." *James* merely quotes *Bruun's* holding on the severability of gains from original capital. 333 F.2d at 752.

address which events qualify, including through attribution of those events to particular taxpayers, as discussed below. *See infra* § II.C. Both *Garlock* and *Eder* treated the corporation's earning of income in the current tax year as the relevant taxable event, one that could be attributed to the taxpayer. *Garlock v. Comm'r*, 489 F.2d 197, 202 (2d Cir. 1973);[7] *Eder v. Comm'r*, 138 F.2d 27, 28 (2d Cir. 1943). Likewise, the Tax Court's decision in *Dougherty v. Commissioner* identified the "taxable event" as a foreign corporation's "investment in U.S. property," which "manifest[ed] the shareholder's exercise of control" over the amount invested. 60 T.C. 917, 930 (1973).

In sum, the Government identifies no authority approving a tax like the MRT that operates in the complete absence of even an arguable taxable event by which taxpayers realize a gain.

## B. The Government Identifies No Authority Authorizing Taxation of Capital Like Past Years' Retained Earnings as "Incomes"

The Government barely musters a response to the Moores' argument that the past years' retained earnings taxed by the MRT are not "income" at all for purposes of the Sixteenth Amendment. *Macomber* specifically held as much: "[W]hat is called the stockholder's share in the accumulated profits of the company is capital, not income." 252 U.S. at 219; *see also id*. at 211. The Government says (at 46) this was *dicta*, but the Court rendered a holding on this point when it rejected the Government's argument to the contrary defending the

---

[7] *See also Garlock v. Comm'r*, 58 T.C. 423, 438 (1972) (describing issue and finding "constructive receipt of income" by the taxpayer).

12

constitutionality of the challenged tax. *Id*. at 219. Moreover, the Government ignores that the Supreme Court subsequently approved that holding in *Glenshaw Glass*. 348 U.S. at 431 (reaffirming *Macomber*'s approach to "distinguishing gain from capital"). Likewise, the Second Circuit has recognized more recently that "the earlier cases' treatment of capital as distinct from income," including in *Macomber*, remains good law. *Nathel*, 615 F.3d at 92. The Government's attempt (at 33) to distinguish *Nathel* as a mere statutory case overlooks that the court's discussion expressly addressed "the scope of 'income' as used…in the Sixteenth Amendment." *Id*. at 87 & n.4. For all the mud that the Government throws at *Macomber*, it is unable to point to a single decision even casting doubt on *Macomber*'s holding that a corporation's previously reinvested profits are not "incomes" taxable under the Sixteenth Amendment.[8]

This likely explains the Government's suggestion (at 33) that the Court "is free" to disregard *Macomber* or limit it to its facts. That would, of course, violate the Supreme Court's instruction that, "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls,

---

[8] Indeed, the only decision the Government cites on this point (at 47) is *Spreckels Sugar Ref. Co. v. McClain*, which stands for the unremarkable and irrelevant proposition that an "excise tax" on sugar refining is not a direct tax subject to apportionment. 192 U.S. 397, 411 (1904). What this has to do with the meaning of "incomes" as used in the Sixteenth Amendment (ratified nearly a decade later), with the status of *Macomber* (decided sixteen years later), or with whether capitalized earnings from previous years are "income" (ostensibly the subject of the Government's argument) is anyone's guess.

leaving to this Court the prerogative of overruling its own decisions." *Agostini*, 521 U.S. at 237 (quotation marks omitted). Here, there is no basis to conclude that *Macomber*'s holding on the distinction between capital and income has been "eroded," Gov't Br. 33, and even the narrowest view of that holding would still invalidate the MRT's treatment of a corporation's retained earnings from previous years as its shareholders' income—the very thing addressed by *Macomber*.

### C. The Government Identifies No Authority Overruling *Macomber*'s Holding on Attribution of Corporate Income to Shareholders

As the Moores argued, the Sixteenth Amendment generally does not permit Congress to "'ignore the substantial difference between corporation and stockholder'" by attributing corporate income to shareholders, as opposed to taxing shareholders on distributions. Moore Br. 17–18 (quoting *Macomber*, 252 U.S. at 214). The Government does not contend that *Macomber* has been overruled on this point, which may be why it avoids any direct response to that argument.[9]

*Macomber* recognized that the general rule against attribution of corporate income to shareholders was not inviolate and that in appropriate cases a court may "look through the form of the corporation and determine the question of the stockholder's right, in order to ascertain whether he has received income

---

[9] The Government cites (at 45) *Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 288 n.4 (1938), for the proposition that, between ratification of the Sixteenth Amendment in 1913 and 1920, accumulated-earnings taxes were laid upon shareholders. But in "all later Revenue Acts, the tax is laid upon the corporation," not its shareholders. *Id.* What happened in 1920? *Macomber*.

taxable by Congress without apportionment." 252 U.S. at 213. But it disapproved doing so in the ordinary case, where the use of the corporate form is *bona fide* and it is merely a "fiction that [shareholders] have received and realized a share of the profits of the company which in truth they have neither received nor realized." *Id*. at 214.

