FOR PUBLICATION

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

FILED

NOV 22 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| CHARLES G. MOORE; KATHLEEN F. MOORE, Plaintiffs-Appellants, v. UNITED STATES OF AMERICA, Defendant-Appellee. | No. 20-36122 D.C. No. 2:10-cv-01539-JCC ORDER |

Before: Ronald M. Gould, Jacqueline H. Nguyen, and
Mark J. Bennett, Circuit Judges.

Order;
Dissent by Judge Bumatay

# SUMMARY[*]

### Tax

The panel denied a petition for panel rehearing and denied on behalf of the court a petition for rehearing en banc, in a case in which the panel affirmed the district court's dismissal of an action seeking to invalidate the Mandatory Repatriation Tax.

Judge Bumatay, joined by Judges Ikuta, Callahan, and VanDyke, dissented from the denial of rehearing en banc. Judge Bumatay stated that the panel erred in disregarding the realization requirement of the Sixteenth Amendment, by allowing an unapportioned direct tax on unrealized income—undistributed earnings of a foreign corporation owned by a U.S. taxpayer—without offering any other limiting principle; and that the opinion opens the door to new federal taxes on other types of wealth and property being categorized as an "income tax" without the constitutional requirement of apportionment.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Moore v. United States 1

**ORDER**

Appellants' Petition for Panel Rehearing is DENIED.

The full court was advised of the Petition for Rehearing En Banc. A judge requested a vote on whether to rehear the matter en banc, and the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35. Appellants' Petition for Rehearing En Banc is also DENIED.

---

BUMATAY, Circuit Judge, joined by IKUTA, CALLAHAN, and VANDYKE, Circuit Judges, dissenting from the denial of rehearing en banc:

"[T]he ratification of the Constitution was the ultimate act of popular sovereignty." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 837 (2015) (Roberts, C.J., dissenting). Its provisions "reflect[] a compromise—a pragmatic recognition that the grand project of forging a Union required everyone to accept some things they did not like." *Id.* And courts have "no power to upset such a compromise simply because we now think that it should have been struck differently." *Id.* But our court's decision does just that.

Under the original constitutional design, Congress could only levy "direct taxes" if such taxes were "apportioned among the several States." U.S. Const. art. I, § 2, cl. 3. The apportionment of direct taxes was to be set "in proportion to the census or enumeration" of the States' populations. U.S. Const. art. I, § 9, cl. 4. Thus, at the Founding, for a direct tax to be constitutional, the federal government had to collect the proceeds proportionally—meaning if one State had twice

2                MOORE v. UNITED STATES

the population of another, it also had to contribute twice as much.  Given this requirement's heavy burden on federal taxing power, the Supreme Court narrowed the definition of "direct taxes" to encompass only certain taxes, such as capitations (head taxes), taxes on real property, taxes on personal property, and taxes on income from personal property.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 571 (2012) (simplified).

But the people changed that system.  In 1913, the people created a limited exception to the apportionment requirement.  By ratifying the Sixteenth Amendment, the people gave Congress the authority to "lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States."  U.S. Const. amend. XVI.  So, today, Congress may enact a direct tax on "incomes"—and only on "incomes"—without apportioning the tax.  The Sixteenth Amendment thus struck a delicate balance for federal taxing power—freeing Congress from the unwieldy requirement of apportionment, but only for taxes on "incomes."  Nothing in the Sixteenth Amendment relieved Congress of its duty to apportion other forms of direct taxation, such as a tax on property interests.

Now, more than a century after its ratification, our court upsets the balance reached by the people.  We become the first court in the country to state that an "income tax" doesn't require that a "taxpayer has realized income" under the Sixteenth Amendment.  *Moore v. United States*, 36 F.4th 930, 935 (9th Cir. 2022).  Instead, we conclude that the Sixteenth Amendment authorizes an unapportioned tax on unrealized gains because the "realization of income is not a constitutional requirement."  *Id*. at 936.  We thus endorse the constitutionality of a federal tax on the share of *undistributed* earnings of a foreign corporation owned by a U.S. taxpayer—despite (in this case) the U.S. taxpayer being a

minority shareholder of the foreign corporation. In other words, we allow a direct tax on the *ownership interest* of a taxpayer—even when the taxpayer has yet to receive any economic gain from the interest and has no ability to direct distribution of gain from the interest.