This is the ordinary case, not the exception. Unlike prior enactments, the MRT targets corporations' active business income,[10] the retained earnings that they use to conduct their business, that is in no sense attributable to shareholders or a mechanism for them to avoid taxation of income that they have constructively realized and control. *See* Moore Br. 5–6 (discussing categories of corporate income subject to Subpart F's attribution regime). Through decades of tax law, Congress observed the line drawn by *Macomber* and declined to take the forbidden step of attributing the genuine active business income of foreign corporations to their U.S. shareholders—which plainly would have simplified the notoriously complex operation of Subpart F. Instead, it danced up to the line, through increasingly reticulated provisions reaching almost everything but that. By 2017, Congress appears to have forgotten the reason for its longstanding restraint. The fact that Congress approached that line, yet without overstepping it, is no defense of the MRT, but only highlights the MRT's novelty and constitutional defect.

---

[10] For ease of discussion, this Section refers to the MRT as taxing corporate "income," rather than "capital," *see supra* § II.B, so as to avoid unwieldy constructions like "capital from retained earnings used to conduct the corporation's business."

Indeed, the MRT goes beyond just attributing corporate income to shareholders. It also attributes to them previous years' corporate earnings back to 1986 that may have been earned long before shareholders subject to the MRT even obtained their shares. *See* 26 U.S.C. § 965(d) (defining income inclusion irrespective of whether current shareholders had an ownership interest when the income was earned by the corporation). This underscores that what the MRT targets is not even arguably shareholder income, through attribution or otherwise.

None of the Subpart F cases cited by the government (at 34–40) support the MRT's attribution of ordinary active business income to shareholders. *Garlock* upheld attribution where a U.S. corporation sought to avoid taxation on foreign sales of the products that it produced and supplied to a foreign subsidiary. 489 F.2d at 198. Likewise, *Eder* upheld attribution of the income of a foreign investment-holding company owned by a U.S. family. *Eder v. Comm'r*, 47 B.T.A. 235, 237 (1942), *aff'd*, 138 F.2d 27 (2d Cir. 1943). *Dougherty* involved a "constructive dividend" that occurred when an inoperative foreign corporation repatriated its profits to invest in the U.S. business of its sole shareholder. 60 T.C. at 917–20. Finally, *Whitlock's Estate v. Commissioner* essentially combines the circumstances of *Eder* and *Dougherty*, upholding attribution of the income of a foreign investment-holding company owned by a U.S. couple that it invested in the United States. 59 T.C. 490, 507 (1972), *aff'd*, 494 F.2d 1297 (10th Cir. 1974).

The argument that these cases support the MRT is a *non sequitur*. Each applied the exception recognized by *Macomber*, not its general rule against

attribution in the ordinary case. That Congress may have the power to look through the corporate form in circumstances where taxpayers "interpos[e] a foreign corporate framework between themselves and income," *id.*, does not mean that it may do so in the ordinary case, where a corporation's income is derived from and used to carry on its own business. Although these cases approve attribution of income, they cannot and should not be understood to reject *Macomber*'s general rule—both because nothing like the MRT was on the books and because the courts that rendered them should not be lightly assumed to have bucked controlling Supreme Court precedent.

Finally, the Government is wrong to contend (at 22 n.11, 39–40) that the Moores' lack of control over KisanKraft is irrelevant. Both *Macomber* and *Glenshaw Glass* identify taxpayers' control as central to the question of whether a gain constitutes *their* income. *Glenshaw Glass*, 348 U.S. at 477 ("complete dominion"); *Macomber*, 252 U.S. at 208 ("[The shareholder] has no right to withdraw, only the right to persist, subject to the risks of the enterprise"). How could it be otherwise? Indeed, the Government does not disagree that the Subpart F cases it cites lean heavily on control to escape *Macomber*'s general rule against attribution of corporate income. *See* Moores Br. 25; Gov't Br. 39–40 (acknowledging the point).