Neither the text and history of the Sixteenth Amendment nor precedent support levying a direct tax on unrealized gains. Ratification-era sources confirm that the prevailing understanding of "income" entailed some form of realization. And a hundred years of precedent establishes that only realized gains are taxable as "income" under the Sixteenth Amendment. While the Supreme Court has allowed flexibility in identifying "incomes," it has never abandoned the core requirement that income must be realized to be taxable without apportionment under the Sixteenth Amendment. Simply put, as a matter of ordinary meaning, history, and precedent, an income tax must be a tax on realized income. And our court is wrong to violate such a common-sense tautology.

Worse yet, by dispensing with the realization requirement for income without offering any other limiting principle, we open the door to expansion of the federal taxing power beyond the limits placed by the Constitution. Indeed, without a realization requirement, it is hard to see what's left of the constitutional apportionment requirement. Now, I fear, *any* tax on property or other interests can be categorized as an "income tax" and elude the requirement of apportionment. While the Sixteenth Amendment expanded the federal government's taxing power, it did not dissolve other constitutional restrictions.

Because we may not rebalance the limits of federal taxing power, I respectfully dissent from the denial of rehearing en banc.

**I.**

This case begins with a husband and wife's investment in an overseas company formed to empower small-scale farmers in impoverished regions of India. Charles and Kathleen Moore own a 13% stake in KisanKraft Machine Tools Private Limited, a small company headquartered in Bangalore, India. KisanKraft was formed in 2006 by Charles's friend and former coworker, Ravindra "Ravi" Kumar Agrawal, to import and distribute affordable farming equipment. Moved by Ravi's vision for helping farmers, the Moores invested $40,000 in KisanKraft and retained about 11% of the common shares in the company. Ravi and his wife moved to India to manage the company's day-to-day operations as approximately 80% owners.

Under Ravi's leadership, KisanKraft's revenues grew each year from 2006 to 2017. True to the original business plan, Ravi reinvested everything in the company. By 2017, KisanKraft employed over 300 people across 14 regional offices, distributing agricultural equipment to thousands of dealers. The Moores received updates and annual financial statements, but they never exercised any control over the company's earnings or operations, and never received any distributions, dividends, or other payments. They were content with supporting their friend's "noble purpose . . . to improve the lives of small and marginal farmers in India."

As the Moores would find out, no good deed goes unpunished. In 2018, they learned that under the Tax Cuts and Jobs Act of 2017, they were on the hook for their share of KisanKraft's lifetime earnings and would owe a one-time tax amounting to $14,729. This surprised the Moores, who had never received any income from KisanKraft and did not expect to pay income taxes just for owning a minority interest in the company. It's undisputed that the Moores did

not realize income from KisanKraft and lacked the authority to compel a dividend payment constituting realized income. Not only are the Moores minority owners, KisanKraft does not have sufficient cash to distribute its retained and reinvested earnings. But nonetheless, under the Act, the Moores were liable for income tax on income they never earned.

This was thanks to the Mandatory Repatriation Tax, a one-time "transition tax" to facilitate the repatriation of foreign earnings. *See* 26 U.S.C. § 965. The Mandatory Repatriation Tax targeted U.S. shareholders who held 10% or more in a "controlled foreign corporation"—a foreign entity with over 50% American ownership, *see* 26 U.S.C. § 967—that retained and reinvested its prior earnings overseas rather than distributing them to shareholders as dividends. *Moore*, 36 F.4th at 933. Previously, those shareholders would ordinarily only incur a tax liability when the foreign corporation distributes earnings and the shareholders repatriate those gains. *Id*. (citing 26 U.S.C. § 951 (2007)). But the Mandatory Repatriation Tax adopted a "novel" approach—it simply deemed the foreign corporation's retained earnings as the shareholders' "income" and taxed them according to their proportional ownership stake. *Id*. at 933–34.