Instead, the Government asserts (at 40) that, because some taxpayers subject to the MRT may exercise sufficient control, the MRT is valid across the board. Or, put differently, Congress may circumvent the structural limitation of the Apportionment and Direct Tax Clauses by taxing broadly enough so that at

least some applications of the law pass muster—which isn't even the case here. That position stands firmly rejected by *Macomber*, which severed from a general income tax reaching "dividends" the application of that tax to "true stock dividend[s]." 252 U.S. at 200 n.1, 219; *see also Pollock*, 158 U.S. at 637 (rejecting severability of tax held to be, in part, an unapportioned direct tax). As the Government denies that the monolithic MRT could be severed in any respect—it twice calls that result "nonsensical," at 22 n.11, 40—there is no basis to sever anything.

### D. The MRT Is Nothing Like the Other Taxes the Government Claims Would Be Threatened by Enforcement of the Constitution

The Government attempts to present a parade of horribles that would follow if the Moores prevail in enforcing a long-recognized constitutional limitation on the Congress's power to impose direct taxes. It's not much of a parade. Having scoured the Tax Code, the Government comes up with a sum total of two taxes that it says are at risk, and neither actually would be. Gov't. Br. 43–44. This meagre showing is a consequence of the MRT's novelty and only confirms the MRT's status as an extraordinary outlier.

The first tax the Government contends to be at risk is an obscure one taxing Americans who renounce their citizenship on the appreciation of their property at the time of renunciation. 26 U.S.C. § 877A. Unlike the MRT, this is a straightforward anti-circumvention measure, preventing taxpayers from avoiding capital-gains liability by abandoning U.S. citizenship. Crucially, this tax permits

liability to be deferred "until the due date of the return for the taxable year in which such property is disposed," *id*. § 877A(b)(1), such that the tax operates upon sale—that is, when the taxpayer realizes the income being taxed. The MRT's flaw is that it takes the opposite approach, imposing tax liability in the absence of any realization.

The other tax is a provision that taxes owners of "S corporations" on corporate income as if those corporations were partnerships. What the Government neglects to mention is that this treatment is not imposed by law, but by the election of "all persons who are shareholders in such corporation." 26 U.S.C. § 1362(a)(2). In other words, the shareholders must unanimously consent to "flow-through" tax treatment in lieu of the default treatment that is imposed by law, which does not tax shareholders on corporate income. *See generally Kean v. Comm'r*, 469 F.2d 1183, 1186–87 (9th Cir. 1972). In so doing, the shareholders concede that the corporation's income is their own and may be treated as such. *See Garlin v. Murphy*, 42 A.D.2d 30, 32 (N.Y. App. Div. 3d 1973), *aff'd*, 34 N.Y.2d 921 (1974). By contrast, the MRT imposes an unchangeable mandate on shareholders like the Moores who have not claimed corporate income as their own: pay up anyway.

## III. The Mandatory Repatriation Tax Violates the Fifth Amendment

### A. The Government's Arguments Against the MRT's Retroactivity Ignore the Tax's Operation and Practical Effect

As the District Court explained, by "its very nature, the MRT is a retroactive tax." ER-11. It attaches new legal consequences—tax liability—to events

completed more than thirty years before its enactment. Specifically, it imposes a one-time tax on shareholders for a CFC's "earnings and profits…accumulated in taxable years beginning after December 31, 1986." 26 U.S.C. § 965(d)(3).

The Government contends (at 49) that the MRT is a statute with only prospective application because it bundles up the previously accumulated earnings and profits and "deems" them to have been repatriated on a date after its enactment. This is pure sophistry. The Government identifies no authority which would give effect to a mere label and ignore the fact that nothing actually happened. Transforming past events into future ones is not among Congress's powers.

The Government's authorities (at 50) do not support its argument against the MRT's retroactivity. *Prescott* assumed that "a tax on prior years' appreciation is retroactive." 561 F.2d at 1294. And *Dougherty* expressly identified the applicable "taxable event" as "constructive dividend" to the taxpayer through an investment in his U.S. business, which occurred after enactment of the statute at issue. 60 T.C. at 929–30. Here, there is no constructive dividend; instead, there is nothing.

The Government also casts the MRT as merely a one-time, prospective "alteration of the tax deferral period" for CFC income. Gov't Br. 55. But, as the District Court explained, "the MRT does more than simply accelerate tax already owing. It *ensures* that a ratable share of a CFC's earnings and profits will be subject to U.S. tax." ER-10. Prior to the MRT—and after—there was no guarantee that a CFC's shareholders would ever realize income from, or otherwise

owe tax on, the CFC's retained earnings. But the MRT taxes shareholders on those earnings no matter what the future holds, even if the CFC goes bankrupt tomorrow before distributing anything. *Polone v. Commissioner* does not affect this analysis; there, the taxpayer owed tax on payments he received *after* the statute in question went into effect. 505 F.3d 966, 968 (9th Cir. 2007). The MRT, by contrast, taxes shareholders on corporate income that they may never see—which is, contrary to the Government's claim (at 54) plainly adverse to them.