The Moores sued seeking a refund of their $14,729 tax payment. Our court affirmed the denial of the refund. We held that the Mandatory Repatriation Tax did not violate the apportionment requirement. *Moore*, 36 F.4th at 935. According to our court, "[w]hether the taxpayer has realized income does not determine whether a tax is constitutional." *Id.* Rather, we held that "the Supreme Court has made clear that realization of income is not a constitutional requirement." *Id*. at 936. Based on the conclusion that unrealized gains qualify as income, we held that taxing the

Moores based on their pro-rata share of KisanKraft's retained profits was constitutional. *Id.*

## II.

"The Sixteenth Amendment, like other laws authorizing or imposing taxes, is to be taken as written, and is not to be extended beyond the meaning clearly indicated by the language used." *Edwards v. Cuba R. Co.*, 268 U.S. 628, 631 (1925). It is "settled doctrine . . . that the Sixteenth Amendment confers no power upon Congress to define and tax as income without apportionment something which theretofore could not have been properly regarded as income." *Taft v. Bowers*, 278 U.S. 470, 481 (1929). Our task is to discern "the commonly understood meaning of [income] which must have been in the minds of the people when they adopted the Sixteenth Amendment." *Merchants' Loan & Tr. Co. v. Smietanka*, 255 U.S. 509, 519 (1921); *see also United States v. Safety Car Heating & Lighting Co.*, 297 U.S. 88, 99 (1936) ("Income within the meaning of the Sixteenth Amendment . . . [w]ith few exceptions, if any . . . is income as the word is known in the common speech of men."). When searching for an Amendment's original meaning, we look to its text, historical context, and early post-ratification interpretations. *See New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2127–28 (2022).

### A.

We start with the history. Before the Sixteenth Amendment, the Constitution spoke of two categories of taxes—direct and indirect. Indirect taxes, such as "Duties, Imposts and Excises," were to be levied "uniform[ly] throughout the United States." U.S. Const. art. I, § 8, cl. 1. On the other hand, "direct Taxes" were to "be apportioned among the several States . . . according to their respective

Numbers." U.S. Const. art. I, § 2, cl. 3. Thus, "[n]o Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or enumeration herein before directed to be taken." U.S. Const. art. I, § 9, cl. 4.

Understandably, the impracticalities and inequities of the apportionment requirement made it difficult for the federal government to impose a direct tax. *See Hylton v. United States*, 3 U.S. (3 Dall.) 171, 179 (1796) (Paterson, J.). One way to deal with the difficulties was to limit the category of direct taxes. *See NFIB*, 567 U.S. at 571 (showing the history of limiting direct taxes to capitations, land taxes, and taxes on personal property and the income from personal property).

The Sixteenth Amendment arose in response to *Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429 (1895). In that case, the Supreme Court struck down the income tax provisions of the Wilson Tariff Act of 1894 as unapportioned direct taxes. 158 U.S. at 637, 683. The *Pollock* decision noted that the "constitution divided federal taxes into two great classes—the class of direct taxes, and the class of duties, imports, and excises"—and sought to determine into which class the taxes on incomes belonged. *Id.* at 617–18. Examining the text of the relevant clauses in the Constitution and the circumstances of their adoption and ratification, the Court concluded that income taxes on real estate and personal property were invariably direct taxes requiring apportionment. *Id.* at 637. Chief Justice Fuller's majority opinion added, "[i]f it be true that the constitution should have been so framed that a tax of this kind could be laid, the instrument defines the way for its amendment." *Id.* at 635.

President William Howard Taft led the public charge for a constitutional amendment expressly authorizing a federal

income tax. In a speech before both houses of Congress, he characterized the *Pollock* decision as "depriv[ing] the National Government of a power" which it "undoubtedly . . . ought to have" and which "might be indispensable to the nation's life in great crises." William H. Taft, *Message Regarding Income Tax* (June 16, 1909).[1] Rather than passing legislation that would force the Supreme Court to reconsider its ruling in *Pollock*, President Taft urged the House and Senate to "propose an amendment to the Constitution conferring the power to levy an income tax upon the National Government without apportionment among the states in proportion to population." *Id.*

When the Senate was weighing amending the Constitution to authorize an income tax, one member floated the possibility of simply striking the apportionment requirement altogether. 44 Cong. Rec. 3377 (1909). Instead, the drafters chose language meant to "confine [the changes] to income taxes alone." *Id.* As a leading scholar of taxation and public finance explained:

> [T]he simplest way out of the difficulty would be entirely to eliminate from the constitution the clause or clauses referring to direct taxes. [But] Congress, however, was unfortunately not much interested in the larger question. What gave it immediate concern was the disposition of the impending imbroglio. It was therefore decided to arrange the matter by an amendment to the constitution which would affect only the income tax.