Finally, the Government's hypothetical (at 56–57) about 401(k) accounts is quite telling. The MRT is nothing like lowering the age when, *in the future*, retirement savers must take and pay tax on distributions from their 401(k) accounts. The correct analogy would be to a change in the law that taxes previously made contributions to a 401(k) account irrespective of any distribution, which the Government would presumably defend on the same ground it advances here: that taxation was merely deferred and so could be imposed at any time, even absent a distribution. That's no different than the change worked by the MRT, and it plainly would impose an adverse retroactive effect on 401(k) savers. The Government's obfuscated hypothetical and inability to defend the obvious analogy speak volumes.

## B. The Mandatory Repatriation Tax Is Wholly New and Therefore Invalid

The Government does not dispute that a wholly new tax may not be retroactively applied and concedes (at 59) that the Supreme Court precedents holding as much—*Nichols v. Coolidge*, 274 U.S. 531 (1927), *Blodgett v. Holden*, 275 U.S.

142 (1927), and *Untermyer v. Anderson*, 276 U.S. 440 (1928)—have not been over-ruled. Instead, it contends that the MRT is not new, for two reasons: (1) "the Moores had every reason to expect that the Government would tax them on their share of their CFC's earnings as soon as that share was distributed to them" and (2) because it "builds upon subpart F." Gov't Br. 60. Neither prevails.

First, it is irrelevant that the Moores could have expected that they might pay a tax if they received a dividend, realized a gain on the sale of their KisanKraft shares, or engaged in some other transaction at some point down the line, because the MRT taxes nothing of the sort. The MRT taxes the Moores not on anything they've done or received, but on the *CFC's* retained earnings from prior years. The Moores "ha[d] no reason to suppose that any transaction[] of the sort"—or, more accurately, the complete lack of a transaction—would "be taxed at all." *Quarty v. United* States, 170 F.3d 961, 967 (9th Cir. 1999) (quoting *United States v. Darusmont*, 449 U.S. 292, 298, 300 (1981)). The Government (at 60) has it exactly backwards: this is about the existence of a tax, not its timing.

Second, the MRT "builds upon subpart F" no more than any new tax builds upon the Tax Code. In the Government's own words (at 61), the MRT "expands the categories of undistributed CFC earnings on which…tax is owed." And that's putting it lightly. The MRT taxes shareholders on an entirely new category of retained earnings and imposes its own unique tax rates, lookback-period, limitations on credits, and timing provisions. 26 U.S.C. § 965. Had Congress inserted this standalone tax anywhere other than in Subpart F, there could be no serious dispute that it is a new tax—especially given that, as the

22

Government concedes, it is a one-time tax that has never been levied before and (under current law, at least) will never be levied again. That Congress put the tax where it did does not reduce its novelty.

The Government relies (at 62–63) on three cases involving small adjustments to the Tax Code to support its argument that the MRT is nothing new, but the minor changes addressed in those cases stand in stark contrast to the MRT. *Furlong v. Commissioner* held that a tax on loan proceeds was not wholly new because Congress had imposed similar taxes and, at the time of the loan at issue, was already well along to enacting the tax in question, such that it was foreseeable. 36 F.3d 25, 27 (7th Cir. 1994). Likewise, *Ferman v. United States* involved not a new tax but a minor tweak to the estate tax to correct an error that Congress had introduced months earlier and that, prior to the transactions at issue, the IRS had specifically identified in a bulletin putting taxpayers on notice that the error could not be relied upon. 993 F.2d 485, 491–92 (5th Cir. 1993). And *Fein v. United States*, like *Ferman*, did not involve a new tax at all, but removal of a minor exemption from the estate tax. 730 F.2d 1211, 1213 (8th Cir. 1984).

Here, by contrast, the MRT reaches back thirty years to tax shareholders on retained active business income that has never before been taxed,[11] pinning the liability on persons who have received nothing and done nothing other than hold shares. Even Congress and the White House understood that the MRT was

---

[11] The Government does not appear to disagree. *See* Gov't Br. 60 (acknowledging this point without disputing it).

the kind of revenue windfall that could only be done once. Moore Br. 35. Tax-payers like the Moores had no notice that Congress would do anything like that. Nobody did. If the MRT is not a wholly new tax, barred from retroactive appli-cation by the Fifth Amendment, then nothing is. As decisions like *Nichols* and *Untermyer* remain on the books, the Court cannot and should not render the cat-egory of "wholly new" taxes a null set.