---

[1] https://perma.cc/LFL6-AH92.

Edwin R. A. Seligman, The Income Tax: A Study of the History, Theory, and Practice of Income Taxation at Home and Abroad 594–95 (1911).

Eventually, Congress settled on draft language and proposed the amendment for ratification by the States through a joint resolution. S.J. Res. 40, 61st Cong. (1909). After an arduous four-year process and extensive debates in the state legislatures, the Sixteenth Amendment was ratified in early 1913.

**B.**

We turn next to the text. The full text of the Sixteenth Amendment reads: "Congress shall have the power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration." U.S. Const. amend. XVI.

Ratification-era dictionaries suggest that the ordinary meaning of "income" was confined to realized gains. One dictionary defined "income" as "that *gain* which *proceeds from* labor, business, property, or capital of any kind." Webster's Revised Unabridged Dictionary (1913) (emphasis added). According to another turn-of-the-century dictionary, "income" meant "[t]hat which comes in to a person as payment for labor or services rendered in some office, or as gain from lands, business, the investment of capital, etc." The Century Dictionary and Cyclopedia (1901).

Ratification-era legal authorities made explicit what these dictionary definitions conveyed: only realized gains qualify as taxable income. The 1910 edition of Black's Law Dictionary defined "income" to include "that which *comes*

10      MOORE V. UNITED STATES

*in* or is *received from* any business or investment of capital." *Income*, *Black's Law Dictionary* (2d ed. 1910) (emphasis added). And Henry Campbell Black—of Black's Law Dictionary fame—addressed the issue in a book-length commentary published within months of ratification. Black noted that an income tax "is not a tax upon accumulated wealth, but upon its periodical accretions." Henry Campbell Black, *A Treatise on the Law of Income Taxation* 1 (1913). In his view, these accretions occurred only when gains were *realized*, not when an asset had merely increased in value:

> When a bond which was purchased at a discount reaches par value in the market, the owner cannot be properly said to have made a profit; he is in a position where he can realize a profit if he sells the bond, but not otherwise. If he sells, then the sum gained may constitute a part of his income, but it cannot be so described while he continues to hold the security.

*Id.* at 76–77.

Black rejected the idea of taxing shareholders for undistributed corporate profits as being "contrary to all the weight of authority," explaining:

> In several of the cases on the subject, it is said that the word "income" is not broad enough to include things not separated in some way from the principal. It is not synonymous with "increase." The value of corporate stock may be increased by good management, prospects of business, and the like, but such increase is not income. It may also be increased by the accumulation of a surplus fund. But so long as that surplus is retained by the corporation, either as a surplus or as increased stock, it can in no proper

sense be called income. It may become income-producing, but it is not income.

*Id.* at 120. Black concluded that the Sixteenth Amendment "does not . . . enlarge the power of taxation previously possessed by Congress, but merely repeals certain parts of the existing Constitution which imposed a limitation upon the levying of . . . an income tax." *Id.* at 11.

Other early commentators shared Black's assessment. In 1919, a well-known authority on income tax and accounting explained that the Sixteenth Amendment only covered taxes on realized gains:

> In the circumstances, no apology is needed for a close inquiry into the right of Congress or the Treasury Department to extend the taxation of income—which is permitted under the sixteenth amendment—to the taxation of capital—which is not permitted. And the inquiry naturally extends itself into the right to tax any transaction unless there is an actual realization of income, as distinguished from the apparent income which may be and often is due to the temporary fluctuations in values."

Robert H. Montgomery, *Income Tax Procedure* 198 (1919).

Taken collectively, these sources reinforce the common-sense notion that "income" refers to the receipt of some economic benefit. And because this "commonly understood meaning" was "in the minds of the people when they adopted the Sixteenth Amendment," *Smietanka*, 255 U.S. at 519, neither Congress nor our court may redefine income to include unrealized gains. *See Burk-Waggoner Oil Ass'n v. Hopkins*, 269 U.S. 110, 114 (1925) ("Congress cannot make a thing income which is not so in fact.").

12        MOORE V. UNITED STATES

### C.

Supreme Court precedent also confirms that the Sixteenth Amendment adopted the ordinary meaning of income—thus, it requires the realization of gain.