## C. The Government Identifies No Authority Upholding a Tax Even Approaching the MRT's Retroactivity or Arbitrariness

Regardless of whether the MRT is a wholly new tax or not, it still violates the Fifth Amendment, which permits "only a modest period of retroactivity" in taxation and disapproves arbitrary and irrational retroactive measures. *United States v. Carlton*, 512 U.S. 26, 32 (1994); *see also Quarty*, 170 F.3d at 967.

It is to the Government's credit that it does not attempt to argue that the MRT's unprecedented retroactive reach is "modest," a word that appears no-where in its brief. Instead, it tries (at 65) to justify the MRT's thirty-year look-back as "retroactivity born of necessity." The stridency of its rhetoric belies the weakness of its argument. Rather than demonstrate why a thirty-year retroactive reach is needed, the Government justifies this unprecedented exactment by ref-erence to administrative convenience, and Congress's desire to tax income rein-vested in the business going back thirty years. Gov't Br. 66–67.

But all these add up to is that Congress wanted more revenue, which is no justification at all. The convenience point is just another way of saying that Con-gress sought to tax *this money*; had it not done so through the MRT or had it left

in place the pre-MRT regime, there would be no issue of convenience. And it cannot be that Congress's eagerness to put its hands on additional sources of revenue justifies retroactive taxation, otherwise there would be no constitutional limitation at all. Nor is it "legitimate" for Congress to reach back thirty years to avoid the possibility that some money somewhere in the world might not be taxed by the United States. Gov't Br. 64. Nothing stopped Congress from avoiding that inconceivable result by continuing to tax CFC shareholders on distributions; it simply chose not to do so. *See* Gov't Br. 7–8. No authority cited by the Government supports its central argument that Congress's choice to limit an existing prospective tax empowers it to impose retroactive taxation reaching back decades.

The Government also does not explain how it is anything but arbitrary to force shareholders to pay tax on earnings that they have no guarantee of ever receiving. That goes double for minority shareholders like the Moores, given their inability to force distributions, even assuming that there is money available to distribute. To all this, the Government offers only the irrelevant observation (at 68) that CFC shareholders holding above ten percent of a CFC have been taxed in other circumstances. But due process bars governments from taxing persons on sums that they "have no right to demand…and are uncertain ever to receive." *N.C. Dep't of Revenue v. The Kimberley Rice Kaestner 1992 Fam. Tr.*, 139 S. Ct. 2213, 2221 (2019). That rule is directly applicable here.[12]

---

[12] The Government asserts (at 68) that this portion of the Moores' Fifth Amendment argument is waived, notwithstanding that they have advanced it

**Conclusion**

The District Court's judgment should be reversed.

Dated: September 13, 2021        Respectfully submitted,

/s/ Andrew M. Grossman

| | |
|---|---|
| SAM KAZMAN | ANDREW M. GROSSMAN |
| DEVIN WATKINS | DAVID B. RIVKIN, JR. |
| COMPETITIVE ENTERPRISE | JEFFREY H. PARAVANO |
| INSTITUTE | SEAN SANDOLOSKI |
| 1310 L Street N.W., 7th Floor | BAKERHOSTETLER |
| Washington, DC 20005 | Washington Square, Ste. 1100 |
| (202) 331-1010 | 1050 Connecticut Ave., N.W. |
| sam.kazman@cei.org | Washington, DC 20036 |
| | (202) 861-1697 |
| | agrossman@bakerlaw.com |

*Counsel for Appellants*
*Charles G. Moore and Kathleen F. Moore*

---

consistently and that the Government engaged it at length below. And what more argumentation could be needed other than for the Moores to observe that the MRT arbitrarily taxes them on fictional distributions that they have not received and lack the power to compel, in violation of governing precedent?

By contrast, the Government's claim (at 68) that it is entitled to "fact finding about the Moores' ability to induce KisanKraft to issue a dividend" is waived, as it neglected to request as much, or even to identify that as a disputed fact, in response to the Moore's summary judgment motion.

<u>**Certificate of Compliance**</u>

This brief complies with the type-volume limitations of Circuit Rule 32-1 because it contains 6,945 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Calisto MT typeface.

Dated: September 13, 2021          <u>/s/ Andrew M. Grossman</u>
                                    Andrew M. Grossman

## **Certificate of Service**

I hereby certify that I electronically filed the Appellants' Reply Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: September 13, 2021          /s/ Andrew M. Grossman
                                   Andrew M. Grossman