The Supreme Court first interpreted "income" under the Sixteenth Amendment in *Eisner v. Macomber*, 252 U.S. 189 (1920).  There, the Court addressed whether a stockholder's receipt of a stock dividend falls within the scope of "incomes, from whatever source derived," for purposes of the Sixteenth Amendment.  *Id.* at 207–08.  After surveying authorities, the Court defined "income" as "the gain derived from capital, from labor, or from both combined." *Id*. at 207.  The Court further illuminated:

> Here we have the essential matter: *not* a gain *accruing to* capital; not a *growth* or *increment* of value *in* the investment; but a gain, a profit, something of exchangeable value, *proceeding from* the property, *severed from* the capital, however invested or employed, and *coming in*, being '*derived*'—that is, *received* or *drawn* by the recipient (the taxpayer) for his *separate* use, benefit and disposal—*that* is income derived from property. <u>Nothing else answers the description</u>.

*Id*. at 207 (underline added).  To the Court, this meaning was the "clear definition of the term 'income,' as used in common speech."  *Id*. at 206–07.

Applying the definition to a stock dividend, the Court concluded, "[t]he dividend normally is payable in money . . . and when so paid, then only . . . does the stockholder realize a profit or gain which becomes his separate property, and thus derive income from the capital

that he or his predecessor has invested." *Id.* at 209. Put simply, *Macomber* says that stock dividends do not constitute "income" until "realize[d]" as profit or gain. *Id.*

*Macomber* remains the seminal case establishing the realization requirement for "income" under the Sixteenth Amendment. *See* Edward T. Roehner & Sheila M. Roehner, *Realization: Administrative Convenience or Constitutional Requirement?*, 8 Tax L. Rev. 173, 174 (1953) ("[T]he Supreme Court has in no post-*Eisner v. Macomber* case indicated the slightest relaxation in the rule that realization is necessary before there can be taxable income."). And more recently, the Court recognized *Macomber* as among its "landmark precedents on realization" and observed that Congress codified *Macomber*'s realization requirement in the Revenue Act of 1924. *Cottage Sav. Ass'n v. C.I.R.*, 499 U.S. 554, 561–62 (1991).

Since *Macomber*, the Court has consistently treated realization—in some form—as the critical component of taxable income. Twenty years after *Macomber*, the Court reiterated "the rule that income is not taxable until realized." *Helvering v. Horst*, 311 U.S. 112, 116 (1940). There, the Supreme Court considered the case of a taxpayer who procured payment of interest as a gift to a family member. *Id.* Even though the taxpayer didn't personally realize income, the "power to procure the payment of income to another is the enjoyment and hence the *realization* of the income." *Id.* at 118 (emphasis added). In other words, the Court found no exemption from taxation when economic gain is enjoyed "by some event other than the taxpayer's personal receipt of money or property." *Id.* at 116.

In *C.I.R. v. Glenshaw Glass*, 348 U.S. 426 (1955), the Court said that punitive damages awards are taxable as income. *Glenshaw Glass* observed that *Macomber*'s

definition of income "served a useful purpose" by "distinguishing gain from capital," but "was not meant to provide a touchstone to all future gross income questions." *Id.* at 431. But *Glenshaw Glass* followed *Macomber*'s lead in requiring realization—it held that the damages were taxable income because they were "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." *Id.*

Six years later, the Court concluded that embezzled funds are taxable as income to the embezzler. *James v. United States*, 366 U.S. 213 (1961). In doing so, it reiterated that the "full measure" of Congress's power to tax incomes "encompass[es] all accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." *Id.* at 218–19. As the Court explained, "[a] gain constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." *Id.* at 219 (simplified).

And until *Moore*, Ninth Circuit caselaw also treated realization as a requirement for taxable "income." Back in 1964, for example, we held that employees realized a taxable gain when they accepted stock instead of salaries. *Comm'r v. Fender Sales, Inc.*, 338 F.2d 924, 929 (9th Cir. 1964). In that case, famous guitar innovator Leo Fender and his business partner Donald Randall were the sole stockholders of Fender Sales, Inc. *Id.* at 925. At a time when Fender Sales was cash-strapped, Fender and Randall agreed to each accept additional shares of stock instead of three years' worth of unpaid salaries. *Id.* As the company's "sole owners," taking the stock instead of salaries caused Fender Sales to increase in value for Randall and Fender. *Id.* at 929. By "augmenting the intrinsic worth of the capital stock they held," Fender and Randall "surely 'realized' for their own benefit the value of the obligations discharged." *Id.* In other

words, we maintained that some form of realization is required for Sixteenth Amendment purposes. There, we said that "the issuance of the corporation's capital stock to the employee is a payment" that amounts to "realization of income by the employee in the amount of the fair market value of the stock." *Id.*

Three decades later, we considered whether Congress exceeded its authority by enacting a tax on the short-term capital gains of investors in commodity futures contracts. *Murphy v. United States*, 992 F.2d 929, 931 (9th Cir. 1993) (analyzing 26 U.S.C. § 1256). Before the enactment of § 1256, futures traders could defer tax on short-term capital gains until a later year, when a lower long-term rate would be applied. *Id.* Murphy argued that Congress could not tax his unsold futures contracts, which he alleged were unrealized gains. *Id.* at 930. We disagreed because, under the "marked-to-market" accounting system, futures traders receive "any gain on [their] position in cash as a matter of right each trading day." *Id.* at 931. Murphy's *ability* to withdraw cash, even if unexercised, meant he effectively realized his gains, subjecting them to Congress's power to tax income. *Id. Murphy* thus illustrates the continuing vitality of the realization requirement—even though we found it satisfied by the *right* to withdraw funds, rather than requiring cash receipts; otherwise, realization would not have been dispositive in our analysis.

## D.

Based on text, history, and precedent, our court erred in disregarding the realization requirement of the Sixteenth Amendment. Rather than hewing to plain meaning and Supreme Court rulings, we recast the very meaning of "income." Without the guardrails of a realization component, the federal government has unfettered latitude

to redefine "income" and redraw the boundaries of its power to tax without apportionment.

The crux of our error is treating *Macomber* as merely an advisory example of what "income may be defined as." *Moore*, 36 F.4th at 937. We essentially called *Macomber* a dead letter, emphasizing its "limited scope." *Id*. While it may be true that *Macomber* does not establish a "universal" meaning of "income" for all situations and all cases, that does not mean we can disregard the Supreme Court's core holding in that case. At bottom, the Court said that "income" is the "gain derived" from a variety of sources. *Macomber*, 252 U.S. at 207. While there may be edge cases that test the outer limits of what constitutes a realized gain, the term "income" still retains realization as a definitional requirement. And none of the later decisions that build on *Macomber* repudiate the ongoing requirement that gains must be "realized" in some form before they can be taxed.

*Moore* was also wrong to rely on a few words from *Horst* to dispense with the realization requirement. 36 F.4th at 936. While *Horst* noted that the realization requirement is "founded on administrative convenience," 311 U.S. at 116, those words didn't open the door for our court to redefine the meaning of "income." Indeed, the realization requirement was assumed in *Horst*; the Court stated that "[t]he sole question for decision" was whether the gift of an interest payment constituted "the realization of income taxable to the donor." *Id.* at 114. So *Horst* did not reject the realization requirement; it just held that a taxpayer can't transfer the cash receipts to someone else and avoid taxation. *Id*. at 117.

Again, it is undisputed that the Moores have received no return on their investment in KisanKraft, and they have no power to direct a dividend payment or otherwise realize a gain. Thus, the Moores had no "control over" the company

nor any "readily realizable economic value from it." *James*, 366 U.S. at 219. Following precedent, we should have recognized that the Moores had not received "income" from KisanKraft under the Sixteenth Amendment. Instead, we embarked on a novel interpretation of the Amendment—one that seriously undermines the constitutional apportionment requirement.

We should have taken this case en banc to correct these errors.

### III.

Our court dislodged settled constitutional limits on federal taxation by aggrandizing Congress's power to levy unapportioned taxes on unrealized gains. This holding conflicts with the Sixteenth Amendment's original meaning and misconstrues binding precedents. And the consequences of our decision extend far beyond the Mandatory Repatriation Tax. Divorcing income from realization opens the door to new federal taxes on all sorts of wealth and property without the constitutional requirement of apportionment. Indeed, without a realization requirement to cabin the scope of "incomes," it is hard to see how the apportionment requirement has any remaining relevance. And only the people have the power to declare a constitutional provision a dead letter.

Because our expansive gloss on the Sixteenth Amendment thwarts its design and defies longstanding Supreme Court and Ninth Circuit caselaw, I respectfully dissent from the denial of rehearing en banc.